# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| LABORERS LOCAL #235 PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RENTOKIL INITIAL PLC., ANDREW M. RANSOM, STUART M. INGALL-TOMBS, and BRADLEY S. PAULSEN,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Laborers Local #235 Pension Fund ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Rentokil Initial plc ("Rentokil" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased Rentokil American Depositary Shares ("ADSs") between December 1, 2023 and September 10, 2024, inclusive (the "Class Period") against Rentokil and certain of its officers and

executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Based in Crawley, England, Rentokil provides pest control, hygiene, and wellness services worldwide.  The Company's three main business lines are Pest Control, Hygiene & Wellbeing, and France Workwear.  Rentokil is the largest global pest control services provider. North America Pest Control accounts for more than half of the Company's annual revenue.

3.    Leading up to the Class Period, Rentokil announced on October 12, 2022 that it had completed its acquisition of Memphis, Tennessee-based Terminix Global Holdings, Inc. ("Terminix") in a transaction valued at $6.7 billion, including $1.34 billion in cash and over 129 million new Rentokil ADSs (the "Terminix Acquisition").  As a result of the Terminix Acquisition, the Terminix business became part of Rentokil's pest control business line, making Rentokil the largest pest control services provider in North America.

4.    After the Terminix Acquisition closed, Rentokil claimed it was well positioned to successfully integrate Terminix into Rentokil's pest control business.  According to the Company, "extensive due diligence previously furnished us with a deep understanding of the Terminix operations" and "those early assumptions about the health of the business, both operational and financial, have remained intact."  Rentokil claimed that "integration planning has confirmed the strong potential of the combination, which is both synergistic and complementary."  Specifically, Rentokil indicated it was making "[e]xcellent progress on [the] Terminix integration" and detailed benefits of the integration, including cost synergies, additional revenues, and non-cash benefits.

5.    Throughout the Class Period, Defendants touted Rentokil's progress and success integrating Terminix and the benefits of the Terminix Acquisition.  For example, on December 1, 2023, the day the Class Period begins, Rentokil issued a press release announcing the Company

had appointed Bradley S. Paulsen to serve as Chief Executive Officer ("CEO") of Rentokil's North America Region ("North America CEO Paulsen"), reporting directly to Company CEO Andrew M. Ransom ("CEO Ransom").  In the press release, CEO Ransom commented, "We have a significant opportunity for growth and value creation as we integrate Terminix in North America[,]" while North America CEO Paulsen stated that he was "very much looking forward to working with John Myers (US Pest Control CEO) and the team to deliver the integration, building on the strong foundations that have already been laid. . . ."

6.     On March 7, 2024, in a press release announcing the Company's financial results for fiscal year 2023, ended December 31, 2023, Rentokil touted its "[s]trong progress on the integration[,]" stating, "The Terminix integration continues to make very good progress.  We have completed the first phase of the integration and in 2023 we delivered $69m of net synergies, ahead of our target of $60m."  The same press release explained that "Phase One of the integration completed at the end of 2023" and further detailed the Company's plans for Phases Two, Three, and Four, with the fourth and final phase set to be completed by 2026.

7.     In the same press release, CEO Ransom was quoted, stating, "We have made strong progress in the integration of Terminix to create a powerhouse business in the world's largest pest control market."  During the related earnings call held later that same day, CEO Ransom discussed the "excellent progress we're making on the integration[,]" including how Rentokil had "completed Phase 1 of the integration program."  CEO Ransom touted, "We've streamlined and unified the organization to create a single Rentokil Terminix team."  In addition, CEO Ransom stated, "So the foundations for future success have been laid, and we've now entered Phase 2 of the integration plan, which is the local planning phase ahead of full branch integration."

8.    Unbeknownst to investors, however, Rentokil faced "levels of disruption" in the "early pilots" of the Terminix integration and significant, ongoing "execution challenges" that hindered the successful integration of Terminix.  As Defendants were forced to admit at the end of the Class Period, these execution challenges were self-inflicted and "not a market phenomenon." Indeed, CEO Ransom ultimately conceded, "I don't think it's market[,] I think this is on us."

9.    Nevertheless, Defendants continued to tout their success integrating Terminix, despite the known risks from disruption and execution challenges that imperiled the Terminix integration plan.  The manifestation of these risks during the Class Period negatively impacted Rentokil's business and operations, particularly organic revenue growth in North America.

10.    On April 18, 2024, before markets opened, the truth began to emerge when Rentokil announced its financial results for the first quarter of 2024, ended March 31, 2024.  Rentokil disclosed that organic revenue growth in North America increased by only 1.5% year-over-year, below prior guidance of 2% for the first quarter and 2% to 4% for the full year issued only six weeks earlier on March 7, 2024.  During the related earnings call, and despite the poor results in North America, CEO Ramson assured investors that "our integration program is on track."

11.    During the same earnings call, notwithstanding CEO Ransom's assurances, analysts expressed concerns that the Terminix integration may be negatively impacting organic growth in North America.  In response these concerns, CEO Ransom stated, "[I]n terms of the impact on growth, we've done our very best to make a good estimate of whatever impact the integration program will have.  And we've included that impact within the 2% to 4%.  So as we sit here, we've got a good level of confidence that the integration will start well and go well."

12.     On this news, the price of Rentokil ADSs fell $2.64 per ADS, or more than 9%, from a closing price of $28.25 per ADS on April 17, 2024, to a closing price of $25.61 per ADS on April 18, 2024.

13.     On July 25, 2024, Rentokil announced its interim results for the first half of 2024, including an update to the Company's full year outlook: "We continue to expect to grow Organic Revenue in North America within the guided 2-4% range for the full year, albeit at the lower end." In the same press release, CEO Ransom was quoted, stating, "The North America integration has made strong progress, with the first branch integrations and synergies delivered firmly on track. We are focused on re-accelerating organic growth in the region."

14.     During the related earnings call held later that same day, North America CEO Paulsen touted Rentokil's progress with the Terminix integration: "So how is it going?  In short, very well.  We have a single set of systems.  Data has been migrated.  Sales leads are flowing as they should.  Work orders are completed."  Paulsen further explained, "In the first half of this year, we have completed Phase 2 of the integration plan to prepare and test for branch integrations in which we delivered the full legal merger, developed and tested 22 systems with 190 features to enable the integrations and harmonize multiple business processes, contracts and applications."

15.     During the same earnings call, analysts once again expressed concerns that the Terminix integration may negatively impact organic growth in North America.  For example, one analyst asked, "On organic [growth] for the second half, you'll finally be doing some of the full integrations in Q4.  Would you share any dis-synergy assumptions that you've got within the organic guidance for North America?"  CEO Ransom responded, "Yes, I'm not going to give you a number on dis-synergy.  All I'll say is that as we put the program together, as we put our plan together, as we put our guidance together, we made certain assumptions that there would be some

level of short-term impact on organic growth as you move into integration." CEO Ransom further explained, "The thing that I'm really most excited about in the second quarter is we've done the systems integration. . . . That's an enormous task, an enormous task, so many things have to be done well. And that's gone really, really well. So we've now got an IT stack that we've converted Terminix colleagues from their system into the new system."

16.     The truth was fully revealed to investors before markets opened on September 11, 2024, when Rentokil issued an unscheduled "Trading Update," disclosing that the Company now anticipated only 1% North America organic revenue growth for the second half of 2024—well below the Company's prior guidance. In the press release, the Company explained, "While we saw some positive momentum in North America sales activity at the end of the second quarter, the trading performance in July and August was lower than anticipated. There has also been some modest disruption to organic growth from branch integration."

17.     During a related conference call with analysts held later that same day, Chief Financial Officer ("CFO") Stuart M. Ingall-Tombs ("CFO Ingall-Tombs") admitted that—after nearly two years of integration efforts—Rentokil still had "2 separate businesses, which are largely at an operational front end, not integrated yet[;] you have got a little bit of friction in the system as we take 2 data flows and bolt them together and then feed them back and understand what's going on."

18.     During the same conference call, an analyst asked to clarify whether "the weakness in growth relative to expectations in the second half is a Rentokil issue, not a market issue." In response, CEO Ransom admitted, "This is a manifestation of execution challenges, execution -- a need to improve our execution. It's not a market phenomenon. As we can see at the moment, if further information comes to light suggest [sic] reserve the right to change that answer, but I don't

think it's market[,] I think this is on us."  During a separate conference call with analysts held later that same day, CEO Ransom elaborated, "Integrations are always complex, and they've always had their challenges.  Certainly, in the early pilots, going back a bit, we saw levels of disruption."

19.    Deutsche Bank analysts highlighted the "[s]elf-inflicted blows over the seasonal peak. . . .  We think today's warning raises questions over guidance and credibility given it comes only 6 weeks after the Interims. . . ."  UBS analysts noted, "Rentokil is facing challenges in restructuring its NA Pest network post-Terminix while trying to reaccelerate organic growth."

20.    On this news, the price of Rentokil ADSs fell $6.65 per ADS, or more than 21%, from a closing price of $31.60 per ADS on September 10, 2024, to a closing price of $24.95 per ADS on September 11, 2024.

21.    As a result of Defendants' wrongful acts and omissions, and the resulting decline in market value of the Company's ADSs when the truth was disclosed, Plaintiff and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Rentokil conducts significant operations in this Judicial District as Terminix is headquartered in Memphis, Tennessee, which Rentokil acquired in October 2022, and as a result, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

25.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

26.    Based in Elmsford, New York, Plaintiff Laborers Local #235 Pension Fund administers funds for the benefit of laborers and retirees in the construction industry and other fields in the Hudson Valley region of New York State, with assets under management of more than $100 million.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Rentokil ADSs during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

27.    Defendant Rentokil is incorporated in England and Wales and headquartered in Crawley, England.  Rentokil's Level II sponsored ADSs are listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RTO."

28.    Defendant Andrew M. Ransom has served as CEO and as a member of the Board of Directors at Rentokil at all relevant times.

29.    Defendant Stuart M. Ingall-Tombs has served as CFO and as a member of the Board of Directors at Rentokil at all relevant times.

30.    Defendant Bradley S. Paulsen has served as CEO of Rentokil's North America region at all relevant times.

31.    Defendants CEO Ransom, CFO Ingall-Tombs, and North America CEO Paulsen (collectively, the "Individual Defendants"), because of their positions with Rentokil, possessed the power and authority to control the contents of, *inter alia*, Rentokil quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors,

*i.e.*, the market.  The Individual Defendants were provided with copies of Rentokil's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

32.    Rentokil and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.    Rentokil, headquartered in Crawley, England, is a global provider of pest control, hygiene and wellbeing, and French workwear services.  Rentokil's operations currently consist of three business lines: Pest Control, including general pest maintenance contracts; Hygiene & Wellbeing, including washroom equipment, consumables, and technicians to service the washrooms; and France Workwear, including the supply and laundering of garments for commercial organizations.  As of December 31, 2023, Rentokil operates 1,933 facilities in 77 countries, and the Company derives over 61% of its revenue from North America Pest Control.

34.    On October 12, 2022, Rentokil announced that it had acquired Memphis, Tennessee-based Terminix at a valuation of $6.7 billion, one of the largest pest control companies in North America.  Pursuant to the terms of the Terminix Acquisition, Rentokil agreed to pay $1.34 billion in cash and issue more than 129 million new Rentokil ADSs to Terminix

shareholders.  The Terminix Acquisition roughly doubled Rentokil's market capitalization and made Rentokil the largest pest control company in North America.

35.     As a result of the Terminix Acquisition, Rentokil anticipated a "mid-teens percent" increase to earnings per share (EPS) in the first full year post completion, and "substantially increased scale in North America, providing an enlarged platform for profitable growth."  Indeed, Rentokil touted that the combined company "will become the leading player in North America, the world's largest pest control market (representing 51% of the global market and estimated to be worth c.US$11bn)."

36.     Calling the Terminix Acquisition an "important milestone" for Rentokil, CEO Ransom emphasized to investors that after "an intense period of successful preparatory work to position the businesses for effective integration, we are now focused on delivering the deal's significant benefits."  In the months that followed, Rentokil continuously assured investors about its plans for the Terminix integration, highlighting "extensive due diligence that furnished us with a deep understanding of the Terminix operations" and that "those early assumptions about the health of the business, both operational and financial, have remained intact."

**Defendants' Materially False and Misleading Statements**

37.     The Class Period begins on December 1, 2023, when before markets opened, Rentokil issued a press release announcing that Bradley S. Paulsen had been appointed as CEO of Rentokil's North America Region, reporting directly to CEO Ransom.  In the press release, CEO Ransom highlighted, "We have a significant opportunity for growth and value creation as we integrate Terminix in North America and Brad brings a proven track record of successful delivery."

38.     The same press release quoted North America CEO Paulsen, stating:

> I'm excited to be joining this world class company and very much
> looking forward to working with John Myers (US Pest Control

CEO) and the team to deliver the integration, building on the strong foundations that have already been laid, and using our strengths of brilliant people, brands, innovations and technologies to drive profitable growth and provide an even better service for customers. I can't wait to get started.

39.     On March 7, 2024, Rentokil issued a press release announcing its financial results for fiscal year 2023, ended December 31, 2023.  In the press release, Rentokil reported North America organic revenue growth of 3.1%.  The Company also issued North America organic revenue growth guidance of 2% for the first quarter of 2024 and 2% to 4% for fiscal year 2024.

40.     In the same press release, Rentokil touted the Company's "[s]trong progress on the integration[,]" highlighting: "The Terminix integration continues to make very good progress.  We have completed the first phase of the integration and in 2023 we delivered $69m of net synergies, ahead of our target of $60m."  As a result of this progress, Rentokil announced "a second increase in the target for the total value of integration cost synergies from the integration of Terminix[,]" with the Company's net synergies target increased by $25 million to $225 million.

41.     The March 7, 2024 press release detailed how "Phase One of the integration completed at the end of 2023 and has delivered the foundations for success[,]" including "large integration pilots and initial branch co-locations[,]" and "[s]trong progress . . . effectively positioning HR and IT."  The press release also described Rentokil's plans for Phase Two in 2024 (including "full preparedness for branch integrations"), Phase Three in 2024 (including "migration of Terminix regions and branches"), and Phase Four to be completed by 2026 (when the Company expected to "see the final Terminix markets and branches complete their integrations").

42.     In the same press release, CEO Ransom was quoted, stating, "We have made strong progress in the integration of Terminix to create a powerhouse business in the world's largest pest control market.  This has been achieved alongside significant improvement in colleague retention, with Terminix service technician retention up more than 8 percentage points since the deal closed."

43.    During the corresponding earnings call later that day, CEO Ransom touted Rentokil's "excellent progress" on the Terminix integration, highlighting:

> So the foundations for future success have been laid, and we've now entered Phase 2 of the integration plan, which is the local planning phase ahead of full branch integration.  And we've got 7 large regional pest control markets in the United States, and each integration will be executed over approximately 10 months from planning to completion of the rerouting.

44.    During the same earnings call, CEO Ransom emphasized that in completing the first phase of the Terminix integration, "We've streamlined and unified the organization to create a single Rentokil Terminix team.  We've delivered a single payroll and benefit system for all 22,000 colleagues.  We've moved 10,500 colleagues on to Workday.  So all of our colleagues are now on a single people management system."  CEO Ransom further highlighted that as Rentokil moved from the second to the third phase of the Terminix integration, beginning in the summer of 2024, "we expect the integration process to become more standardized as the Terminix branches are all using the same systems and processes."  CFO Ingall-Tombs stressed that the 3.1% North America organic revenue growth "was achieved alongside significant progress in the Terminix integration."

45.    The above statements set forth above in ¶¶ 37-44 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) Rentokil experienced levels of disruption in the early pilots of the Terminix integration; (2) Rentokil experienced significant, ongoing, self-inflicted execution challenges integrating Terminix; (3) the disruption and execution challenges imperiled Rentokil's integration plan for Terminix; (4) Rentokil and Terminix were still two separate businesses that were not yet integrated; (5) Rentokil's failure to integrate Terminix negatively impacted the Company's business and

operations, particularly organic revenue growth in North America; and (6) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins To Emerge**

46.     On April 18, 2024, before the markets opened, investors began to learn the truth about the Terminix integration when Rentokil issued a press release announcing its financial results for the first quarter of 2024, ended March 31, 2024. In the press release, Rentokil reported that organic revenue growth in North America had increased by only 1.5% year-over-year—below the Company's guidance of 2% for the first quarter and 2% to 4% for the full year, issued just six weeks earlier on March 7, 2024.

47.     During the corresponding earnings call held later that day, CEO Ransom assured investors that "our integration program is on track." While acknowledging that "March didn't quite deliver the way we hoped it had[,]" CFO Ingall-Tombs maintained that "we're pretty confident about our revenue guidance now. . . ." During that same call, and despite the slowed growth in North America, CEO Ransom once again assured investors that the "integration program is on track." CEO Ransom explained that Rentokil was "now well into phase 2 of the integration program, which is preparing for full route and branch integration. We successfully completed the merger of the two legal entities[,]" and that "[w]e've made good progress with the combination of the general ledger and internal reporting systems and we've implemented multiple further developments in the operational technology stack."

48.     However, during the same call, analysts began to raise concerns about the negative impact the Terminix integration had on the Company's growth prospects in North America. For example, an analyst at Morgan Stanley asked how Rentokil would "balance progressing the integration with delivering on your organic guide." In response, CEO Ransom claimed that

Rentokil was "measuring everything that we do in that integration to make sure that it's not having a deleterious effect on growth or customer experience or colleague experience. And if we see anything, we'll pivot. That's what we do." CEO Ransom further stated, "[I]n terms of the impact on growth, we've done our very best to make a good estimate of whatever impact the integration program will have. And we've included that impact within the 2% to 4%. So as we sit here, we've got a good level of confidence that the integration will start well and go well."

49.     As a result of this news, the price of Rentokil ADSs fell $2.64 per ADS, or more than 9%, from a closing price of $28.25 per ADS on April 17, 2024, to a closing price of $25.61 per ADS on April 18, 2024.

50.     On July 25, 2024, Rentokil issued a press release reporting its interim financial results for the first half of 2024, ended June 30, 2024. The press release included an update to the Company's full year outlook: "We are encouraged by the positive quarterly momentum in our US pest control business in H1 and anticipate further improvement through H2. We continue to expect to grow Organic Revenue in North America within the guided 2-4% range for the full year, albeit at the lower end." CEO Ransom continued to tout the Terminix integration, stating, "The North America integration has made strong progress, with the first branch integrations and synergies delivered firmly on track. We are focused on re-accelerating organic growth in the region."

51.     During the accompanying earnings call held later that day, CEO Ransom continued to tout the "excellent progress we're making on the integration. In the first half, we completed Phase 2 of the integration, which included the detailed preparation of the branch integration program." North America CEO Paulsen also touted the Terminix integration, stating, "So how is it going? In short, very well. We have a single set of systems. Data has been migrated. Sales

leads are flowing as they should.  Work orders are completed.  And calls from customers following the expected initial spike have returned to usual levels after a few days."

52.    During the same earnings call, North America CEO Paulsen elaborated on the success of Phase Two of the Terminix integration:

> In the first half of this year, we have completed Phase 2 of the integration plan to prepare and test for branch integrations in which we delivered the full legal merger, developed and tested 22 systems with 190 features to enable the integrations and harmonize multiple business processes, contracts and applications. . . .  It's been an outstanding second quarter of progress, rounded off by the green light for the first branch integrations. . . .  We have delivered the integration for residential customers, for commercial customers and for national account customers, and we have migrated combined revenues of around $37 million.

CFO Ingall-Tombs echoed the same positive sentiments: "The Terminix integration has also made strong progress with the first branch integrations well underway and $22 million of net cost synergies delivered in the region in H1. . . .  [A]t the current time, we are strongly focused on driving up organic revenue growth . . . and successfully integrating Terminix."

53.    Also, during the same earnings call, analysts continued to express concerns that the Terminix integration may negatively impact North America organic revenue growth.  For example, a JPMorgan analyst asked, "On organic [growth] for the second half, you'll finally be doing some of the full integrations in Q4.  Would you share any dis-synergy assumptions that you've got within the organic guidance for North America?"  CEO Ransom responded by stating:

> Yes, I'm not going to give you a number on dis-synergy.  All I'll say is that as we put the program together, as we put our plan together, as we put our guidance together, we made certain assumptions that there would be some level of short-term impact on organic growth as you move into integration.  So rather, and hopefully, I'm not going to give you that number.  But I also said, look, we've done many integrations where the impact has been 0 [(zero)] and we've done many integrations where the impact has been significant.

CEO Ransom further explained, "The thing that I'm really most excited about in the second quarter is we've done the systems integration. . . .  That's an enormous task, an enormous task, so many things have to be done well.  And that's gone really, really well.  So we've now got an IT stack that we've converted Terminix colleagues from their system into the new system."

54.    The above statements set forth above in ¶¶ 46-53 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) Rentokil experienced levels of disruption in the early pilots of the Terminix integration; (2) Rentokil experienced significant, ongoing, self-inflicted execution challenges integrating Terminix; (3) the disruption and execution challenges imperiled Rentokil's integration plan for Terminix; (4) Rentokil and Terminix were still two separate businesses that were not yet integrated; (5) Rentokil's failure to integrate Terminix negatively impacted the Company's business and operations, particularly organic revenue growth  in North America; and (6) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Is Revealed

55.    On September 11, 2024, before the markets opened, the truth was fully revealed when Rentokil provided an unscheduled "Trading Update," announcing that the Company now expected only 1% organic revenue growth in North America for the second half of 2024—well below the Company's prior guidance.  In the press release, Rentokil further disclosed, "While we saw some positive momentum in North America sales activity at the end of the second quarter, the trading performance in July and August was lower than anticipated.  There has also been some modest disruption to organic growth from branch integration."

56.     During a related conference call with analysts held later that same day, CFO Ingall-Tombs revealed that, after nearly two years of integration efforts, "I think what we have got is still because we've got 2 separate businesses, which are largely at an operational front-end not integrated yet[;] you have got a little bit of friction in the system as we take 2 data flows and bolt them together and then feed them back and understand what's going on."

57.     During that same conference call, a BNP Paribas Exane analyst asked whether "the weakness in growth relative to expectations in the second half is a Rentokil issue, not a market issue."  In response, CEO Ransom admitted, "This is a manifestation of execution challenges, execution -- a need to improve our execution.  It's not a market phenomenon.  As we can see at the moment, if further information comes to light suggest [sic] reserve the right to change that answer, but I don't think it's market[,] I think this is on us."

58.     During a separate conference call with analysts held later that day, CEO Ransom elaborated, "Integrations are always complex, and they've always got their challenges.  Certainly, in the early pilots, going back a bit, we saw levels of disruption.  I think we've remediated the vast majority of that.  So it's just hard.  There's just a lot of it.  There's a lot to be got [sic] through."

59.     Analysts swiftly reacted to the failed integration.  For example, in a report titled, "Integration pains, execution wanes.  Cut PT[,]" UBS analysts cut their price targets and reported,

> Rentokil is facing challenges in restructuring its NA Pest network post-Terminix while trying to reaccelerate organic growth.  After the unscheduled trading update, we cut FY'24 profit forecasts ~9% in-line with new guidance – but also now see a slower organic growth path over FY'25-26e (given the long period of integration ahead), and greater reinvestment requirements to try and overcome this.

UBS analysts further explained that their reduced North America organic revenue growth forecast "reflects stalling execution on initiatives to improve volumes, adding to our existing concerns around integration-driven disruption and RTO's planned branch model."

60.     Similarly, Deutsche Bank analysts highlighted the "[s]elf-inflicted blows over the seasonal peak. . . .  We think today's warning raises questions over guidance and credibility given it comes only 6 weeks after the Interims, and we think there is the potential for further bumps in the road, particularly as branch integration proceeds in 4Q24 and beyond."

61.     As investors digested these disclosures, the price of Rentokil ADSs fell $6.65 per ADS, or more than 21%, from a closing price of $31.60 per ADS on September 10, 2024, to a closing price of $24.95 per ADS on September 11, 2024.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased Rentokil ADSs between December 1, 2023 and September 10, 2024, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Rentokil ADSs actively traded on the NYSE (an open and efficient market) under the symbol "RTO." Millions of Rentokil ADSs were traded publicly during the Class Period on the NYSE.  As of March 27, 2024, the Company had more than 500 million ADSs outstanding, with each ADS representing five ordinary shares.  Record owners and other members of the Class may be identified from records maintained by Rentokil or its transfer agent and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

64.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

    b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Rentokil;

    d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Rentokil;

e)        whether the market price of Rentokil ADSs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)        the extent to which the members of the Class have sustained damages and the proper measure of damages.

67.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

68.        The market for Rentokil ADSs was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Rentokil ADSs traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased Rentokil ADSs relying upon the integrity of the market price of the Company's ADSs and market information relating to Rentokil and have been damaged thereby.

69.        During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rentokil ADSs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Rentokil's business, operations, and prospects as alleged herein.  These material misstatements

and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's ADSs to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's ADSs at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

70.     As alleged herein, Defendants acted with scienter in that Defendants: knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

71.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Rentokil, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Rentokil, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

72.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Rentokil who knew that the statement was false when made.

## LOSS CAUSATION

74.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

75.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Rentokil ADSs and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Rentokil ADSs fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

76.     The market for Rentokil ADSs was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Rentokil ADSs traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the

Company's ADSs relying upon the integrity of the market price of Rentokil ADSs and market information relating to Rentokil and have been damaged thereby.

77.    At all times relevant, the market for Rentokil ADSs was an efficient market for the following reasons, among others:

a)    Rentokil ADSs was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, Rentokil filed periodic public reports with the SEC and/or the NYSE;

c)    Rentokil regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    Rentokil was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

78.    As a result of the foregoing, the market for Rentokil ADSs promptly digested current information regarding Rentokil from all publicly available sources and reflected such information in the price of Rentokil ADSs.  Under these circumstances, all purchasers of Rentokil ADSs during the Class Period suffered similar injury through their purchase of ADSs at artificially inflated prices, and a presumption of reliance applies.

79.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

80.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rentokil ADSs; and (iii) cause Plaintiff and other members of the Class to purchase Rentokil ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

82.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain

artificially high market prices for Rentokil ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

83.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Rentokil's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rentokil's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Rentokil and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

84.    Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects;

(iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

85.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Rentokil's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its ADSs. As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Rentokil ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the ADSs traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the

other members of the Class purchased Rentokil ADSs during the Class Period at artificially inflated prices and were damaged thereby.

87.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Rentokil was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Rentokil ADSs, or, if they had purchased such ADSs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

88.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

<u>**COUNT II**</u>

**For Violations of Section 20(a) of the Exchange Act**
<u>**Against All Individual Defendants**</u>

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91.     The Individual Defendants acted as controlling persons of Rentokil within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the

content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## PRAYER FOR RELIEF

94.     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)     Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment

interest, as well as their reasonable attorneys' and experts' witness fees and other

costs; and

d)    Awarding such other and further relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

95.    Plaintiff demands a trial by jury.

Dated: November 26, 2024                          Respectfully submitted,

                                                  **STRANCH, JENNINGS & GARVEY PLLC**

                                                  By: */s/ J. Gerard Stranch IV*
                                                  J. Gerard Stranch IV
                                                  The Freedom Center
                                                  223 Rosa L. Parks Avenue
                                                  Suite 200
                                                  Nashville, TN 37203
                                                  Tel.: (615) 254-8801
                                                  gstranch@stranchlaw.com

                                                  *Local Counsel for Plaintiff Laborers Local*
                                                  *#235 Pension Fund*

                                                  **SAXENA WHITE P.A.**
                                                  Marco A. Dueñas (*pro hac vice*
                                                  forthcoming)
                                                  10 Bank Street, Suite 882
                                                  White Plains, NY 10606
                                                  Tel.: (914) 437-8551
                                                  Fax: (888) 631-3611
                                                  Email: mduenas@saxenawhite.com

                                                  *Counsel for Plaintiff Laborers Local #235*
                                                  *Pension Fund*