# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| LABORERS LOCAL #235 PENSION FUND, on behalf of itself and all others similarly situated, | Case No.: 2:24-cv-02932-SHL-tmp |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | **DEMAND FOR JURY TRIAL** |
| RENTOKIL INITIAL PLC., ANDREW M. RANSOM, STUART M. INGALL-TOMBS, and BRADLEY S. PAULSEN, | **Judge Sheryl H. Lipman** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.  PRELIMINARY STATEMENT ....................................................................... 2

II.  JURISDICTION AND VENUE ..................................................................... 8

III.  PARTIES ................................................................................................ 9

    A.  Lead Plaintiff .................................................................................. 9

    B.  Defendants ...................................................................................... 9

IV.  OVERVIEW OF THE FRAUD ................................................................. 10

    A.  Rentokil Buys Terminix: "By Far… The Biggest And Most Strategic
Acquisition In The History Of Our Company, And Of Our Industry" ................ 10

    B.  Leading Up To The Class Period, Defendants Assured Investors Of Their
"Tremendous Work Mapping Out The Technology Road Map" And
"Excellent Progress" On The Integration.............................................. 14

    C.  Throughout The Class Period, Defendants Touted Their Purportedly
"*Excellent Progress*" In The Integration, Including The Critical And
Successful Integration Of The Companies' IT And Operational Systems........... 19

    D.  Defendants Unequivocally Asserted That "Phase 2" Of The Integration
Was "Complete," And That Rentokil And Terminix Now Had A "Single
Set Of Systems" That Were "Fully Integrated" ...................................... 24

    E.  In Truth, Rentokil And Terminix Were Not "On A Single Set Of Systems"
That Were "Fully Integrated" With "Every Single One" Of The Glitches
"Resolved And Put To Bed"; Nor Was The Company Achieving Massive
"Synergies" ................................................................................... 27

        1.  *A "Total Sh\*tshow"*: Contrary To Defendants' Repeated
Statements To Investors, The Terminix Integration Was Not
Making "Excellent Progress" And The Companies' IT Systems
Were Not Integrated.................................................................. 28

        2.  Other Former Rentokil And Terminix Employees From Branches
Located Across The Country Confirmed That The Integration Was
An Abject Failure Throughout The Class Period.............................. 35

        3.  Rather Than Achieving "Synergies," Rentokil Slashed Personnel
And Customer Service, Leading To Steep Declines In Sales ................. 41

        4.  Former Employees Confirm That The Utter Lack Of Competent
Integration Led To Internal Competition And Sales Cannibalization....... 44

        5.  A Senior Rentokil Executive Described How The Failed Terminix
Integration Followed The Pattern Of An Another Major
Acquisition, As Management Engaged In The Same Disordered IT
Integration And Failed Cost-Cutting Strategies........................... 45

i

F.  The Truth Is Gradually Revealed ............................................................ 47

    1.  September 11, 2024: Contrary To Their Repeated Assurances To Investors, Defendants Reveal That Rentokil And Terminix Remain "Two Separate Businesses" With "Two Operational Reporting Processes" and "A Lot of Work to Get These Systems Integrated" ......... 47

    2.  Rentokil "Reviews" Its Integration And Delays Its Promised "Synergies" And Its CFO, North America CEO, And Three Other North America Executives Resign Within Three Months ........................ 52

    3.  March 6, 2025: Rentokil Does An Abrupt "U-Turn," Admitting The Terminix Integration Was A Failure And Scrapping Its Plan ............. 53

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................................ 57

    A.  Rentokil's October 19, 2023 Trading Update ........................................ 57

    B.  Rentokil's March 7, 2024 Financial Results ......................................... 59

    C.  Rentokil's April 18, 2024 First Quarter Trading Update ....................... 63

    D.  Rentokil's July 25, 2024 Interim Financial Results ............................... 66

    E.  Rentokil's September 11, 2024 Trading Update .................................... 69

VI.  ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 72

VII.  LOSS CAUSATION ...................................................................................... 79

    A.  April 18, 2024 Partial Corrective Disclosure ....................................... 79

    B.  September 11, 2024 Partial Corrective Disclosure ............................... 80

    C.  March 6, 2025 Corrective Disclosure .................................................. 82

VIII.  PRESUMPTION OF RELIANCE ................................................................... 83

IX.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .............................................................. 84

X.  CLASS ACTION ALLEGATIONS ................................................................ 85

XI.  CLAIMS FOR RELIEF ................................................................................. 87

XII.  PRAYER FOR RELIEF ................................................................................ 91

XIII.  JURY DEMAND ........................................................................................... 92

Lead Plaintiff City of Birmingham Retirement and Relief System ("Plaintiff" or "Lead Plaintiff"), by and through the undersigned counsel, brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Rentokil Initial plc ("Rentokil" or the "Company") and certain of its officers (collectively, "Defendants"). Lead Plaintiff brings these claims on behalf of all persons and entities that purchased Rentokil American Depositary Shares ("ADSs") between October 19, 2023 and March 5, 2025, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, the investigation of Lead Plaintiff and its counsel, which includes, without limitation: (a) review and analysis of public filings made by Rentokil with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on Rentokil's website concerning Defendants' public statements; (d) interviews with former employees of Rentokil and its subsidiary companies; and (e) review of other publicly available information concerning the Company and the Individual Defendants.

Lead Plaintiff's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.    Rentokil is a global pest control company headquartered in the U.K.  In recent years, the Company's business strategy has focused on gaining a larger foothold in North America—the world's largest pest control market.  This strategy reached a peak on December 14, 2021, when Rentokil announced the $6.7 billion acquisition of Terminix Global Holdings, Inc. ("Terminix"), the second largest pest control company in North America.  Defendants touted this "*transformational combination*" as "***the biggest and most strategic acquisition in the history of our Company, and of our Industry***," boasting that it would more than double Rentokil's North America revenue and achieve hundreds of millions of dollars in "synergies" through unified IT systems, branches, routes, and personnel.  Significantly, Defendants also claimed that the merger featured "*limited integration risk*" because Defendants had already completed an "***intense period of successful preparatory work to position the businesses for effective integration***."

2.    Throughout the Class Period, Defendants repeatedly assured investors of the "*excellent progress*" of the Terminix integration according to the "***very, very, very detailed plan***" the Company had carefully mapped out.  For example, on October 19, 2023—the first day of the Class Period, and a full year into the merger integration process—Defendants emphasized that the "***Terminix integration plan has progressed well in the third quarter***," and that "***the cost synergy programme is on track***" and "***firmly on course***" to deliver the hundreds of millions of dollars in synergies that Defendants had promised to investors.  Similarly, on March 7, 2024, Defendants proclaimed that they had "***now completed Phase 1 of the integration program***," and in so doing, had "***streamlined and unified the organization to create a single Rentokil Terminix team***."  And one month later, on April 18, 2024, Defendants again emphasized that they had made "***further progress towards full branch integration***," including "***continued progress on the development of the operational technology stack***."

2

3.      On July 25, 2024—nearly two years after the merger's close—Defendants announced that they had "**completed Phase 2 of the integration**, which included the **detailed preparation of the branch integration program**." The completion of Phase 2 was a crucial milestone in the integration process, as the full integration of hundreds of Terminix and Rentokil branches was essential to the merger's profitability goals, and could only be achieved once Phases 1 and 2 of the integration process were complete. Indeed, Rentokil's CEO, Defendant Ransom, specifically assured investors that the integration of Rentokil's and Terminix's respective systems had been fully completed during Phase 2, boasting to investors that what he was "**most excited about**" was that "**we have done the systems integration**" because "**to integrate this business fully and properly…[w]e have to get the systems fully integrated**." Ransom further asserted that this systems integration "**has gone really, really well**," and that, consequently, "**we have now got an IT stack that we have converted Terminix colleagues from their system into the new system.**" Moreover, Ransom unequivocally stated that any initial setbacks in this integration had already been remedied—*i.e.* that while there had been some "**day one glitches**" during the process, "**every single one of [them] has been resolved and put to bed**." Fueled by Defendants' representations, Rentokil's ADS price climbed to a high of $32.96 per ADS on August 26, 2024.

4.      However, Defendants' wholly positive statements about the merger integration were utterly false and misleading. In reality, Phases 1 and 2 of the integration process were decidedly *not* complete, as the Terminix integration was not "on track," the "systems integration" was not "done," and the "glitches" were not "resolved and put to bed." Indeed, no fewer than 15 former Rentokil and Terminix employees from all regions of the United States—including senior IT executives, region managers, district managers, and branch managers—described catastrophic failures in integrating the IT systems and sales processes of Terminix and Rentokil's various

subsidiary companies, such that "*[t]he integration was a disaster*."  For example, a region manager responsible for ten branches across several midwestern states recalled that "*we lost customers left and right*" due to service and billing issues because "*the system was not working in the field or in the office*."  A high-ranking IT officer explained that the data migration to a single, unified system—a foundational element of any "systems integration"—was repeatedly postponed and *still not done when he left the Company in late 2024*.  Other former employees recalled "*huge issues getting the systems to talk to each other*" and "*errors all the time*" in some of the most rudimentary functions of a business, including even identifying which customers were already being serviced by Rentokil or Terminix to prevent sales personnel from cannibalizing each other's sales.  These basic IT and operational failures caused missed service calls, accidental contract cancellations, an inability to "take payments" from clients, and other customer service problems that rapidly drove down sales.  As one district manager explained, "*we ended up losing a lot of customers because of billing issues.  The cancellations just kept coming*."  Consequently, as an area sales manager put it, "*anybody that said [the] integration was going smoothly – that's a lot of horsesh\*t*."  In fact, due to these widespread integration problems, and in direct contradiction to Defendants' repeated Class Period statements, former employees across the country reported that by the end of the Class Period, Rentokil and Terminix remained "*two totally separate businesses*."

5.     The truth began to emerge on September 11, 2024, when—just six weeks after Defendants assured the market that they had "completed Phase 2" and "done the systems integration"—Defendants stunned investors with an unscheduled "trading update" that completely contradicted those statements.  Indeed, Defendants now admitted that the exact opposite was true: in Defendant Ransom's own words, "*we've got two separate businesses which are largely at an operational front end not integrated yet*."  Ransom further disclosed that, rather than systems

being "fully integrated," Rentokil and Terminix still had "*two operational reporting processes*," such that each of the Company's regions had "*a different flow of information from the operational system for either heritage Rentokil or heritage Terminix*." Consequently, Rentokil still had "*a lot of work to do to get these systems integrated as we go through the next two years*."

6.  Moreover, despite having forecasted strong North America revenue growth just *six weeks earlier*, Defendants now revealed that "disruption" from the integration had brought business to a screeching halt, with Rentokil "*seeing net volume decline*" in its North America sales and guiding flat revenue growth for the rest of 2024. And further, contrary to Defendants' repeated promises that the merger was producing massive "synergies," in reality, the integration produced such massive operational problems that they resulted in "*higher sales, service and other costs*," forcing Defendants to reduce their profit margin forecasts. Finally, Defendants admitted during their investor call the same day that, notwithstanding their prior positive statements, they had been fully aware of the integration's problems during the Class Period, as they had always had "*good visibility*" on these issues, such that "*the core of this is not a visibility issue*." Incredulous at this response, an analyst on the call noted the "*disconnect…between having reasonably good visibility and then having quite a big profit warning*."

7.  In response to this news, Rentokil's ADS price plummeted 21% in one day, or $6.65 per ADS, from $31.60 per ADS on September 10, 2024 to $24.95 on September 11, 2024.

8.  Analysts heavily criticized management for their sudden about-face, and in particular—and in a rarity for securities analysts—directly and uniformly questioned management's credibility. For example, Deutsche Bank noted that the disclosure directly contradicted management's recent prior statements, finding that "*today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims*." HSBC questioned

"*the timing of the profit warning*" and the veracity of management's commentary, noting that there were "*[p]lenty of questions… and not too many answers*."  Similarly, Citi underscored that the sudden shift from Rentokil's positive statements six weeks earlier "*significantly dents credibility*."  RBC Capital emphasized that they were "*very surprised there was no improvement in the NA organic growth rate and slightly flabbergasted at the [] operational hit for H2*," and as such, "*we think management have a tough task to rebuild credibility*."

9.      Notwithstanding these revelations, Defendants continued to minimize the integration's problems, assuring the market that they still were making good progress on the integration.  For example, Defendant Ransom claimed that the IT systems integration "*continues to go well*," and that any disruption to the process was a mere "*small element*."  In direct response to analysts' questions about Defendants' "execution on the integration," Ransom maintained that Defendants had "*done very, very significant heavy lifting on systems integration*," that they had "*mov[ed] historic Terminix branches and Terminix systems onto the new platform*," and that there was purportedly "*no change*" to the branch integration plan.

10.      Tellingly, however, behind the scenes, Rentokil was conducting a mass purge of the executives tasked with overseeing and implementing the failed integration.  Specifically, on October 17, 2024, Rentokil announced that it had replaced the Chief Financial Officer and Chief Operating Officer of its North America operations, and that it would conduct an in-depth "review" of the Terminix integration.  Just over a month later, on November 25, 2024, Rentokil announced the sudden resignation of its CFO, Defendant Ingall-Tombs.  Two months after that, the Company announced that its North America CEO, Defendant Paulsen, had also resigned despite having spent only a year in his position.

11.     Then, on March 6, 2025, in its 2024 Preliminary Results release that day, Rentokil finally admitted the full truth: the Terminix integration had been an abject failure, and had materially adversely impacted the Company's business.  Indeed, the problems were so severe and pervasive that Rentokil was forced to admit that "***executing [the integration] has clearly impacted our North American business performance***," and further, that it was ***essentially abandoning its Terminix integration strategy***.  In fact, notwithstanding Defendants' prior assurances that they had made extensive and thorough preparations to fully integrate and consolidate hundreds of Terminix and Rentokil branches, Defendants now admitted that such integration was impossible, and as a result, the Company would implement a "revised branch and brand strategy" that would require the Company to maintain ***more than 500*** separate, unintegrated branches.  And tellingly, instead of consolidating branches under the Terminix and Rentokil brands, the Company would now maintain separate "***regional brands[] rather than merging them over time with Terminix***."

12.     Further, in a striking reversal of their repeated assurances that the merger would result in hundreds of millions of dollars in "synergies," Defendants now acknowledged that ***they were wholly unable to identify any synergies that resulted from the merger***.  Suddenly—after more than two years of relentlessly hyping such synergies—Rentokil announced that "***going forward we will not report separately on net synergy delivery***," purportedly because attempting to "disaggregate" them from other costs was "***overly subjective***."

13.     Analysts and investors were stunned by the Company's disclosure.  As one analyst incredulously asked during Rentokil's investor call: "***what has been the challenge in rolling out these systems?***"  Another analyst voiced astonishment at the fact that "***we're 2 years into the integration…now digital leads and conversions are still weak… [and] [y]our brand and branch strategy is changing today***."  Defendant Ransom had few answers, responding that the Company

"*had to do some pretty extensive work on IT systems*" and that it was still "*hacking our way through the jungle here of integration*."

14.    On this news, Rentokil's ADS price fell another 10%.

15.    Analysts uniformly noted that Rentokil's disclosure meant that the integration had been a colossal failure and had not occurred.  Indeed, Citi emphasized that the Company's "*lack of US progress disappoints*," and in light of the "*branch strategy U-turn*, *with management no longer pursuing consolidation*," "*it seems operationally the business remains challenged 4 years after the announcement of the [Terminix] deal in December 2021, which could be described as underwhelming*."  Similarly, UBS highlighted that, with the abandonment of synergies reporting, "*investors may have concerns about … the limited visibility on the building blocks to >20% [North America] margins post-integration*."  And RBC underscored that there had been numerous "*about-turns on branding, branch numbers*" and other key aspects of the integration, and took this as "*an admittance that the original plan wasn't working*."

16.    In total, Rentokil ADSs lost at least $660 million in market value due to Defendants' fraud.  This action seeks redress on behalf of investors in those ADSs.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

21.    Lead Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") is a public pension system organized for current and former employees of the City of Birmingham, Alabama.    Birmingham manages approximately $1 billion in assets for the benefit of its approximately 7,000 active and retired participants.    As reflected in its PSLRA certification (ECF No. 10-1), Birmingham purchased Rentokil ADSs during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

22.    Defendant Rentokil is incorporated in England and Wales and headquartered in Crawley, England. Rentokil's Level II sponsored ADSs are listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RTO."

23.    Defendant Andrew M. Ransom has served as CEO of Rentokil since 2013.

24.    Defendant Stuart M. Ingall-Tombs served as CFO of Rentokil from August 2020 to December 2024, at which time he resigned from the Company.    Defendant Ingall-Tombs previously served in a variety of other roles at Rentokil.

9

25.     Defendant Bradley S. Paulsen has served as CEO of Rentokil's North America region since December 2023.  Defendant Paulsen announced his resignation from Rentokil on January 28, 2025, effective April 2025.

26.     Defendants Ransom, Ingall-Tombs, and Paulsen are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Rentokil, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    OVERVIEW OF THE FRAUD

### A.    Rentokil Buys Terminix: "By Far… The Biggest And Most Strategic Acquisition In The History Of Our Company, And Of Our Industry"

27.     Rentokil is a UK-headquartered global provider of pest control and hygiene & wellbeing services.[1]  Pest Control has long made up the vast majority of Rentokil's business, accounting for over 60% of global revenue even prior to Rentokil's acquisition of Terminix.

28.     North America is the largest market for pest control in the world, accounting for over 50% of the global market.  Thus, it was critical to Rentokil's global strategy to increase the

---

[1] Rentokil also owns and operates a French Workwear business, which accounted for approximately 4% of the Company's 2023 revenue.

Company's foothold in the North American market.  In the years leading up to the Terminix acquisition, Rentokil had been growing its North America business using a "bolt-on" strategy, whereby Rentokil would buy up dozens of regional and local pest control businesses and would continue to operate them under their existing brand names.  Through this strategy, by the end of 2021, roughly 44% of Rentokil's revenue came from North America.  However, Rentokil's "bolt-on" approach meant that a large part of the Company's presence in North America consisted of a patchwork of local and regional brands that Rentokil operated independently under separate brand names (such as Ehrlich Pest Control, Arrow Pest Control, Florida Pest Control, and dozens of others).  And moreover, Rentokil's primary strength in North America was in the commercial pest control market, whereas it was a smaller player in the North American residential pest control market.

29.    On December 14, 2021, Rentokil took a dramatic step in its North America and global strategy.  Specifically, that day, Rentokil announced that it had agreed to acquire Terminix—the second largest pest control company in North America—for approximately $6.7 billion in total consideration.[2]  Rentokil's investor presentation on the acquisition touted that the proposed merger was "***by far…the biggest and most strategic acquisition in the history of our Company, and of our Industry***," and emphasized that the combination would create the "global leader in pest control" and the number one pest control company in North America.  The presentation further touted a "***[t]ransformational combination***," with "increased scale and leadership in the global pest control market," and "substantially increased scale in North America, providing an enlarged platform for profitable growth."  Indeed, Rentokil's acquisition of Terminix would ***more than***

---

[2] Under the terms of the Merger Agreement, the consideration that Rentokil would pay was comprised of 80% in newly issued ADSs, and 20% ($1.3 billion) in cash.

*double* the Company's total North America revenue, massively increase its presence in residential pest control, and place it on roughly equal footing with competitor Rollins, Inc., the largest pest control company in North America.

30.     Significantly, in a departure from its prior "bolt-on" strategy, Rentokil would not merely operate Terminix as a separate business under its own brand name. Instead, Rentokil would "fully integrate" Terminix with Rentokil and its dozens of U.S. subsidiary companies, thereby combining Terminix's IT systems, management, personnel, office space, and equipment, with those of Rentokil and its local and regional companies. Indeed, one of Rentokil's primary stated rationales for the merger was that, by fully integrating Terminix in this manner, the merger would allow Rentokil to achieve massive "synergies"—net cost savings and improvements in revenue generation from the combination of the two companies' operations, particularly given Rentokil's focus on commercial pest control and Terminix's focus on residential pest control. To that end, Defendants touted the merger as "[a] ***complementary and synergistic combination***," and claimed that there was a "***strong operational and cultural fit, creating significant synergy opportunities***," due to "complementary service lines (combining Rentokil Initial's expertise in commercial pest control globally with Terminix expertise in residential and termite pest control in North America)."

31.     The initial phases of this full integration plan called for Rentokil to first integrate the two companies' management, payroll, IT systems and other functions, and also "co-locate" numerous Rentokil and Terminix branches on the same properties to save on real estate costs. Once these crucial milestones were completed, Rentokil would "fully integrate" hundreds of Rentokil and Terminix branches. Specifically, Rentokil would reduce the combined companies' total number of branch locations from over 600 prior to the merger to roughly 400 branches after the integration was complete. In addition, the Company would consolidate these branches under

either the Rentokil or Terminix brand—the Rentokil brand would be used for commercial pest control, while the Terminix brand would be used for residential pest control.

32.    In addition to generating numerous synergies from combined branding, personnel, IT systems, and equipment, Defendants also emphasized that integrating their hundreds of branches would achieve synergies through "greater route-density"—*i.e.*, by combining Terminix and Rentokil service routes.  By doing so, the combined company would be able to place more customers on the same technicians' routes, ostensibly saving costs *without sacrificing customer service*.  As investor slides regarding the merger elaborated, the "[s]ignificantly enhanced network and route density will bring the Combined Group closer to customers[] with… less driving time to and from customer visits."

33.    As a result of all of these planned efficiencies, Defendants promised that the merger would achieve "*material annual pre-tax cost synergies of at least US$150m*…by the third full year of completion, owing to greater footprint density, procurement leverage, property rationalisation, duplicate administrative and overhead rationalisation, marketing, sales effectiveness, head office synergies and financing."  As such, according to Rentokil's investor presentation, Rentokil would be able to achieve higher profit margins due to the "*[c]ombined Group's margin profile and operating scale efficiencies [which] will enable it to reduce its costs and increase overall efficiencies*."

34.    Notably, notwithstanding the substantial scope and scale of the Rentokil-Terminix integration, Defendants assured investors that there was "*limited integration risk*" in the merger due to the "M&A track record of both Rentokil Initial and Terminix," and because Rentokil had purportedly already done extensive preparations, planning, and due diligence for the integration. Indeed, in subsequent statements, Defendant Ransom would emphasize that the merger followed

an "*intense period of successful preparatory work to position the businesses for effective integration*," such that the Company was ready to hit the ground running in integrating Terminix.

35.    Analysts and investors lauded the acquisition announcement.  JPMorgan applauded the "*transformative deal with material synergy potential*."  RBC Capital Markets noted the "*clear positives in terms of doing the deal*" as "*it increases the scale and customer density in the US*, it increases the overall proportion of the group in Pest control and gives more of a presence in the residential and termite sector to go along with Rentokil's strong commercial capability and makes Rentokil the clear US market leader ahead."  RBC further repeated Defendants' representations concerning the synergies that the merger would provide,  highlighting that "*[t]he synergy number is also large - $150m*."

36.    On October 12, 2022, Rentokil closed its acquisition of Terminix.  On the news, Rentokil's ADS price increased over 5%, or $1.37 per ADS, on unusually high volume, to close at $26.95 per ADS.

**B.    Leading Up To The Class Period, Defendants Assured Investors Of Their "Tremendous Work Mapping Out The Technology Road Map" And "Excellent Progress" On The Integration**

37.    In the year following the merger closing, Rentokil repeatedly emphasized the "extensive due diligence" and "integration planning" that the Company had already completed regarding the Terminix integration, as well as the "excellent progress" it had made in integrating the two companies' systems, processes and personnel.  Thus, Rentokil's actions had paved the way for the Company to achieve a smooth full integration of Terminix's branches and to achieve its promised synergies and revenue growth.

38.    For example, in the Company's 2022 Preliminary Results release filed on Form 6-K with the SEC on March 16, 2023, Rentokil headlined its "*[e]xcellent early progress on Terminix integration*," and offered a multi-page update headlined "Acquisition and Integration of

14

Terminix[:] Value Creation opportunity confirmed; synergy guidance raised." That 6-K explicitly touted the "*[e]xtensive due diligence*" that the Company had supposedly already done that "*furnished us with a deep understanding of the Terminix operations and those early assumptions about the health of the business, both operational and financial, have remained intact*." Defendants similarly emphasized that "integration planning has confirmed the strong potential of the combination, which is both synergistic and complementary," and that "[t]he combined group will enjoy the benefits of scale as well as higher density in our operations that will enable margin acceleration." Further, under the header "*Excellent early integration*," Rentokil specifically claimed that it had already made significant progress toward integrating the two companies' technology systems and personnel. In particular, the Company stated that "*[e]xcellent early progress has been made on delivering the integration plan to ensure use of the most effective systems, processes and technology from each organization*" and that "we have made *strong progress in building a joint team* that is based on the best of talent and with a shared mission, vision and values."

39. The release also discussed in further detail Rentokil's purportedly well-developed plan to combine and integrate Rentokil and Terminix branches, reducing the total number from more than 600 locations to 400 and thus reducing costs, achieving "synergies" and "accelerating route density." This "consolidation" would involve "not only the physical locations, but also the IT systems and other office infrastructure, the brands, the service offering and technicians and sales teams" and the creation of "a back-office field support function of the future through process integration and efficiency improvements, drawing on existing best practice capabilities." Rentokil also detailed its plans to combine all of its smaller local and regional brands into either the Rentokil or Terminix brand, explaining that "[b]etween the two companies in North America, there is also

15

a large number of regional and local brands" and that the integration "will see convergence of the vast majority of the smaller brands" such that "[r]esidential, termite and SME commercial business will take the Terminix brand, while larger commercial and national account customers will enjoy the Rentokil name."

40.    In an earnings call and presentation the same day, Defendants emphasized the "***tremendous work***" they had done in connection with the integration of Terminix and Rentokil's IT systems, such that the "***pre-work has now all been completed,***" and Rentokil had a "***clear view***" of how the systems and branches would integrate.  As the Company's then North America CEO Brett Ponton stated:

> The second enabler of our strategy is technology.  I spoke earlier about the Rentokil Terminix Way, while it starts with establishing clear standards and processes and then training to those standards, you must also have the technology in place that will enable this work to be performed in a consistent and efficient manner.  ***The pre-work has now all been completed, and we have really assembled a very impressive team across the organization.  They've done tremendous work mapping out the technology road map to deliver best-in-class systems and architecture.  We have a clear view on where we're headed from a systems point of view and how to get there***.

41.    Defendant Ransom further emphasized that synergies from the transaction were already apparent, stating that "***early synergies have started to come through*** ... So, an excellent performance during the year, ***really good progress being made with Terminix***."

42.    Similarly, Rentokil's investor slides accompanying the call touted the Company's "***swift transition from integration planning into execution***," and cited such milestones as "new organization structure implemented," "best of breed top team appointed," "best of breed systems and processes being adopted," and "early synergies coming through."

16

43.    Defendants continued to make similar assurances in the following months.  For example, in the Company's Q1 Trading Update[3] on April 20, 2023, Defendants reiterated that "*[d]elivery of the Terminix integration plan has progressed well* in the first quarter of the year and the cost synergy programme is on track to meet full year guidance."

44.    On July 27, 2023, Rentokil issued an earnings release that further boasted of the Company's integration efforts, quoting Defendant Ransom as stating that he was "*especially pleased with our progress in integrating Terminix*," and that *"[w]e start the second half of the year with continued confidence in our plans, both operational and strategic*."   More specifically, the earnings release detailed the two "integration pilots" that the Company had undertaken to test out its branch integration strategy by combining and fully integrating dozens of Rentokil and Terminix branches.  Defendants claimed that the pilots had already produced excellent results, and thus touted the "*Positive Results from Initial Integration Pilots*," stating "*[w]e are seeing clear evidence of density benefits with the start of the [branch integration] pilot programme and we remain firmly on track to deliver synergies*," as this "combination of larger branches with higher network density drove an approximately 5 percentage point margin expansion in the pilot areas." As such, Rentokil said that it was fully prepared to enter its broader "branch integration phase"— *i.e.*, the full integration of hundreds of Terminix and Rentokil branches—as early as January 2024. And further, Defendants claimed to have already mapped out how to fully integrate the two companies' respective IT systems, which it claimed would drive further synergies.[4]

---

[3] UK reporting companies issue "trading updates" as unscheduled bulletins to inform investors and the market about their recent trading performance. These updates often include information on revenues, profits, and other key financial metrics.  Companies issue them both as routine updates on financial performance—usually between scheduled financial reports—and sometimes to notify investors of unexpected changes or developments.

[4] The earnings release also announced that Rentokil's then North America CEO, Brett Ponton, would be resigning later in the year.  Ponton would be replaced by Defendant Paulsen soon after.

45.     In an earnings call the same day, Defendant Ransom further touted the purported successes and benefits of the "pilot programme" in co-locating and integrating branches, noting that Rentokil had 1,000 colleagues "working together closely and successfully in collocated branches," and that, in the fully integrated branches, the pilot had shown that "the detailed migration processes…were successful" and delivered "*one consistent brand, one pay plan, one set of systems*":

> In the first half [of 2023], we exited 44 individual branch sites, taking the total number of properties exited since closing the deal to 64. And by the end of the second half, we would expect this to exceed $100 million. As each site closes, the colleagues of that branch move to share location of a nearby branch. *So we now have around 1,000 colleagues working together closely and successfully in colocated branches*.

> ***

> *So what did we learn? Well, first, our approach to these pilot integrations showed that the detailed migration processes, whilst undoubtedly demanding, were successful, integrating 40 properties down to 23, delivering one consistent brand, one pay plan, one set of systems*. Secondly, the combined branch headcount was reduced from 836 to 709, and this was achieved mainly through natural attrition.

46.     Defendant Ransom further touted that Defendants now had "a really valuable set of colocations and integration pilots to learn from," enabling the Company to "*minimize disruption to the business*" from the integration.

47.     Analysts were reassured by Defendants' representations.  A July 27, 2023 Barclays report noted that the "integration [was] on track," and that the Company had seen "[s]uccess from [the] results of [its] first integration pilots in North America," which encompassed 40 branches and "several brands within the legacy Rentokil network," stating these branch integrations were "successful in demonstrating density benefits and delivered margin expansion" and thus noting that "synergies and integration pilots [were] proving successful."

18

C.    **Throughout The Class Period, Defendants Touted Their Purportedly
      "*Excellent Progress*" In The Integration, Including The Critical And
      Successful Integration Of The Companies' IT And Operational Systems**

48.    Throughout the Class Period, Defendants repeatedly and emphatically assured investors that the Terminix integration was "***firmly on course***" and making "***excellent progress***," thus laying the "***foundations for success***" of its integration plan.  Indeed, Defendants expressly boasted of having "***now completed Phase 1 of the integration program***" by the beginning of 2024, thus completing a bevy of highly specific and critical integration milestones.  These foundational integration achievements included enabling "***detailed customer tracking***" across the two companies, the ability to "***follow[] the sales process end to end***," and unified "***internal reporting systems*** facilitating ***integrated performance management***."  Significantly, as a result of these milestones, Defendants would proclaim to investors that they had successfully "***streamlined and unified the organization to create a single Rentokil Terminix team***."  Moreover, by mid-2024, Defendants claimed that they had fully completed "Phase 2" of the integration, thus bringing Rentokil and Terminix onto a "***single set of systems***" and accomplishing the "***enormous task***" of "***get[ting] the systems fully integrated***."  Thus, by representing that they had "completed" "Phase 1" and "Phase 2" of the integration, Defendants made clear to investors that they had a "green light" to fully integrate hundreds of Rentokil and Terminix's branches, unlocking the hundreds of millions of dollars in merger "synergies" that they had repeatedly promised to investors.

49.    On October 19, 2023, the first day of the Class Period, Rentokil issued a Trading Update for 3Q 2023 in which Defendants made a series of wholly positive statements regarding the Terminix integration process, and specifically assured investors that the integration remained "firmly on course" to deliver hundreds of millions of dollars of net cost synergies.  Indeed, the Trading Update touted the Company's "***[c]ontinued good progress on [] the integration of Terminix ...***" and stated that the "***[d]elivery of the Terminix integration plan has progressed well***

19

*in the third quarter* and the cost synergy programme is on track to meet full year guidance of $60m of pre-tax net P&L synergies." The Trading Update further touted "***the significant benefits of the combination with Terminix***" and assured investors that Defendants were "***on course with our integration plans ... The Terminix integration programme continues apace and we remain firmly on course*** to deliver our full year pre-tax net cost synergy guidance."

50. In the update, Defendant Ransom praised the progress of the integration, stating: "[t]he strong fundamentals of our operations are further enhanced by our value-creating M&A programme, ***led by the integration of Terminix***." Defendants further claimed that they had "completed several important initiatives" regarding the integration process, "including moving all of our 22,000 US colleagues onto the same Human Capital Management and payroll system." As a result, Defendants purportedly "remain[ed] confident in the significant benefits of the combination with Terminix and are ***on course with our integration plans***."

51. Four months later, on March 7, 2024, Defendants continued to highlight the wholly positive progress of the integration. Specifically, on that date, Rentokil reported its preliminary financial results for the second half and full year 2023 and issued its guidance for 2024, which included a material increase to Defendants' "target for the total value of integration cost synergies from the integration of Terminix…by $25 million to $225 million." In the Company's earnings release issued that day, Defendant Ransom again emphasized to investors the "***excellent progress we're making on the integration***."

52. Significantly, in their earnings release and accompanying investor call and presentation, Defendants made highly specific claims assuring investors that the Company had completed several key milestones in integrating the two companies' systems. These purported milestones included numerous critical HR, IT, administrative and operational functions,

culminating in Defendants' proclamation that they had "***now completed Phase 1 of the integration***

***program***," which constituted the "***foundations for success***" of the integration. Among the

"substantial" integration achievements that Defendants specifically touted were "***71 foundation***

***IT system enhancements***," as well as "***important advances to the Group's digitally enabled***

***products and processes***." Defendants also highlighted multiple "key initiatives realized in the

year" that integrated the Company's customer and sales data and processes, including a new

customer communications management tool that "better empower[ed] our call agents with detailed

customer tracking," and "enhanced field sales tools" that allowed employees to "***follow[] the sales***

***process end to end***." Rentokil also specifically represented that it had updated the Company's

Customer Relationship Management ("CRM")[5] platform, which the Company claimed improved

service technicians' ability to "generate sales leads and upsell opportunities."

  53. Rentokil also stated that its integrated "big data platform" would "***allow for***

***Terminix data to be integrated and increasingly provide actionable analytics from across our***

***entire branch network***"—a critical function if Rentokil and Terminix were to truly operate as a

unified company that would achieve the promised synergies from the merger. And in further

highlighting the "many activities and achievements that our disciplined approach to this integration

has delivered" during "Phase 1" of the integration, Ransom explained that the Company had

already reduced its branch network by roughly 100 branches by "co-locating" those branches with

others on the same properties—a precursor to fully integrating those branches.

  54. In sum, the integration was so advanced and had progressed so well that the most

senior officers of the Company made clear that Rentokil and Terminix were *already* operating as

---

[5] CRM platforms are critically important software that help businesses manage and improve their relationships with customers and prospects. Among other things, they are used to store customer data, track customer communications, manage sales pipelines, automate tasks (such as follow-up emails, scheduling calls, and assigning leads), analyze customer trends, and manage customer support functions.

a single entity.  Indeed, as Defendant Ransom himself emphasized to investors: Defendants had

"*streamlined and unified the organization to create a single Rentokil Terminix team*."

55.    Moreover, as a result of the "advances" that Defendants had purportedly achieved

during Phase 1 of the integration, Defendant Ransom stated that "the foundations for future success

have been laid," and explained that "*we've now entered Phase 2 of the integration plan, which is

the local planning phase ahead of full branch integration*."  Ransom stated that the first six

months of 2024 were being "used to develop specific local plans for the branches being integrated,"

which "then delivers the integration of branch systems and the migration of data."  Ransom again

emphasized that successfully integrated IT systems would be the key to this branch integration and

the "synergies" that would result, explaining that "[a]t the very heart of our integration is a

commitment to best-in-class technologies, systems and processes."  Ransom summed up by

touting the Company's "*excellent progress in technology*" for the integration.

56.    Defendants also made clear that they were fully involved with and informed about

every step of the integration's progress, and that they were meticulously tracking all aspects of the

integration on a weekly basis.  For example, during the investor call, a Barclays analyst inquired

where Defendants' "confidence" came from with regard to the integration and in particular the

"higher gross synergy target announced today."  In response, Defendant Ransom emphasized that

the Company had done "this long planning [phase] to make sure that we've got it all.  … *we've

tested and tested and tested lots of things*."  Moreover, Ransom described the Company's "*very,

very, very detailed plan*" and extensive tracking of the integration progress, stating: "[w]here is

the confidence?  *We've always had a very, very, very detailed plan*.  We keep that plan up to date.

*We track it every single – not every single day, but we're tracking every single week*.  We have

*fortnightly reviews of the program*.  And we make sure that all of our colleagues, who own a piece

of that synergy pie, update their assumptions regularly." Ransom further added that the Company's increased synergy target was "*informed by our experience and the progress that we're making*," and that "*we can see now the evidence that we know what we can get out*."

57. One month later, in the Company's April 18, 2024 Trading Update on first quarter 2024 earnings, Defendants continued to make wholly positive statements about the progress of the integration. For example, Ransom boasted that the "[T]erminix integration plan *saw further progress towards full branch integration*," and thus stated that the Company was "*in the advanced stages of preparation for the first full branch integrations commencing mid-year*." Significantly, Defendants claimed that critical operational systems had been successfully integrated and were fully working, thereby allowing for combined "internal reporting" and "integrated performance management" that enabled Rentokil and Terminix to operate as a single company. Specifically, Defendants touted that the integration included the "*[g]o live of the new combined general ledger and internal reporting systems, facilitating integrated performance management, and continued progress on the development of the operational technology stack*."

58. During the Company's earnings call the same day, Defendant Ransom again assured investors that "*our integration program is on track*," and reiterated Rentokil's full-year guidance of 2-4% growth for North America. Moreover, while analysts questioned whether integration issues could potentially impact the Company's ability to meet its guidance, Ransom assured investors that their guidance was already accounting for any disruptions the integration might cause, explaining that "*we've included [integration] impact within the 2% to 4%* [organic revenue growth guidance]. So as we sit here, *we've got a good level of confidence*" about the integration and the Company's guidance.

**D.    Defendants Unequivocally Asserted That "Phase 2" Of The Integration Was "Complete," And That Rentokil And Terminix Now Had A "Single Set Of Systems" That Were "Fully Integrated"**

59.    With Phase 1 of the integration now complete and the two companies purportedly operating as a "streamlined and unified" organization, Defendants continued to assure the market that the integration was proceeding smoothly.  On July 25, 2024, the Company announced its interim results for the first half of 2024, including an update to the Company's full year outlook. Significantly, in the earnings call accompanying the announcement, Defendants triumphantly proclaimed that they had now "*completed Phase 2 of the integration plan*"—*i.e.*, the full integration of Rentokil's IT systems that had to be completed in order to integrate hundreds of Rentokil branches.  Indeed, Defendants trumpeted the "*enormous task*" of "*get[ting] the systems fully integrated*"—a process that had purportedly gone "*really, really well*," with all "*glitches…resolved and put to bed*."  As such, with the two companies on a single, unified "IT Stack," Rentokil now had the "green light" for full branch integration and the massive synergies that would result.

60.    During the earnings call, Defendant Paulsen—Rentokil's North America CEO now responsible for the integration—touted the success of the Terminix integration, announcing that "[i]n the first half of this year, *we have completed Phase 2 of the integration plan*," which included having "*developed and tested 22 systems with 190 features to enable the integrations and harmonized multiple business processes, contracts and applications*."  Notably, Paulsen emphasized that the integration process had gone so "very well" that the Company now had "a single set of systems" that were fully integrated and functioning properly, remarking: "*So how is it going?  In short, very well.  We have a single set of systems.  Data has been migrated.  Sales leads are flowing as they should.  Work orders are completed*."  As such, Paulsen claimed, "*[i]t's been an outstanding second quarter of progress*."

61.     To further hammer home the portrayal that the integration was an entire success, Defendants presented slides accompanying the earnings call that touted in exacting detail the various critical milestones that the Company had purportedly completed during Phase 2 of the integration, which had been supposedly "*completed on schedule at the end of H1 2024*."  For example, Rentokil emphasized it had completed "*22 systems developed to enable integrations to commence in June with over 190 features*," which included fundamental capabilities such as "*shared reporting and KPIs [Key Performance Indicators] for field leadership*" and "*updated financial systems to provide a shared view of financials*"—thus unifying the Company's operational reporting and its ability to manage the entire branch network of Terminix and Rentokil branches as a single, unified Company.

62.     Moreover, and significantly, Defendants emphasized that each and every one of these systems were not only implemented but were successfully operating as intended by the now unified company, as "*all [of these systems were] successfully tested and deployed*."  And furthermore, Defendants assured investors that the completed integration milestones were *already* providing the operational synergies that Defendants had promised to the market, as the integration achievements had "*harmonized multiple business processes, contracts, and applications to support cost-saving synergy delivery*."  Crucially, Defendants made clear that they were able to achieve these milestones with no negative impact on customer service or other execution issues, as the integration had produced "*consistent pest service lines of business implemented*," and had actually "*[r]educ[ed] errors and streamlin[ed] processes*."

63.     Removing any doubt that Rentokil was now fully prepared to integrate Terminix's hundreds of branches and realize the full synergy benefits of the merger, Defendant Ransom unequivocally asserted that Rentokil's and Terminix's operating systems, including its IT systems,

had been fully integrated. Specifically, Ransom asserted that Rentokil had "***done the systems integration***" and the systems were now "***fully integrated***." Indeed, completing the systems integration was so significant that Ransom explicitly told investors that the milestone was "***a big thing***" and an "***enormous task...that has gone really, really well***." Ransom further represented that Terminix and Rentokil were now purportedly successfully converted to the same unified IT systems, stating that "***we've now got an IT stack that we've converted Terminix colleagues from their system into the new system***." Moreover, Ransom assured investors that not only was the systems integration complete, but any problems that had arisen had been fixed, insisting that "***every single one***" of the systems' "***day one glitches [had been] resolved and put to bed***":

> ***The thing that I'm really most excited about*** in the second quarter is ***we've done the systems integration***. I know that might not sound a big thing to many of you, but ***it is a big thing. So to integrate this business fully and properly, we have to do two things. We have to get the systems fully integrated. That's an enormous task, an enormous task, so many things that have to be done well and that has gone really, really well. So we've now got an IT stack that we have converted Terminix colleagues from their system into the new system. We've converted standalone acquisitions to the new system. We've converted commercial, residential, termite to the new system***. We've had multiple day one glitches, ***every single one of which has been resolved and put to bed***.

64.     Further emphasizing just how critical and important these IT systems integration were to the Terminix merger, Defendant Ransom exclaimed: "***my goodness me, that is a big tick to say you have got the systems integration done. Well done, good, excellent***."

65.     In sum, Defendants repeatedly conveyed to investors that, with the many integration milestones of "Phase 2" now "complete," Rentokil had a "***green light***" for the "first branch integrations," which had begun a full month earlier and were already having a "***good start and [were] on schedule***."

66.     Analysts praised Defendants' wholly positive reports on the success of all aspects of the integration. For example, Oppenheimer emphasized that "[t]he Terminix integration remains on track," that "phase 2 [was] completed," and that the Company was a full month into

the next phase of the integration process, underscoring that "phase 3 was launched in June, which is focused on the migration of Terminix branches."  Similarly, RBC "came away confident that management has the right actions in place to deliver improved growth, along with executing on the [Terminix] integration," which was "on track" with "management believ[ing that] most of the heavy lifting has been done on functionality."

> **E.    In Truth, Rentokil And Terminix Were Not "On A Single Set Of Systems" That Were "Fully Integrated" With "Every Single One" Of The Glitches "Resolved And Put To Bed"; Nor Was The Company Achieving Massive "Synergies"**

67.    In truth, at the time of Defendants' statements, Rentokil was experiencing severe and pervasive problems with the Terminix integration, rendering those statements materially false and misleading.  In reality, "Phase 1" and "Phase 2" of the integration were never successfully completed—the "IT Stack" was never successfully integrated, "internal reporting" systems were never harmonized, and the "day one glitches" were never "resolved and put to bed."  As such, Rentokil and Terminix were not in any sense functioning under a unified "single set of systems," and were actually operating as two totally separate, unintegrated companies.

68.    Indeed, numerous former employees confirmed that, from the outset, and continuing throughout the Class Period, Rentokil's integration attempts with Terminix were a "***disaster***," plagued by failures in integrating disparate sales platforms, customer relationship management (CRM) platforms, sales tools, facilities, and personnel.  These former employees confirmed that Rentokil was "***having huge issues getting the systems to talk to each other***," and thus its integration plans were materially delayed over and over again in 2023 and 2024.  And in the face of the endless glitches, billing problems, and missed service calls caused by the integration, Rentokil "***lost customers left and right***," leading to plummeting sales.

69.     Moreover, Rentokil's so-called "synergies" from the merger of the two companies were not true "synergies" but were in reality often just cost cuts to marketing, personnel, and other areas that saved money in the short term but led to massive customer service issues and lost sales, and cost the Company far more in revenue declines than it saved in costs.  And further, Rentokil's inability to integrate the companies' IT systems meant that Rentokil and Terminix's sales personnel often wound up unwittingly competing for the same customers and cannibalizing each other's sales, as employees of both companies were unable to determine whether a customer was already serviced by Rentokil or Terminix.

70.     Strikingly, these facts were confirmed and cross-corroborated by no fewer than 19 former Rentokil employees from across the U.S.—including employees from Florida, California, Oklahoma, Mississippi, Wisconsin, Massachusetts, Michigan, Kentucky, Minnesota, Arizona, New York, Georgia, Washington DC, and Louisiana—and from both the Rentokil and Terminix sides of the merger.

    **1.**    *A "Total Sh\*tshow"*: **Contrary To Defendants' Repeated Statements To Investors, The Terminix Integration Was Not Making "Excellent Progress" And The Companies' IT Systems Were Not Integrated**

71.     Numerous former Rentokil and Terminix employees from across the country independently reported that, while they were repeatedly told of full integration plans that were imminent, little if any progress was made.  Moreover, these employees uniformly explained that one of the main problems preventing progress on full integration was that Rentokil's and Terminix's IT systems were not properly integrated, and Rentokil was facing massive problems trying to integrate them.  Significantly, these former employees said that these problems were ongoing when they left the Company **in or after July 2024**—*i.e.*, *after* Defendants told investors that Phase 2 had supposedly been "completed" with the "systems integration" fully "done" and

"every single one" of the system's "day one glitches…resolved and put to bed." Yet, these former employees confirmed that behind the scenes, an entirely different story had unfolded.

72. CW 1,[6] a Rentokil Region Manager responsible for as many as ten branches across Minnesota, Wisconsin, and Michigan, described the integration as a "**sh\*tshow**" from the outset.[7] CW 1 explained that he believed his region was part of the first phase of Rentokil's Terminix integration, which included integrating two subsidiary companies – Batzner (which Rentokil owned) and Wil-Kil (which Terminix owned). He explained that he had specifically worked on the integration of Batzner into Rentokil in 2023—which was part of the larger plan to integrate Rentokil and its various brands with Terminix—and stated that "*[t]he integration was a disaster.*" As he recalled, "*we lost customers left and right by the tune of hundreds [or] thousands of customers* because *no one was trained on the system, and the system was not working in the field or in the office. We had huge billing issues with big [commercial] customers, so we lost a ton of customers*." He explained that, even in early 2023, they knew "*right away that it was a sh\*t show*." As an example, he recalled that his largest customer, Aurora Health, a hospital chain within the Wisconsin market, was furious over its billing problems, which it had never experienced previously as a Batzner customer for decades. He noted many customers were double billed, and that, in many cases, "[w]e were sending customers to the wrong [Rentokil-owned] company, and all kinds of wild stuff was happening." CW 1 said that he regularly reported these problems up the chain to VP Dan Tripoli (who later became the Company's COO), but that "[i]t was always just ignored like a lot of other things."

---

[6] Former Rentokil employees are referred to herein as "confidential witness" or "CW #" and are all referenced herein in the masculine form to maintain their confidentiality.

[7] Prior to working for Rentokil, CW 1 had previously worked successively for two different companies acquired by Rentokil and Terminix (first Batzner Pest Management and then Wil-Kil Pest Control), and then worked for Rentokil starting in July 2021. CW 1was then involved in the effort to fully integrate Batzner into Rentokil as a step toward fully combining Rentokil and all of its subsidiary companies with Terminix. CW 1 left Rentokil in July 2024.

73.    CW 1 was also in contact with branch managers and region managers in the Phoenix, Arizona area, which CW 1 said was another test market for integrating IT systems after the acquisition of Terminix. He said that Phoenix, too, was a "total sh*tshow." CW 1 explained that, prior to the acquisition, Terminix had been trying to develop their own freestanding service system, and that Rentokil used Phoenix as a test market for that new system after it acquired Terminix. However, the system ended up being a disaster during the initial testing of it, and Rentokil scrapped this project after Terminix had spent between $15mm to $20mm on it.

74.    As one example of the problems he experienced, CW 1 explained that Rentokil's field app used by the technicians, known as ServiceTrac, would go down for weeks at a time during the integration, which he said was very frustrating for the technicians, and contributed to many technicians leaving the Company. He added, "*[e]ven the system that was supposed to be working wasn't working. They were trying to integrate [Terminix] into a system that was already not working. They were integrating into a system that they knew had big problems. The system crashed constantly*." He said that technicians would complete a whole day's work, and then the system would crash when they were entering information, forcing the technicians to go back and do their work on paper.

75.    CW 1 indicated that Rentokil was also integrating branches into a proprietary digital sales tool known as Winning Formula—a tool the Company sometimes touted in its investor presentations—which he described as also being a faulty system. He explained, "*Winning Formula was not working right during my integration in May and June [2024]*" and said that he had "heard it was not working right for a lot of people in Florida and Phoenix." Multiple other CWs corroborated that there were serious integration problems with Winning Formula – indeed,

both CW 2[8] (an operations manager in Florida) and CW 3[9] (an area sales manager in Kentucky and then Ohio) confirmed that they had integration problems with Winning Formula, and CW 2 explained that employees jokingly referred to it as "***Losing Formula***."

76.    CW 1 explained that his region was still not fully integrated by the time he left in July 2024, and asserted "***[t]he Company was no way near being fully integrated. They are probably four years away from that***."

77.    Significantly, contrary to Defendants' claims that Rentokil and Terminix were operating as a "streamlined and unified" organization and a "single Rentokil Terminix team," and that Defendants had integrated the two companies' IT systems, former employees of both companies confirmed that the exact opposite was true.  For example, CW 4 was an IT Senior Program Manager who started with Terminix in August 2022 and reported to Kevin Schumm (VP IT Merger Integration and Finance), who in turn reported to the Chief Information Officer.[10]  CW 4 was on a team called IT-PPM (which stood for Project and Planning Management), and his job involved funding for IT projects and supporting the CIO.  In terms of integration, CW 4 explained that Rentokil had a program called MVP (which he recalled stood for More Viable Product), and that there were multiple MVP teams that were tasked with integrating all the software, practices, offices, pricing, and products.

78.    CW 4 explained that, as part of the Terminix integration, Rentokil wanted to integrate a variety of customer and technical data into unified platforms, but Rentokil was still

---

[8] CW 2started with Rentokil in 2015, and served as an Operations Manager with Rentokil in Wisconsin prior to serving as an Operations Manager with Arrow Exterminating, a Rentokil company, in Florida.  He left the Company in November 2024.

[9] CW 3served as an area sales manager for Rentokil in the Terminix part of the business from April 2023 to August 2024.  He first worked for the Company in Kentucky and then in Ohio.

[10] CW 4 was an IT Senior Program Manager who started with Terminix in August 2022 and reported to Kevin Schumm (VP IT Merger Integration and Finance), who in turn reported to the Chief Information Officer.  He left the Company in December 2024.

working on accumulating the data needed for this integration at the time he left in December 2024. He further explained that *the project got postponed multiple times, being delayed from May 2024 until July and then to October*. Indeed, he explained that *the only project that ever got completed on time was the combination of all Human Resources data*.

79.    Other senior employees confirmed that the companies' IT systems were never integrated, and as a result, Defendants' much-touted branch integration was unsuccessful. Indeed, according to several former employees, Rentokil's original plan had been to fully integrate its branches in Florida first, since Florida was one of the largest markets for pest control in the U.S. But the Florida integration process was a disaster, and Rentokil was forced to abandon it and try to fully integrate branches in another region (Central) first instead, which, in turn, also had integration problems. For example, CW 5,[11] an area district manager in Florida, explained that "Florida was supposed to be the first region to go" with the integration, but "they actually stopped it in Florida and moved into the Central region." CW 5 explained that the companies' respective IT systems simply would not work together properly, and this was never fixed by the time he left in October 2024. He explained, "*[t]hey were having huge issues getting the systems to talk to each other*" and that "[t]hey ran into major issues with Terminix coming over to [Rentokil's] PestPac [Customer Relationship Management] platform," and recalled these problems being discussed at virtual meetings with Defendant North America CEO Paulsen, VP Steven Frost and other higher-ups.

80.    CW 5, who came to Rentokil through Arrow Pest Control – another company that had been acquired by Rentokil – explained that the plan that was originally conveyed to him was

---

[11] CW 5 was an area district manager for Rentokil in Florida. CW 5 started at Arrow Pest Control in 2020, and started working for Rentokil after it acquired Arrow in or about 2021. At Rentokil, CW 5 managed three branches. He reported to Regional District Manager Ramona Akouri, who reported to Steve Frost (Regional VP), who reported to the CEO. CW 5 left Rentokil in October 2024.

that "Terminix was going to merge with us and that we'd all be one company, running on the same systems and programs." However, CW 5 recalled that the Terminix-Rentokil full integration date for Florida kept getting pushed back, and that it had already been delayed three times by the time he left in October 2024. He explained that "*[w]e were supposed to be integrated a couple of years ago*[,]" but that this hadn't happened.

81. CW 5 specifically recalled that Rentokil's inability to fully integrate its branches was a direct result of its inability to integrate Rentokil and Terminix's IT systems—a prerequisite to branch integration. And strikingly, while Defendants had boasted to investors of their customer communications management tool that "better empowers our call agents with *detailed customer tracking*"; "enhanced field sales tools" that "*follow[] the sales process end to end*"; and an upgraded CRM system that allowed Company employees to "generate sales leads and upsell opportunities," CW 5 described a reality that was entirely the opposite. For example, CW 5 explained that Rentokil struggled to get both companies to integrate the companies' respective sales tools into Rentokil's CRM system. He explained that the systems "didn't communicate," and that as a result, "[t]he sales guys would sell it and it would go to sales entry, who had to manually input all the data" since it would fail to feed into the CRM system, causing delays and sometimes leading to lost customer and sales data. Moreover, in stark contrast to Defendants' claims of having "100% of colleagues and customer data migrated," CW 5 explained that "*[e]verything that they tried to migrate to Terminix was actually holding up the migration. The systems just didn't communicate*."

82. CW 5 also recalled that these problems with integrating the Company's IT systems contributed to severe customer losses, explaining that "*[t]he [customer] cancellations went up when we started migrating, even when we started just flirting with it*." He recalled that one

Rentokil-owned company in his area – Heron – had a huge cancellation problem when they migrated to the Rentokil system from their own system, and that similar problems happened after the Terminix merger at two other Rentokil-owned companies – Arrow and Bug Out: "*[w]hen we went from [the other companies' customer relationship management platform] to the Rentokil PestPac, we ended up losing a lot of customers because of billing issues. The cancellations just kept coming*." He said that these problems, and the resulting cancellations started in early 2023, as Rentokil tried to integrate Terminix along with its other owned companies.

83.    CW 6,[12] a Revenue Cycle Manager who was responsible for dealing with accounts receivable, also confirmed that IT system integration problems and difficulties migrating customer data led to serious customer service and billing issues.   For example, CW 6 explained that the combined billing and payment systems led to payments getting mixed up, such that "*[t]hey were sending payments to Terminix that belonged to Rentokil and vice-versa*." He said that by the time he left in April 2024, these systems were already supposed to be integrated so that all billing would come from Rentokil, but that the data migration was failing, and thus Terminix customer data was still stuck in Terminix's legacy systems, and that customers were getting frustrated with constant billing issues.   He remarked that, by the time he left in April 2024, "*[t]he headache was just beginning.  I was so stressed out that I made the decision to leave.*"

---

[12] CW 6 worked as a Revenue Cycle Manager – first for Terminix and then for Rentokil (following the Terminix acquisition) from July 2021 – April 2024.

    2.    **Other Former Rentokil And Terminix Employees From Branches Located Across The Country Confirmed That The Integration Was An Abject Failure Throughout The Class Period**

84.    Like CW 5, CW 7,[13] a Florida district manager, described how he had been repeatedly told of plans to fully integrate Rentokil and its various subsidiary brands with Terminix, but that this kept getting delayed – for example, he said that in Winterhaven, Florida, the date where full integration of brands under a "Rentokil-Terminix" umbrella was supposed to happen was ***pushed back three times in two years***. He explained that, while branches of Rentokil and its subsidiaries were "co-located" with Terminix branches in his district as early as mid-2023 (i.e. moved onto the same physical properties), the integration of these branches never progressed beyond that even by the time he left in September 2024 due to pervasive problems integrating the Companies' systems, and that the "co-located" branches still operated as two separate companies that merely shared a building.

85.    For example, CW 7 specifically recalled multiple Google Meet meetings with Stephen Frost, the VP of the Company's Southeast region, in which Frost told them that they were struggling to properly integrate Terminix's "Mission" CRM with the PestPac CRM system that Rentokil used, and that this was preventing critical functions from being performed. CW 7 described this as a major barrier to integration. CW 7 also explained that integration of various other IT platforms failed—such as the differing versions of SalesForce and the Companies' respective service platforms—and that this led to problems that hurt sales and customer satisfaction. For example, he explained that "*[t]here were errors all the time … and we were*

---

[13] CW 7was a District Manager for Rentokil in Florida. He began working for Florida Pest Control in 2015, which Rentokil acquired in 2022, and he subsequently managed an area that included Terminix, Rentokil, and Florida Pest Control branches. CW 7left Rentokil in September 2024.

*having to fight through those*," that "*[w]e couldn't take payments [] and documentation would not load up*[,]" and that systems were regularly crashing.

86.    CW 7 explained that these IT system integration problems were present in his district at least from the beginning of 2024, and that, even by September 2024, when CW 7 left, "*[t]he systems had not been integrated to the full extent that they should have been*," and that "[w]e used it as best that we could, but it was problematic."

87.    CW 2, who worked as an operations manager for Rentokil's Arrow brand in Florida during the Class Period, similarly recalled that much of the IT integration in his area barely got off the ground.  Like other Florida-based CWs, he explained that, while his Arrow location wound up co-located with a Terminix branch on the same property, the two companies at the location remained entirely separate and never further integrated.  He explained that "[t]hey [Terminix] had one side of the building, and we [Rentokil-owned Arrow] had the other, for storage and offices" and that the only things shared were the lunchroom and training room.  He described how the goal was to move the companies onto unified IT platforms, but that "*they were struggling with it.  They had to keep pushing out the dates.  It was a disaster*[,]" and that this still had not been completed by the time he left in November 2024.

88.    According to CWs 1 and 5, when the Company realized it couldn't get its Florida branches integrated due to IT problems, it decided to switch to integration in the "Central" region first, as this was perceived to be easier.  However, CW 8,[14] a branch manager in the Central region, explained that the Company had similar problems integrating in the Central region as well, and that management "*kept on pushing it back because we're having these problems.*"  By the time

---

[14] CW 8 worked as a branch manager for Rentokil's Terminix business from September 2023 to October 2024 in Oklahoma City.

he left in October 2024, he had not seen integration in his area. Similarly, CW 2 recalled learning that Rentokil's branches in Tennessee—also part of the Central region—were unable to integrate their IT systems. He explained that Terminix, which had its own sales platform, was supposed to convert to the Rentokil platform, but that "*in the Tennessee area, which is still the Central Region, they are not pulled into that system yet. I don't know how they keep anything straight*." Similarly, CW 2, who had previously worked for Rentokil in Wisconsin in the Company's Central region prior to working in Florida, and kept in touch with his colleagues there, said that IT integration had not been completed in the Central region either.

89.     Similarly, CW 9,[15] a business development representative for Rentokil in the Washington, DC area, said that he saw no integration-related changes whatsoever for the first year after the acquisition, and said that although there was discussion of integration plans, they never came to fruition by the time he left in July 2024. For example, CW 9 was told he would become a manager of a team consisting of both Rentokil and Terminix employees, but this never occurred. As such, the companies operated entirely separately, and "[t]here was nothing that we [at Rentokil] were doing that they [at Terminix] did and vice versa." CW 9 also explained that he knew the Companies' respective IT systems would clearly be difficult to integrate, explaining that "[t]he sales processes for the systems were completely different from each other."

90.     CW 3, an area sales manager for Terminix—first for commercial business in Kentucky and then for residential business in Ohio—recalled being assured that his team would be converting to Rentokil's version of Salesforce software, but that this was delayed. He also described how Terminix used a Microsoft platform for many functions, while Rentokil used

---

[15] CW 9 served as a business development representative for Rentokil in the Washington, DC area from May 2018 through July 2024. He primarily focused on commercial accounts.

Google's platform, and that Rentokil used laptops while Terminix used iPads – this meant that customer and sales data didn't migrate well, often leading technicians to miss service calls. He further stated that when Terminix finally switched over to Rentokil's version of Salesforce, it caused massive glitches and automatically sent emails to 12,000 customers stating that their contracts were being canceled. CW 3 further explained that branches couldn't be consolidated until the tech platforms were consolidated, and thus, because of all of the tech problems in his area, he never saw branches fully integrated. According to CW 3, "*anybody that said [the] integration was going smoothly – that's a lot of horsesh\*t.*"

91.    Other former employees who worked at Rentokil and Terminix locations across the country confirmed that, even as Defendants were publicly claiming the exact opposite, Rentokil's independent regional pest control businesses remained entirely separate and unintegrated from an operational standpoint throughout the Class Period. CW 10,[16] a tech director and field operations trainer who worked for Magic Pest Management—a New York company acquired by Rentokil in November 2021—said that as of July 2024 his company was still operating separately from both Terminix and from Rentokil's other brands. CW 10 explained that Rentokil also owned two other companies operating in the same area – Suburban Exterminators and Arrow Exterminators, and that these three companies alone earned $40-50 million in annual revenue for Rentokil. However, he explained that, as of his July 2024 departure from the Company, "*any of the three ha[d] yet to be integrated*. It wasn't just Terminix that hasn't been merged, it's a lot of these little companies." CW 10 added that he was aware of two locations in his area where some of the brands had begun to share a property – including one shared between Magic and Terminix, and another in

---

[16] CW 10 was a tech director and field operations trainer for Magic Pest Management – a company that was acquired by Rentokil in November 2021 and remained with Rentokil until July 2024. He worked for the Company in the Long Island region of New York and worked with as many as 80 different branches of the Company.

Ronkonkoma, NY where Suburban, Terminix, and Arrow shared a property. However, he explained that there was no further integration at these locations – "[t]hey drive their own vehicles and wear their own uniforms."

92.     Similarly, CW 11[17]—a Rentokil residential sales specialist in the greater Boston area—recalled that he was shown a video about a program to integrate local Terminix and Rentokil offices, but while he continued to hear "talk about coming to the offices and combining the offices," it never happened. He said that he never even met anyone from Terminix, and that "*[w]e were operating totally separately until I left*" in May 2024. CW 12[18] likewise stated said that, even as of recently, no Terminix and Rentokil offices had been fully integrated in his area in Georgia, and instead, "*[i]t was two totally separate businesses*." He recalls hearing about scheduled dates for name changes, common uniforms, new vehicles, and a complete brand changeover, and recalled that these notifications came from executive management. However, he and other employees saw these as a "*pipe dream*" and said "[w]e never counted on any of these things happening."

93.     CW 13, a Terminix sales executive in the Hattiesburg, Mississippi area, similarly stated that while he had heard Rentokil had better IT tools for some functions, nothing was switched while he was there, and that this had not changed by the time he left in November 2024.[19] CW 14,[20] a Terminix sales representative in the northwestern U.S. who was at the Company until October 2024, recalled he could never get any clarity on the timeframe of integrating, observing

---

[17] CW 11was a Rentokil sales representative and residential sales specialist in the greater Boston area from October 2023 to May 2024. He worked for Rentokil via Ehrlich Pest Control, which Rentokil acquired in 2008.

[18] CW 12worked for Rentokil in Georgia via Active Pest Control, a company Rentokil acquired in 2019. CW 12was an area sales manager. He left the Company in February 2024.

[19] CW 13was a Terminix Sales Executive in the Hattiesburg, Mississippi market from March 2020 to November 2024.

[20] CW 14 was a Terminix sales representative in the northwestern U.S. (including parts of Washington, Oregon, and Idaho) from May 2023 to October 2024.

"[i]t was a real gray area of like – *we are one company, but are we really one company?*"  Like other former employees, he said that he had heard that the Companies' respective versions of Salesforce would be integrated, but never saw this happen even as late as October 2024, when he left the Company.  As he explained, *"[t]hey never combined them while I was there.  The companies ran separately*."

94.    Significantly, many of these employees also reported attending monthly "Town Hall" virtual meetings that were also attended by Defendant Paulsen himself.  During these meetings, according to CW 5, employees were shown a detailed integration "Road Map" graphic that laid out, in detail, the integration plans, and Defendant Paulsen and others would discuss where they were on the "road map," which frequently entailed discussing delays in IT systems integration and other integration problems.  CW 5 said that Paulsen clearly was aware of all issues and delays in integrating the companies, because he openly discussed them in detail at these meetings with other personnel.  He explained "[t]here were always town halls and things like that going on where they were discussing the road map, and *it was all the way up to Brad Paulsen …It was all the way up to the top*."

95.    Revenue Cycle Manager CW 6 also recalled these "town hall" meetings run by the North America CEO.  CW 6 corroborated that there was a chart used during the calls illustrating when everything was supposed to happen with the integration, and that management talked about phases and the integration of certain regions, but that they'd also talk about the integration's numerous delays: "they talked about – we ran into a hiccup with the testing and it's been delayed, or they would say something else like – we're supposed to here at this time, but we're there."

96.    Notably, CW 10 also recalled these monthly "town hall" meetings with Defendant Paulsen, and said that there was a question and answer component where employees regularly

asked questions about integration delays in the Google Meet chat window.  He said that it was regularly discussed in these Town Hall meetings that "we're having some difficulties" with the integration, "because they had to restart certain things that didn't go quite the way they wanted, so they had to revise everything and start over," and that "[t]hey would say that certain things had to be pushed back because they ran into glitches that they had to iron out."  CW 10 also recalled that the town halls also involved discussions of sales numbers, and that "they would tell you how many sales were done in that particular month, and whether it was up or down, or whether we were meeting our objectives," with data presented for each region.  He said that Defendant Paulsen obviously "knew that [Rentokil] wasn't integrated yet with Terminix" because of these meetings.

### 3.    Rather Than Achieving "Synergies," Rentokil Slashed Personnel And Customer Service, Leading To Steep Declines In Sales

97.    With respect to the so-called "synergies" that Defendants were publicly touting to investors during the Class Period, numerous former employees described that they saw no true synergies resulting from the merger, but rather that any savings were nothing more than Rentokil's efforts to slash personnel and other customer service costs that had an immediate negative impact on basic customer service functionality.  In truth, these cuts were entirely short-term in nature and never achieved "synergies" because they hurt sales much more than they saved in costs.

98.    For example, as District Manager CW 7 said of the Florida market, Rentokil "*downsized upper management big time*, and shifted people and told them – take this position or take a walk."  But while these personnel changes temporarily reduced costs, the Company wound up then having to ramp up hiring of sales personnel again because the cuts had hurt sales and "there was no sales coming in."  He said that he was seeing sales decline 5% per month during 2024 in his market.  CW 1, who was in charge of as many as ten branches across several midwestern states, recalls significant cost cuts to marketing after the Terminix acquisition, i.e.: "*[m]arketing support*

41

*was totally gone, and we were playing with a forty-card deck because of Rentokil*. All the previous support that we had in radio, advertising, and internet marketing with Google leads, were gone in 2023." He said some of the companies under their umbrella, such as McCloud and Wil-Kil, were $20mm companies that no longer had marketing support, and yet were expected to maintain the same profit margins without that critical support. He added that management was "*well aware of that debacle*" as it "*had a huge impact in Midwest markets*." CW 5 similarly recalled that, in his area of Florida, Rentokil "*completely 100% turned off marketing… and our leads just dropped like a rock*." This was also corroborated by CW 15,[21] a Terminix branch manager in Northern New Jersey, who recalled that, after Rentokil acquired Terminix, "*they stopped spending money on advertising*," and explained that "*[o]ur leads decreased because of this…[t]he leads went down at least 25% over the last two years*, but they still asked for more revenue every year."

99.    CW 1 also said that the Company cut costs by changing pay plans for some employees, but that this, too, hurt business in the long term. He explained that top technicians were previously able to make $100k under Terminix's plan, but that, under the revised pay plan, "[t]he technicians were making around $60,000 and many felt that they could make that much or more working for themselves." He explained that this hurt business because it was technicians who brought in revenue, and thus "[t]he technicians were the most important part of that business." CW 1 said that he keeps in contact with a number of current Regional Directors, and they have told him that the technician retention is a "disaster." Moreover, he described how Rentokil had had a hiring freeze for the past six quarters which they only recently lifted.

---

[21] CW 15was a Terminix branch manager in New Jersey from January 2018 to December 2024.

100.    CW 8, a Terminix Branch Manager in Oklahoma City, similarly observed personnel cuts that saved money but hurt sales, thus costing the Company more than they saved.  For example, after the merger, Rentokil was "doing away with all their Branch Managers and letting the Service Managers run [branches]."  He explained that "[t]hey created a new position called an ADM (Area District Manager) where one guy would have three or four branches to save money."  This practice was corroborated by CW 5, who was made an Area District Manager in Florida and took over three branches as a result, and who similarly said, "*I didn't see any [synergies] at all*."  CW 8 explained that "their strategy was to get rid of all the Branch Managers and let technicians go," to save money, but that, as a result, "*[t]he customer service lacked, it got worse, they had no leadership*[.]"  CW 8 said that the loss of customer service that resulted led to sharply declining sales, and that, in his area, "Every single branch was losing anywhere from 10% to 15% just on pest control services alone."

101.    CW 16,[22] a commercial account executive for Terminix in southern California, similarly described how Rentokil cut personnel after the merger, forcing him to cover a much larger territory than he had previously—adding Orange County and Bakersfield to his previous coverage in Los Angeles.  Eventually he was the only employee remaining in his branch.  And CW 17[23]—a Terminix Commercial Account Executive in Detroit—said that due to cuts after Rentokil's acquisition, he at one point became the sole commercial account representative in his branch for a full nine months, even though the branch covered a number of major accounts like the Detroit Zoo and a major convention center.  CW 17 described "*dysfunction*" and disorder after the acquisition,

---

[22] CW 16 worked as a commercial account executive for Terminix from July 2021 through October 2024 – i.e., both before and after Rentokil acquired Terminix. CW 16 worked for Terminix in southern California.

[23] CW 17 worked as a commercial account executive for Terminix from August 2021 through October 2024 – i.e., both before and after Rentokil acquired Terminix.  CW 17 worked for Terminix in Detroit.

and said that, consequently, business "***dropped off significantly without a shadow of doubt***."  He estimated that the Detroit branch lost at least 25% of its revenue in the first quarter after the acquisition, and said it "***continued to go downhill, that's why I stepped away from the company***."

### 4. Former Employees Confirm That The Utter Lack Of Competent Integration Led To Internal Competition And Sales Cannibalization

102.    Former employees also confirmed that—in direct contradiction to Defendants' numerous statements touting the success of the integration from an IT and operational standpoint— the merger integration was in fact so bad that the Company's systems could not even track the most basic information that a business must know: who its customers are.  In fact, while Defendants boasted of newly integrated IT systems that provided "detailed customer tracking," and "enhanced field sales tools" that "follow[] the sales process end to end," and an upgraded CRM system that allowed Company employees to "generate sales leads and upsell opportunities," numerous former employees explained that the exact opposite was true: the merger led to Rentokil cannibalizing its own sales, as Rentokil had no centralized way of tracking which customers already belong to Terminix vs. Rentokil or its sub-brands.  As such, Rentokil employees would poach Terminix customers and vice versa, leading to the appearance of new business but no actual benefit to the Company.

103.    For example, CW 18,[24] who worked under Rentokil's Ja-Roy pest control brand in Louisiana, said he had no way to know whether the accounts he was pitching were already Terminix accounts, even though he was instructed not to pitch Terminix customers.  CW 10 similarly explained that, because the Rentokil companies in his area (Magic, Suburban, and Arrow) were never integrated into the same CRM system as Terminix, there was no way to know if

---

[24]  CW 18worked for Rentokil in Louisiana under the Ja-Roy pest control brand from November 2023 to January 2024.

Rentokil's brands were competing against each other for the same customers.  CW 16, a Terminix commercial account executive in southern California, similarly saw cannibalization and internal competition due to a lack of ability to share information between Rentokil companies and Terminix – for example, he said that he would sometimes show up to perform an inspection and have a Rentokil representative show up at the same time because the customer had called both companies for an estimate.  He said that there was no system in place whatsoever to prevent this from happening.

104.    CW 7, a district manager in Florida, corroborated this, explaining that, for example, if you were with Rentokil's FPC brand and a customer called in to Terminix "you couldn't see their account" from FPC, and wouldn't know they were already an FPC customer. He said this remained true even after Terminix began to share spaces with Rentokil's other companies like FPC and Heron Pest Control.   And CW 5 similarly recalled that Rentokil's companies and Terminix continued to compete for the same customers, even when they were "co-located" on the same properties.  He confirmed that this happened because the companies' respective systems were not integrated and had no way of sharing information about customers.  He explained that, even by the time he left in October 2024, "*there were still Terminix people trying to outsell Rentokil people, and they were still acting like competitors rather than one entity*."

     **5.     A Senior Rentokil Executive Described How The Failed Terminix Integration Followed The Pattern Of An Another Major Acquisition, As Management Engaged In The Same Disordered IT Integration And Failed Cost-Cutting Strategies**

105.    According to one high-ranking Rentokil executive, the poor results from the Terminix acquisition were unsurprising, since Rentokil had already run this exact same acquisition playbook before, with similarly poor results.  Specifically, in 2017, Rentokil purchased control of the largest Indian pest control company, Pest Control India ("PCI")—a company with over $100

million in annual revenue. CW 19 was an AVP of Finance and Strategy who was specifically hired by Rentokil in 2018 to integrate the operations of Pest Control India into Rentokil.[25]

106.    CW 19 explained that he was unsurprised that Rentokil's claims of smooth integration progress and extensive "synergies" had turned out to be false, because he observed similar patterns in Rentokil's acquisition of PCI under Defendant Ransom's management. He explained: "I am very aware of Rentokil's culture and handling of acquisitions and how they manage and take that company forward post-acquisition. *Rentokil has a practice of forecasting a higher amount of revenue synergies than they actually achieve*."

107.    Specifically, CW 19 explained that Rentokil had forecasted a certain amount of revenue synergies that were going to be achieved post-acquisition of PCI. He explained that once Rentokil began its integration efforts, however, they realized that achieving those revenue synergies forecasted at the time of acquisition was difficult. As such, they would fire the acquired Company's CEO and cut personnel and other costs to save money and make profit margins appear higher, but at the expense of revenue growth going forward. As he explained, "*[t]hey lose much more than what they would have saved. They make very short-sighted decisions just to report quarterly profits*."

108.    CW 19 explained that, for example, Rentokil would cut "people cost" by firing sales personnel and trying to merge branches that were located within a certain distance of each other, but that this resulted in lost sales. One reason for this was that after Rentokil made personnel cuts at PCI, many of those personnel would simply go into business for themselves or for other companies, thus competing with Rentokil/PCI and eating into their revenues. CW 19 further

---

[25] CW 19worked at Rentokil from 2018 through January 2023 as an AVP of Finance and Strategy. He was based in Mumbai, India. He was specifically hired to manage the integration of PCI into Rentokil.

elaborated that Rentokil would use "ethical and unethical practices" to drive cost savings, including withholding commissions from pest control technicians.  CW 19 said that these same tactics were employed at Terminix, with predictably similar effects, and noted that, as with PCI, the Terminix North America CEO was fired when their revenue targets were not achieved.

109.    CW 19 explained that, not long after the acquisition, Rentokil "realized that they were never going to achieve those numbers" in their forecasts, that "***they knew those numbers were unachievable***," and said that "***the same thing happened with Terminix also***."  He said that, once that happens with a Rentokil acquisition, the person responsible for the acquired Company achieving the forecasts becomes the "scapegoat," with no examination of the underlying causes.

### F.    The Truth Is Gradually Revealed

#### 1.    September 11, 2024: Contrary To Their Repeated Assurances To Investors, Defendants Reveal That Rentokil And Terminix Remain "Two Separate Businesses" With "Two Operational Reporting Processes" and "A Lot of Work to Get These Systems Integrated"

110.    On September 11, 2024, before the market opened—and just six weeks after publicly proclaiming that they had successfully completed all milestones of Phase 2 of the integration—Rentokil stunned investors by issuing an unscheduled trading update.  The trading update disclosed a disastrous financial outlook for Rentokil's North America business and contradicted what Defendants had told investors as recently as July 25, 2024 about the purportedly strong progress of the Terminix integration.

111.    *First,* while Defendants had as recently as ***six weeks earlier*** claimed that they remained "firmly on track" toward full branch integration, with the "systems integration" fully "done" and "Phase 2 of the integration" purportedly "completed," Defendant Ingall-Tombs now admitted that the exact opposite was true: Rentokil and Terminix were still operating as "***two separate businesses***, ***which are largely at an operational front end***, ***not integrated yet***."  For

example, in an investor call held that day,[26] Defendant Ingall-Tombs explained that, far from being

on "a single set of systems," Rentokil remained seven separate "regions," each of which still lacked

rudimentary functionality such as tracking the operations and performance of Rentokil and

Terminix branches in a unified way.  Thus, Ingall-Tombs admitted that the integration was very

much "***still a work in progress, if I'm honest***," because "***what we have still got is 2 operational***

***reporting processes.  So – because we've integrated on a management basis, each of the 7***

***regions has a different flow of information from the operational system for either heritage***

***Rentokil or heritage Terminix***."  As such, Rentokil still had "***a lot of work to do to get these***

***systems integrated as we go through the next two years*** which will enable us to have a much more

holistic view of the performance of the business…."  Consequently, the Company's vaunted full

branch integration plans had made only minimal progress, because the Company's IT and other

systems were still not close to unified.

112.    *Second*, Defendants revealed that, under the strain of the stalled integration,

Rentokil's North America growth was at a standstill.  More specifically, Rentokil revealed that

"trading performance in July and August was lower than expected," and that it now expected its

North America Organic Growth to be ***an anemic 1% in the second half of 2024***, in spite of having

forecasted 2-4% growth as recently as six weeks earlier on July 25.  Indeed, during one of the

Company's investor calls that day, Defendant Ransom admitted that Rentokil's ***North American***

***sales were actually decreasing***, as 1% growth effectively meant a "***net volume decline***":

> …[W]e would expect to have market-leading margins once we get through the
> integration once we've got the sales engine turned around.  But it's taking clearly
> longer than we anticipated.  And in the end, ***if we're getting circa 1% growth, that***
> ***means we are seeing net volume decline, and we have to stabilize and start***
> ***reversing that volume decline in order to deliver on our margin objectives*** because

---

[26] Rentokil held two separate investor calls on September 11, 2024.  For narrative simplicity, quotes from both calls
are discussed together in this section.

in the end, we're a business that relies on density of customer routes, technician routes.  So we've got to get that going.

113.    *Third*, despite repeatedly touting the purported "cost synergies" that the merger provided the Company, Rentokil now admitted that the integration was so deficient that the Company's North America operations were experiencing "***higher sales, service and other costs***," such that North America adjusted operating profit margin outlook would be significantly reduced to just 17.2% (rather than the 19% most recently forecasted).  And in contrast to Defendants' previous positive statements touting the success of the Terminix integration, Rentokil now acknowledged "***disruption to organic growth from branch integration***."

114.    *Fourth*, while Defendants had previously blamed any slowdowns in Rentokil's North American growth on "market" and "industry" forces, Defendant Ransom now unequivocally admitted that this was ***not*** the case, that he had "***certainly not seen evidence … of a market-specific weakness***," and that it was in fact entirely Rentokil's company-specific "***execution challenges***" that had caused the poor North America growth, such that "***this is on us***."  Indeed, as Defendant Ransom admitted:

> ***I don't think it would be reasonable for us to point any of this at the market.  I've certainly not seen evidence nor heard anecdotally evidence of a market-specific weakness…we're not seeing that. So I can't point to that. This is a manifestation of execution challenges, execution -- a need to improve our execution.  It's not a market phenomenon… I don't think it's market I think this is on us.***

115.    *Fifth*, and significantly, Defendants admitted that they were in no way in the dark about these severe issues, as they had been fully aware of these "execution challenges" in the integration during the Class Period due to their "good visibility" into the process.  For example, Defendant Ingall-Tombs emphasized that "***we've got reasonably good visibility***…You've recruited the people, you've acquired the stock and therefore, you either get the revenue to deal with that or you don't. And ***if you don't, then clearly, you've got the sort of issue that we've got. So that's not***

*really a visibility issue…*this is a fact that the revenue just hasn't turned up for us to support a level of investment that we committed to *…. the core of this is not a visibility issue*." Incredulous at this response, an analyst on the call noted the "*disconnect…between having reasonably good visibility and then having quite a big profit warning again in Q3*."

116.    In response to Defendants' September 11, 2024 disclosures, Rentokil's ADS price plummeted 21% in one day, or $6.65 per ADS, from $31.60 per ADS on September 10, 2024 to a close of $24.95 on September 11, 2024, on extraordinarily high volume.

117.    Analysts were astonished by the Company's disclosure and pointedly noted that it raised serious questions about the veracity of management's prior representations to investors concerning the progress of the merger integration.  For example, Deutsche Bank noted that "*today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims*."  Deutsche Bank further emphasized that the Company's problems represented "self-inflicted blows" to its North American business, noting that "[t]he bulk of the downgrade [to forecasts] is attributed to North America, where revenue growth in 2H24E is now expected to be c. 1% versus previous guidance of c. 3%."  Similarly, Jefferies highlighted that the "unscheduled trading update warning on weaker growth and profit expectations in [Rentokil's] North America Business . . . *will raise further questions on management control and visibility in the region*," particularly given the "*lack of growth recovery despite additional investment*" in the Company's business and the fact that Rentokil remained "*at an early stage in the branch integration progress*," which "will *be seen as a concern by the market*."

118.    UBS headlined its September 12, 2024 report "*Integration pains, execution wanes. Cut [Price Target]*," which emphasized the "Tougher Terminix integration" and "*the long period of integration ahead*."  UBS further underscored that the issues the Company was facing were

self-inflicted, noting that "*[m]anagement were clear that this is an execution, not market issue*," and that "*our concern is that there is still a long way to go in the integration process…*." Likewise, HSBC pointedly questioned how management could not have known about these issues earlier, noting that there were "a number of recurring themes in the questions investors wanted to discuss with us post trading update" including "*the timing of the profit warning*" and "whether integration is going to further hinder organic growth in the future." Calling into doubt management's explanations, HSBC described "*confusion*" and "*[p]lenty of questions… and not too many answers*," given management's recent representations "*discussed in late July*" in the Company's interim financial report. Citi also emphasized the disparity between management's recent representations to investors and the Company's disclosure, headlining its report "*A Series of Unfortunate Events*," and noting that "[d]espite talking about encouraging momentum at their interims on 25 July, management downgraded 2H PBI expectations by c20% due to weaker trading in July and August, *which significantly dents credibility*."

119. In a report the following week, on September 17, 2024, RBC Capital Markets lambasted management credibility and expressed that they were "*very surprised*" and "*flabbergasted*" by the disclosure, noting their "confidence [was] waning" and that "*management credibility has taken a further dint*." RBC further emphasized that "the fact remains that over the last few quarters, we have seen significant negative EPS momentum, *and management keeps missing its targets. Hence, we think management have a tough task to rebuild credibility.*"

120. Notwithstanding these revelations, however, Rentokil management minimized the significance of the severe problems plaguing the Terminix integration and still sought to portray that the Company was making good progress on the integration. For example, while Defendant Ransom conceded that—contrary to his prior statements—the IT systems integration was *not*

complete, Ransom maintained that the IT systems integration "*continues to go well*."  Ransom further suggested that while "when you change systems, inevitably, *there is some disruption*," this disruption was nothing more than a "*small element*" that the Company experienced.

121.    Similarly, in response to an analyst question about "execution on the integration so far" and whether "there's anything in there that you think you need to sort of rethink around that branch strategy, particularly closing some of those smaller branches," Defendant Ransom responded "*[w]e've done very, very significant heavy lifting on systems integration, moving historic Terminix branches and Terminix systems onto the new platform*.  That's very complex, very multifaceted [and] *that has gone extremely well so far*…*Lots and lots of issues have popped up, but the vast majority have all been resolved very, very, very quickly*."  Thus, as to whether Rentokil could still "migrate Terminix branches on their IT stack, onto the new IT stack without major drama," he explained "*the answer would appear to be a strong yes*," and therefore there was purportedly "*no change*" to the branch integration plan.

### 2.    Rentokil "Reviews" Its Integration And Delays Its Promised "Synergies" And Its CFO, North America CEO, And Three Other North America Executives Resign Within Three Months

122.    Despite Defendants' attempts to minimize the significance of the integration's problems, Defendants' actions told a different story.  Indeed, over the next five months, Rentokil would announce that no fewer than five C-suite officers of the Company—each of whom was directly responsible for overseeing the Terminix integration—either resigned from the Company or were reassigned to other positions.

123.    For example, on October 17, 2024, Rentokil released its financial results for the third quarter of 2024.  Among other things, Rentokil announced that, in light of the integration problems it was experiencing, it would now conduct an in-depth "review" of the Terminix integration, stating that "during Q1 2025 we will review our optimal branch network footprint" for

North America, and revealing that the vaunted "synergies" it had promised throughout the Class Period would be further delayed—*i.e.*, that "[t]he review will result in 2025 synergies being pushed out by approximately 2 to 3 months." Notably, Rentokil announced it had replaced its North America CFO, Jason Coyle, and its North America Chief Operating Officer, Eric Rimiller, both of whom departed the Company. In addition, Rentokil's North America Chief Marketing Officer was replaced and reassigned to another position within the Company.

124. Just over a month after Rentokil announced that it would be conducting a review of the Terminix integration, the Company announced that the senior-most officers responsible for the integration would also be a part of the termination exodus. Specifically, on November 25, 2024, Rentokil announced that its CFO, Defendant Ingall-Tombs, would resign effective January 1, 2025. Two months later, on January 28, 2025, Rentokil announced that Rentokil's North America CEO, Defendant Paulsen, would resign from the Company despite serving only a little over a year in his position. Rentokil further issued a trading update that again reported near-flat organic revenue growth in North America.

### 3. March 6, 2025: Rentokil Does An Abrupt "U-Turn," Admitting The Terminix Integration Was A Failure And Scrapping Its Plan

125. On March 6, 2025, the full truth was revealed when Rentokil released its 2024 Preliminary Results filed with the SEC on Form 20-F. Strikingly, the disclosure revealed that the integration had been an abject failure—and in fact, its progress was so deficient that the Company was now reversing itself and admitting that there would, in effect, be no integration at all.

126. Specifically, on this date, Rentokil announced a stunning reversal of its "integration strategy," essentially abandoning its plan to combine and "fully integrate" hundreds of branches under the Rentokil and Terminix brand names. Acknowledging that "***executing [the integration] has clearly impacted our North American business performance***," and on the heels of an

"integration strategy review," Rentokil announced that, rather than consolidate all of its numerous brands under the Rentokil and Terminix brands, it would now reverse course and adopt a "***revised brand strategy***" where it would "***focus on 9 regional brands***, plus national Rentokil and Terminix brands." In other words, contrary to Defendants' repeated representations throughout the Class Period, the Company would maintain its disparate regional brands "***rather than merging them over time with Terminix***." Moreover, rather than fully integrating and consolidating the Company's many Rentokil and Terminix branches into a network of just 400 branches, Rentokil announced a "***revised branch strategy***" that would maintain "***over 500 [branches] including satellites***," as well as an additional "***over 100 franchise-owned and operated Terminix branches in the US***."

127. Due to the Company's serious integration problems, Rentokil also gave further details on its "Q1 2025 Terminix Integration review," whereby it was "reviewing the progress made to date with the integration and the priorities for the next phase." Indeed, the problems with the integration were so severe that Defendants admitted that they were forced to pause any further movement on the "full branch integration process," which was now "planned to restart in early H2 2025" in its dramatically reduced form.

128. And further, in a striking reversal of its previous emphasis on hundreds of millions of dollars in "synergies" that Rentokil's merger with Terminix would supposedly generate for the Company, ***Rentokil now abandoned its synergies metrics entirely***, acknowledging that it could not clearly identify such synergies as they were wholly "subjective." Specifically, Rentokil announced that "[t]hree years post the acquisition announcement of Terminix, and going forward ***we will not report separately on net synergy delivery***" because Defendants now deemed such an exercise as being "***overly subjective***."

54

129.    Significantly—months after explicitly representing to investors that Phases 1 and 2 of the integration were complete, and that Rentokil's and Terminix's respective IT systems were fully integrated—Defendants now admitted that the Company *still* had not achieved these foundational milestones and would not even come close to doing so for at least another six months.

130.    Specifically, on the earnings call the same day, Defendants admitted that, while they had previously claimed that the Company's IT systems had been fully integrated by July 2024, in reality, such integration would not occur until the second half of 2025.  For example, Defendant Ransom explained that "***the integration program is now planned to restart early in the second half [of the year] by which time the core IT developments will be essentially completed***."  Moreover, Ransom further admitted that even as of March 2025, only "***around 15% of the Terminix branch network has now been fully integrated***" into the Company's systems.  Ransom acknowledged that the systems integration had been "***a significant lift for the organization and there's much work ahead of us***," and thus the full integration of Terminix—even in its now dramatically limited form—was no longer targeted to be complete until "the end of next year," or the end of 2026, a full 19 months at least after this disclosure.

131.    During the call, analysts expressed incredulity at the failure of the integration.  For example, Bank of America Securities pointedly questioned: "***what has been the challenge in rolling out these systems…why are we still at the 250 branches?***"  Tellingly, Defendants failed to answer the question.  Similarly, a Jefferies analyst noted the magnitude of Defendants' integration pivot and the length of time that it took for Defendants to announce the failure of the integration: "***obviously we're 2 years in to the integration.  There's a lot changing, I guess, again, now digital leads and conversions are still weak.  The sales incentives [are] still to change.  Your brand and branch strategy is changing today***."  In response, Defendant Ransom admitted that Defendants

were still "*hacking our way through the jungle here of integration*," and that they "*had to do some pretty extensive work on IT systems*."

132.    Further, when a UBS analyst who asked "*how many branches do you now have in North America?  What's that number?*"—Defendant Ransom could not provide a clear answer, explaining "*[t]hat's one I'm going to duck*," while noting that the number of locations was "in a state of flux."  Ransom explained that the Company might even wind up with significantly more than the disclosed over 500 branches that it now contemplated, explaining that he "wouldn't rule out" a much higher branch number than initially contemplated.

133.    On this news, Rentokil's ADS price fell another 10%—or $2.50 per share—from a close of $25.15 on March 5, 2025 to a close of $22.65 on March 6, 2025, on unusually high volume.

134.    Following the call, analysts continued to express disbelief at the magnitude of Defendants' disclosures.  For example, Citi noted that the Company's "*lack of US progress disappoints*," and highlighted in particular the "*branch strategy U-turn*," with management now contemplating a "footprint of 500 branches."  Citi further emphasized that "[l]ead flow in North America remains weak," and opined that "[w]ith the group still looking to appoint a new head of North America, *it seems operationally the business remains challenged 4 years after the announcement of the [Terminix] deal in December 2021, which could be described as underwhelming* and could potentially lead to further management  change."

135.    Several analysts also underscored the Company's about-face regarding its decision to no longer report or guide on the hundreds of millions of dollars in so-called merger "synergies" that Defendants incessantly touted to the market for the better part of four years.  For example, UBS noted that "*investors may have concerns about the softer start to the year in NA Pest, as well as the limited visibility on the building blocks to >20% [North America] margins post-*

56

*integration*." RBC similarly noted that there had been several "***about-turns on branding, branch numbers***" and other key aspects of the integration, and took this as "***an admittance that the original plan wasn't working***."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

136.    During the Class Period, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Rentokil's trading updates, SEC filings, and analyst and investor presentations included material misstatements and omissions concerning the status and progress of Rentokil's integration with Terminix. These material misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of Rentokil's business and its ability to successfully integrate Terminix. In truth, Defendants knew throughout the Class Period that Rentokil was experiencing significant and widespread problems with the Terminix integration—issues that Defendants deliberately concealed from and actively misrepresented to investors.

### A.    Rentokil's October 19, 2023 Trading Update

137.    On October 19, 2023, Rentokil issued a Trading Update for the third quarter of 2023. In the Trading Update, Defendants made a series of false statements touting the progress of the Terminix integration. For example, the Trading Update touted "***[c]ontinued good progress on Group strategy and the integration of Terminix ...***" and stated that "***[d]elivery of the Terminix integration plan has progressed well in the third quarter and the cost synergy programme is on track to meet full year guidance of $60m of pre-tax net P&L synergies***." The Trading Update further stated, "[w]e remain confident in the significant benefits of the combination with Terminix ***and are on course with our integration plans ... The Terminix integration programme continues***

*apace and we remain firmly on course to deliver our full year pre-tax net cost synergy guidance of $60m year over year*."

138.    The statements in paragraph 137 were materially false and misleading and omitted material facts.  Contrary to Defendants' wholly positive statements touting that the integration was "continu[ing] apace" and that Defendants were "on course with our integration plans," in reality, the exact opposite was true.  Indeed, as dozens of former Rentokil and Terminix employees located across the country attested, at the same time that Defendants were making these statements, internally the Terminix integration was experiencing severe and pervasive problems.  For example, as CW 1 recalled, in 2023, the integration produced "***huge billing issues with big [commercial] customers***," Rentokil's "***system was not working in the field or in the office***," and as a result, the Company "***lost customers left and right by the tune of hundreds [or] thousands of customers***."  As CW 1 succinctly stated, "***[t]he integration was a disaster***," and he knew "***right away that it was a sh\*t show***."  Numerous other branch and area managers from across the country provided corroborating reports regarding the integration's issues.  In fact, these former employees recalled that the integration experienced such significant problems in 2023 that Defendants were forced to delay integration milestones and push them out into 2024: Defendants "***had to keep pushing out the [integration] dates.  It was a disaster***."  Notably, these problems and delays were so widespread and well-known throughout the Company that Defendants convened "town hall meetings" during which Defendant Paulsen discussed the fact that the Company was facing serious delays in executing its integration plan (or "road map").

139.    Moreover, it was materially misleading for Defendants' October 19, 2023 trading update to tout the purported tens of millions of dollars in so-called "synergies" that the merger was supposedly providing to the Company.  In reality, the merger integration was not producing true

"synergies" in any sense; rather, any cost savings that the Company was experiencing were the result of mere short-term cost-cutting measures that temporarily inflated profit margins, but that produced such profound customer service and operational failures that they led to significant lost sales. Indeed, numerous former employees from across the country confirmed that Rentokil's substantial cuts to marketing, personnel, customer service and other areas in 2023 failed to create any "synergies" at all and instead "*had a huge impact*" on sales—to the point that "*[e]very single branch was losing anywhere from 10% to 15% just on pest control services alone*." These former employees told similar stories of cutting personnel and requiring single employees to cover large territories to cut costs, which negatively impacted sales and growth. As one Area District Manager stated: "*I didn't see any [synergies] at all*." Tellingly, by the end of the Class Period, the merger integration had proved so financially ruinous—and had abjectly failed to produce any meaningful synergies whatsoever—that Rentokil's new CFO admitted that the Company could not identify any synergies at all and would cease reporting them to the market moving forward.

### B. Rentokil's March 7, 2024 Financial Results

140. On March 7, 2024, Rentokil issued a press release (which it filed with the SEC on Form 6-K) announcing its financial results for fiscal year 2023, which again touted the Company's "very good progress" on the integration. Specifically, the March 7, 2024 release announced that Rentokil had completed numerous "substantial" and highly specific milestones as part of Phase 1 of the Terminix integration, proclaiming that "*Phase One of the integration [was] completed at the end of 2023 and has delivered the foundations for success*." Significantly, Defendants emphasized that these "substantial" milestones involving the combined Company's "IT systems and products" included "*71 foundation IT system enhancements*"; a new customer communications tool that "better empowers our call agents with detailed customer tracking"; "enhanced field sales tools" that "*follow[] the sales process end to end*"; an upgraded CRM

59

platform that improved service technicians' ability to "generate sales leads and upsell opportunities"; and a "big data platform" that would "*allow for Terminix data to be integrated and increasingly provide actionable analytics from across our entire branch network*."

141.   During the Rentokil earnings call the same day, Defendants emphatically touted the significance of these numerous IT and operational milestones in completing Phase 1 of the Terminix integration.   Indeed, Defendant Ransom again touted the integration's "progress," emphasizing that "*We've now completed Phase 1 of the integration program*."   Similarly, Defendant Ransom triumphantly proclaimed that the completion of Phase 1 had successfully "*streamlined and unified the organization to create a single Rentokil Terminix team*," and touted that the Company was already well into "Phase 2 of the integration plan, which is the local planning phase ahead of full branch integration":

> *We've streamlined and unified the organization to create a single Rentokil Terminix team.* We've delivered a single payroll and benefit system for all 22,000 colleagues. We've moved 10,500 colleagues on to Workday. So all of our colleagues are now on a single people management system . . . *we've now entered Phase 2 of the integration plan, which is the local planning phase ahead of full branch integration*.

142.   The statements in paragraphs 140-41 were materially false and misleading and omitted material facts.   *First*, contrary to Defendants' representations that Defendants had successfully "completed Phase 1 of the integration program," and that as a result, Defendants had now "streamlined and unified the organization to create a single Rentokil Terminix team," in reality, the exact opposite was true.   Indeed, as Defendants explicitly admitted on September 11, 2024, the integration had progressed so poorly throughout the Class Period that even at that late date, Rentokil and Terminix were "*still operating as two separate businesses*," with "*2 operational reporting processes*" and "*each of the [Company's] 7 regions ha[ving] a different flow of information from the operational system for either heritage Rentokil or heritage Terminix*."   In

Defendants' own words, even six months after those statements were made, the merger of Rentokil and Terminix remained "*largely at an operational front end, not integrated yet*." Thus, it was materially false and misleading for Defendants to make these wholly positive representations about the merger integration process without disclosing these highly material facts.

143.    *Second*, Defendants' statements touting their purported "substantial" integration milestones were likewise materially false and misleading. Indeed, as discussed herein, numerous former employees from Rentokil and Terminix locations around the country—including Florida, Arizona, Ohio, Kentucky, Mississippi, and numerous other states in the Northwest and Central regions—reported severe, pervasive and persistent problems in each of these IT and operational areas throughout 2023 and 2024. For example, the Company's field sales tools did *not* allow employees to "follow the sales process end to end"; rather, employees reported a host of problems materially impacting those very processes, including "*huge billing issues with big [commercial] customers*," which resulted in the Company "*los[ing] customers left and right by the tune of hundreds [or] thousands of customers because no one was trained on the system, and the system was not working in the field or in the office*."

144.    Similarly, the Company's purportedly "upgraded" CRM platform was *not* allowing employees to "generate sales leads and upsell opportunities," as the reality was the exact opposite. CWs reported lost customer and sales data because disparate CRM platforms "didn't communicate" with each other, and as a result, "*we ended up losing a lot of customers because of billing issues. The cancellations just kept coming*." In fact, these customer management tools were so poorly integrated that the Company could not perform some of the most basic functions of a business, including even identifying which customers were already being serviced by Rentokil or Terminix to prevent sales personnel from cannibalizing each other's sales. Former employees

61

reported other significant problems as a result of the deficient integration, including unmigrated customer and sales data, missed service calls, massive glitches in Company software, and automatic emails being sent to 12,000 customers falsely stating that their contracts were being canceled. Thus, by ***2023***, it was clear that "***[t]he integration was a disaster***," and "***anybody that said [the] integration was going smoothly – that's a lot of horsesh\*t***."

145.   Also during the March 7, 2024 earnings call, Defendants again touted the purportedly massive "synergies" that the merger was supposedly producing for the Company, even going so far as to materially increase the total synergies target that Defendants purportedly expected to produce from the merger, which at this point had ballooned from an initial target of $150 million to $225 million. Specifically, Defendants emphasized that they "***announced a second increase in the target for the total value of integration cost synergies from the integration of Terminix ... the net synergies target is increased by $25 million to $225 million***."

146.   Defendants' statement in paragraph 145 was materially false and misleading and omitted material information. Again, it was materially misleading for Defendants to tout any purported "synergies" from the merger integration because, in reality, any such cost-saving "synergies" were the product of short-term cost-cutting measures that temporarily inflated profit margins at the expense of sales growth. Indeed, as noted herein, former employees confirmed that they did not observe any true synergies from the merger; rather, Defendants' substantial cuts to marketing, personnel and other areas "***had a huge impact***" on sales, as "***[t]he customer service lacked, it got worse, they had no leadership***," and it led to a situation where "***[e]very single branch was losing anywhere from 10% to 15% just on pest control services alone***." As a Florida Area District Manager summed up: "***I didn't see any [synergies] at all***." In fact, and tellingly, by the end of the Class Period, the merger integration had proved so financially disastrous—and had

abjectly failed to produce any meaningful synergies whatsoever—that Rentokil's new CFO admitted that the Company could not identify any synergies from the merger at all, and thus the Company would cease reporting them to the market moving forward.

      C.    **Rentokil's April 18, 2024 First Quarter Trading Update**

147.    On April 18, 2024, Rentokil issued a First Quarter 2024 Trading Update, which it filed with the SEC on Form 6-K. The Trading Update announced that "***the Terminix integration plan***" was "***in the advanced stages of preparation for the first full branch integrations commencing mid-year***," and, similarly, that the "[T]erminix integration plan ***saw further progress towards full branch integration starting mid-year***." Moreover, Defendants again made highly specific statements about the purported progress of the integration of Rentokil and Terminix's systems, including "***[g]o live of the new combined general ledger and internal reporting systems, facilitating integrated performance management,*** and continued progress on the development of the operational technology stack."

148.    Also on April 18, 2024, Rentokil held an investor call, during which Defendant Ransom reiterated that "***our integration program is on track***" and reaffirmed organic revenue growth guidance of 2-4% for North America. When analysts specifically questioned Defendants' confidence in the progress of the integration and whether guidance included any possible disruptions caused by the integration, Defendant Ingall-Tombs doubled down, insisting that "***that's still our outlook. That's still what I'd expect. So I'll reiterate the guidance***."

149.    The statements in paragraphs 147-48 were materially false and misleading and omitted material information. In truth, the integration was *not* "on track"; the Company had *not* seen meaningful progress towards full branch integration, let alone being in "advanced stages of preparation for the first full branch integrations"; and Rentokil decidedly did *not* have "combined…internal reporting systems" or "integrated performance management." Indeed, as

Defendants would later admit on September 11, 2024—five months after making the above representations to investors—the reality was the exact opposite, as the Company did not even have the most basic operational processes necessary to integrate the two companies. As Defendant Ingall-Tombs acknowledged, the Company was still operating as "***two separate businesses***, which are largely at an operational front end, ***not integrated yet***" and had "***2 operational reporting processes***," whereby "***each of the 7 regions has a different flow of information from the operational system for either heritage Rentokil or heritage Terminix***." As such, even five months after claiming that the Company had successfully "combined" and "integrated" reporting and performance management systems, Defendants admitted that Rentokil still had "***a lot of work to do to get these systems integrated as we go through the next two years***." And as late as March 6, 2025—nearly a year after Defendants made the above representations—Defendants acknowledged that the integration was so profoundly and fundamentally deficient that the Company's IT and reporting systems remained completely unintegrated, to the point where Defendants were forced to completely reverse course and abandon their plan to integrate hundreds of Rentokil and Terminix branches.

150.    Moreover, as discussed herein, Defendants' admissions were entirely consistent with the independent accounts of numerous former employees, each of which explained that during this timeframe, the Company's integration was facing massive delays, its integration attempts thus far had been plagued by failures, and its IT systems were still far from integrated—causing massive disruptions and harming sales and service. As CW 1—who was responsible for ten midwestern branches that the Company was trying to integrate in 2023 and 2024—explained, "***[t]he integration was a disaster***"; the Company experienced "***had huge billing issues with big [commercial] customers, so we lost a ton of customers***"; and "***we lost customers left and right by***

*the tune of hundreds [or] thousands of customers because no one was trained on the system, and the system was not working in the field or in the office.*" Other former employees in Florida, Georgia, Washington D.C., Arizona, Ohio, Kentucky, Mississippi, and numerous other states in the Northwest and Central regions provided nearly identical accounts of unmigrated customer and sales data, missed service calls, massive glitches in Company software, and automatic emails being sent to 12,000 customers falsely stating that their contracts were being canceled. These CWs described "*huge issues getting the systems to talk to each other*," and reported "*errors all the time*" creating numerous glitches, including that "*[w]e couldn't take payments [] and documentation would not load up*." As a result of these catastrophic integration issues, the Company experienced massive delays in integration milestones: "*[t]hey had to keep pushing out the dates. It was a disaster*." Significantly, these former employees confirmed that Rentokil's severe integration problems persisted at the time Defendants made their statements, and even into late 2024 and early 2025.

151. In addition, under these circumstances, it was materially misleading for Defendants to reaffirm their guidance under the pretense that the integration was progressing smoothly. Indeed, Defendants had no reasonable basis to confidently reaffirm guidance and to claim they had already "included" the potential impact of any integration disruptions in their guidance in light of the massive disruptions they knew the integration was already causing at the time and the impact this was already having on sales and growth. Indeed, just five months later, on September 11, 2024, Defendants revealed sales volume was actually *declining* and that its revenue growth was near flat due to "disruptions" from the integration. Moreover, within a year, Defendants admitted that the integration had been so detrimental to the business that they had been forced to entirely abandon their branch integration plans.

### D.    Rentokil's July 25, 2024 Interim Financial Results

152.    On July 25, 2024, Defendants unequivocally asserted to the market that they had successfully completed Phase 2 of the integration, which featured several additional critical milestones that culminated with Rentokil and Terminix now purportedly on a "***single set of systems operating well***," with "***100% colleagues and customer data migrated***," and an immediate "***green light***" for full branch integration, which was already successfully underway.   Specifically, on that date, Rentokil issued its interim financial results release for the first half of 2024, which it filed with the SEC on Form 6-K.  The release quoted Defendant Ransom as stating that the "***[t]he North America integration has made strong progress, with the first branch integrations and synergies delivered firmly on track***."

153.    On that same day, Rentokil held an investor call during which Defendant Ransom again emphasized the "***excellent progress we're making on the integration***," triumphantly touting that "***[i]n the first half, we completed Phase 2 of the integration, which included the detailed preparation of the branch integration program***."  Defendant Paulsen—the North America CEO now in charge of the integration—further reaffirmed this completion of "Phase 2" of the integration, asserting that, "***[i]n the first half of this year, we have completed Phase 2 of the integration plan to prepare and test for branch integrations in which we … developed and tested 22 systems with 190 features to enable the integrations and harmonize multiple business processes, contracts and applications***."   Regarding the integration, Paulsen rhetorically asked himself "So how is it going?" and responded, "***In short, very well.  We have a single set of systems. Data has been migrated***.  ***Sales leads are flowing as they should.  Work orders are completed***." As such, Paulsen claimed, "[i]t has been an outstanding second quarter of progress, ***rounded off by the green light for the first branch integrations***."

154.     In slides accompanying the earnings call, Defendants similarly touted that Phase 2 of the integration had been "*completed on schedule at the end of H1 2024*," and set forth in exacting detail a plethora of critical integration milestones that had purportedly been successfully completed.  For example, Rentokil emphasized it had completed "*22 systems developed to enable integrations to commence in June with over 190 features*," which included "*shared reporting and KPIs for field leadership*," and "*[u]pdated financial systems to provide a shared view of financials*." And, critically, the slides assured investors that these critical features were operating successfully, as they had "*all [been] successfully tested and deployed*."  As a result, Defendants' slides proclaimed that they had a full "*green light*" for the "first branch integrations," which were already having a "*good start and on schedule*" with a "*single set of systems operating well*," "*100% colleagues and customer data migrated*," and "sales lead flow working well."

155.     Strikingly, during the same call, Defendant Ransom now unequivocally asserted that the two companies' systems were fully integrated.  Indeed, Ransom emphatically stated that the accomplishment that he was "*most excited about*" was that the "*systems integration*" *was* "*done*"—which he took pains to emphasize was an "*enormous task*" that the Company "*ha[d] to*" complete in order "*to integrate this business fully and properly*."  Ransom emphasized that this essential IT integration was not only "*done*," but had "*gone really, really well*:"

> The thing that I'm really most excited about in the second quarter is *we've done the systems integration*. I know that might not sound a big thing to many of you, but *it is a big thing.* So to integrate this business fully and properly, we have to do two things. *We have to get the systems fully integrated. That is an enormous task, an enormous task, so many things that have to be done well.  And that has gone really, really well. So we've now got an IT stack that we've converted Terminix colleagues from their system into the new system. We've converted standalone acquisitions to the new system. We've converted commercial, residential, termite to the new system*.

156.     In addition, Ransom made crystal clear to investors that not only were the systems now combined and implemented, but that they were functioning smoothly and with all glitches

resolved.  Specifically, Ransom explained, "[w]e have had multiple day one glitches, *every single one of which has been resolved and put to bed*."  And further underscoring the significance and magnitude of these achievements, Ransom exclaimed "*my goodness me, that's a big tick to say you've got the systems integration done. Well done, good, excellent*."

157.    Defendants' statements in paragraphs 152-56 were materially false and misleading and omitted material information.  In truth, Defendants had absolutely no credible basis to so vociferously claim that Rentokil and Terminix had "done the systems integration" unified under a "a single set of systems" that were "operating well," that "100% [of] colleagues and customer data [had been] migrated," that there was "shared reporting" and "shared view of financials," and that all of the integration's critical IT and operational features had been "successfully tested and deployed."  In short, Defendants had no basis whatsoever to claim that the integration was "on track" or "excellent" in any meaningful way.  Instead, a wealth of evidence demonstrates that the exact opposite was true.

158.    Indeed, as Defendants admitted a mere *six weeks later* on September 11, 2024, the Company was still operating as "*two separate businesses*, which are largely at an operational front end, *not integrated yet*."  Moreover, in stark contrast to Defendants' claim that the Company had completed "IT stack" integrations such as "shared reporting and KPIs for field leadership," and "updated financial systems to provide a shared view of financials**,**" Defendants admitted the opposite was true: Rentokil still had "*2 operational reporting processes*," whereby "*each of the 7 regions has a different flow of information from the operational system for either heritage Rentokil or heritage Terminix*."  As such, Defendants admitted that Rentokil still had "*a lot of work to do to get these systems integrated as we go through the next two years*."  And undermining any notion that Defendants had a credible basis to claim that they had successfully

completed the foundation for completing full branch integrations, on March 6, 2025—*eight months* after Defendants made the above representations—Defendants admitted that the integration had was so fundamentally deficient that the Company was forced to completely reverse course and abandon its plan to integrate hundreds of Rentokil and Terminix branches, including maintaining separate "*regional brands[] rather than merging them over time with Terminix.*"

159.    Moreover, as numerous former employees—including IT executives, region managers, district managers, and branch managers from around the country—confirmed, Rentokil had decidedly *not* "resolved" or "put to bed" "every single one" of the systems' "glitches."  Instead, the integration of Rentokil's "systems" and "IT stack" was an abysmal failure, as there were "*huge issues getting the systems to talk to each other*" and "*errors all the time*" that created numerous operational and customer service glitches.  As a result, "*[w]e couldn't take payments [] and documentation would not load up,*" and these IT failures caused missed service calls, accidental contract cancellations, and other customer service problems that rapidly drove down sales.  As one former employee explained, "*we ended up losing a lot of customers because of billing issues [due to the IT problems].  The cancellations just kept coming*."  Another former employee, CW 1, explained that "*[t]he integration was a disaster,*" "*we lost customers left and right by the tune of hundreds [or] thousands of customers*" because "*the system was not working in the field or in the office,*" and as a result, "*[w]e had huge billing issues with big [commercial] customers, so we lost a ton of customers*."  Significantly, these former employees confirmed that Rentokil's severe integration problems persisted at the time Defendants made their statements, and even into late 2024 and early 2025.

### E.    Rentokil's September 11, 2024 Trading Update

160.    On September 11, 2024, Rentokil released an unscheduled Trading Update, and held two investor calls the same day during which it discussed the progress of the Terminix

integration and reported disappointing North America growth and guidance.  In sharp contrast to Defendants repeated representations touting the progress of the integration, Defendants now acknowledged that Rentokil and Terminix were still operating as **"**two separate businesses, which are largely at an operational front end, not integrated yet," and that they had "two operational reporting processes," such that "each of the 7 regions has a different flow of information from the operational system for either heritage Rentokil or heritage Terminix."

161.    Notwithstanding these admissions, Defendants sought to stem the market's negative reaction to their disclosure by minimizing any problems with the integration. Specifically, Defendant Ransom maintained that "*[t]he integration is going well*... *we were really pleased with the systems integration*, which is the main cutover to move Terminix branches onto the new single IT stack. *That continues to go well*."  And while Ransom further claimed that while "inevitably, *there is some disruption*" emanating from the integration that could contribute to the "organic weakness" that the Company reported, he made clear to investors that "*[i[t's more accurate to say a small element of it is*."  Indeed, Ransom insisted that mentioning this disruption was "not to call anything specific out. It's certainly *not to call out any major concerns*."

162.    Similarly, in the second earnings call that day, analysts again questioned whether Defendants' disclosure signaled problems with the integration, *e.g.*, with "early branch integration," and whether there was anything "you're seeing that may be different from expectations," or any "need to sort of rethink around that branch strategy."  In response, Defendant Ransom again assured investors that there was no major cause for concern from the integration, *i.e.,* that there was "*not a lot to tell on the integration story so far*," because the Company had "*done very, very significant heavy lifting on systems integration*," and that this had gone "*extremely well*" with issues "*resolved very, very, very quickly*":

*…[T]here's not a lot to tell on the integration story so far*. The … original pilots that we did some time ago, we had -- we did them [to] see what we could learn to find out where the pinch points were, and we learned a tremendous amount. So *we've avoided those pinch points in the integrations we've done so far*. So to be clear, what have we done so far? *We've done very, very significant heavy lifting on systems integration, moving historic Terminix branches and Terminix systems onto the new platform. That's very complex, very multifaceted that has gone extremely well so far. Lots and lots of issues have popped up, but the vast majority have all been resolved very, very, very quickly*.

163.    Similarly, Defendant Ransom assured analysts that, to the extent there had been "levels of disruption" in the integration process, "*we've remediated the vast majority of that*."

164.    The statements in paragraphs 161-63 were materially false and misleading and omitted material information.  Indeed, contrary to Defendants' representations seeking to minimize any perceived problems with the integration process and assuring investors that the Company had "remediated the vast majority" of any such issues, which had been "resolved very, very, very quickly," in reality, the exact opposite was true.  As Defendants would admit a mere six months later, on March 6, 2025, the integration was an abject failure, as only "*around 15% of the Terminix branch network [was] fully integrated*" into the Company's IT systems and the systems integration had been "a significant lift for the organization…*[with] much work ahead of us*."  In fact, the integration was so deficient that the "core IT developments" of the integration would not be completed until the second half of 2025, and the full Terminix integration plan—in greatly reduced form—was *no longer targeted to be complete until "the end of next year"—i.e., the end of 2026*.  Further, Defendant Ransom admitted that Defendants were still "*hacking our way through the jungle here of integration*," and that they "*had to do some pretty extensive work on IT systems*."  In sum, Rentokil's integration of Terminix was so fundamentally deficient that the Company would be forced to scrap entirely its plan to combine Rentokil and Terminix branches and instead announced a "revised branch strategy" pursuant to which the Company would maintain

over 500 branches (and likely far more) that would remain separate and unintegrated—including, tellingly, maintaining separate "*regional brands[] rather than merging them over time with Terminix*"—thereby abandoning one of the primary rationales for the merger itself.

165.    Moreover, Defendants' statements on September 11, 2024 stand in stark contrast not only to their own later admissions, but also to the consistent, corroborating accounts of numerous former employees discussed herein.   These former employees confirmed that, by September 2024, Rentokil's integration of Terminix's systems was still plagued by severe and pervasive errors and incompatibilities, including failed IT system integrations that created "*errors all the time*" because there were "*huge issues getting the systems to talk to each other*."   These failures caused missed service calls, accidental contract cancellations, inability to "take payments" from customers or even to "load up" customer information, and other customer service problems that rapidly drove down sales, such that "*we ended up losing a lot of customers because of billing issues.  The cancellations just kept coming*."   Consequently, as CW 3 put it, "*anybody that  said [the] integration was going smoothly – that's a lot of horsesh*t*."

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

166.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the Terminix integration and their North America business were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

167.    *The Terminix Acquisition Was The Largest And Most Important Transaction In The Company's History And The Key To Its Growth Strategy*.   Defendants explicitly touted the magnitude and significance of the Terminix acquisition to investors, stating in announcing the transaction that it was "*by far…the biggest and most strategic acquisition in the history of our Company, and of our Industry*," which would create the "*global leader in pest control*" and the

number one pest control company in North America. Indeed, Terminix itself was the second largest pest control company in North America prior to the acquisition with annual revenue of $2 billion, and was orders of magnitude larger than Rentokil's past acquisitions. Moreover, the acquisition dramatically increased Rentokil's footprint in the largest pest control market in the world, more than doubling its North American revenue, and after the transaction, the North America market would be responsible for the vast majority of the entire Company's revenue.

168.    Further, Defendant Paulsen served as Rentokil's CEO of North America—the executive directly in charge of the Terminix integration—during the Class Period, and thus was particularly and intensely focused on the Terminix integration, which implicated the entirety of Rentokil's North America business and was by far the most important development in the Company's history in North America. Defendants Ransom and Ingall-Tombs likewise touted the significance of the Terminix transaction and were directly involved in overseeing and executing the Terminix integration. Indeed, all three of the Individual Defendants regularly discussed and touted the progress of the integration throughout the Class Period, as discussed below.

169.    *The Individual Defendants regularly discussed details of the integration and assured investors they were closely tracking its progress and that they had a strong basis for their statements*. As alleged herein, throughout the Class Period, the Individual Defendants made highly detailed positive statements about the progress of the Terminix integration, thus holding themselves out to be knowledgeable of the subject, supporting scienter. Indeed, in every single earnings release, trading update, investor call and presentation during the Class Period, Defendants discussed in exacting detail the purported "progress" of the Rentokil-Terminix integration.

170.    Moreover, the Individual Defendants specifically referred to their own "very, very, very detailed plan" with respect to the integration and their regular, personal "tracking" of the

progress of the integration.  For example, in a March 7, 2024 investor call, Defendant Ransom was

asked by a Barclays analyst "where does the confidence come from" regarding the progress of the

Terminix integration and the purported synergies that the integration would provide to Rentokil.

In response, Ransom emphasized that Defendants' "confidence" was derived from the fact that

they had "*always had a very, very, very detailed plan.  We keep that plan up to date.  We track it*

*every single – not every single day, but we're tracking every single week.  We have fortnightly*

*reviews of the program.  And we make sure that all of our colleagues, who own a piece of that*

*synergy pie, update their assumptions regularly*."    Ransom further underscored that the

Company's representations were "*informed by our experience and the progress that we're*

*making*."  Similarly, in the same call, Ransom described how he tracked performance even at the

individual branch level, noting "*[w]e stack rank [branches].  So I know exactly who the best*

*performing [were], and I know where the worst performing [were]*."

171.    Defendants also assured analysts that they had valid basis for their statements.  For

example, during the March 7, 2024 investor call, in response to an analyst question about where

"confidence" in the Company's statements was coming from, Defendant Ransom responded,

"*[w]e've had two months of the first quarter.  So we can see broadly where we're tracking*."

Similarly, in an October 17, 2024 trading update call, Ransom touted that Defendants had "*daily*

*visibility*" into numerous key metrics, explaining that "on a daily basis, we are monitoring lead

flow…we're monitoring technician leads from our field force on a daily basis...we have *daily*

*visibility of customer cancels*."

172.    *The Individual Defendants' admissions in the Company's corrective disclosures*

*support scienter*.  Defendants' admissions directly contradicted many of their Class Period

statements about the Terminix integration and confirmed that throughout the Class Period, the

Individual Defendants were fully aware of the Company's severe and pervasive integration problems and the fact that they were causing North America revenue growth to slow down. For example, on September 11, 2024, Defendant Ingall-Tombs admitted that, in direct contrast with Defendants' Class Period statements, Rentokil and Terminix were still operating as "***two separate businesses***, which are largely at an operational front end, ***not integrated yet***." Defendant Ransom similarly indicated that he knew during the Class Period that it was integration problems, rather than market or industry problems, that caused the Company's growth problems, admitting that he had "***certainly not seen evidence…of a market-specific weakness***," and that it was in fact entirely Rentokil's company-specific "***execution challenges***" that had caused the poor North America growth, concluding that "***this is on us***." Indeed, as Defendant Ransom admitted:

> ***I don't think it would be reasonable for us to point any of this at the market. I've certainly not seen evidence nor heard anecdotally evidence of a market-specific weakness…we're not seeing that. So I can't point to that. This is a manifestation of execution challenges, execution -- a need to improve our execution. It's not a market phenomenon… I don't think it's market I think this is on us.***

173.    Significantly, and in direct contradiction to Defendants' wholly positive Class Period statements touting the successful integration of Rentokil's and Terminix's IT and operational systems, Defendants ultimately admitted that even as late as September 2024, Rentokil and Terminix still had "***2 operational reporting processes***," and thus, "***each of the [Company's] 7 regions has a different flow of information from the operational system for either heritage Rentokil or heritage Terminix***." As such, Rentokil still had "***a lot of work to do to get these systems integrated as we go through the next two years which will enable us to have a much more holistic view of the performance of the business***…."

174.    Further, Defendants admitted that they had been fully aware of these "execution challenges" in the integration during the Class Period due to their "good visibility" into the process.

For example, Defendant Ingall-Tombs emphasized that "*we've got reasonably good visibility*… *So that's not really a visibility issue*… *the core of this is not a visibility issue*."

175.    Defendants also admitted at the end of the Class Period, in Rentokil's March 6, 2025 corrective disclosure, that the integration was such an abject failure that Defendants were now abandoning their plan to integrate Rentokil and Terminix branches—a primary rationale for the merger itself—and instead would be forced to maintain **over 500 branches** that would remain separate and unintegrated, which analysts understood as "**an admittance that the original plan wasn't working**."  Similarly, Defendants also implicitly admitted that they could not back up their Class Period claims that the merger was delivering hundreds of millions of dollars in purported "synergies."  Indeed, and tellingly, in the Company's first financial quarterly results after Defendant Ingall-Tombs resigned as CFO, Rentokil's new CFO, Paul Edgecliffe-Johnson, announced that the Company was abandoning the metric entirely and would no longer publicly report it to the market, explaining that "**going forward we will not report separately on net synergy delivery**" because attempting to "disaggregate" them from other costs was "**overly subjective**."

176.    *Former employees confirmed that the Individual Defendants, and particularly Defendant Paulsen, kept a close watch over integration developments and problems and discussed them in meetings.*  As discussed herein, a multitude of former Rentokil and Terminix employees described in detail that Rentokil integration problems were severe, pervasive and well-known throughout the Company.  Indeed, the fact that no fewer than 19 former employees, each of whom were located in geographically dispersed locations throughout the country, all reported remarkably similar accounts demonstrating the abject failure of the integration, heavily supports scienter.

177.    Moreover, these CWs reported that the Individual Defendants were well aware of these Company-wide issues and even discussed these problems with employees.  For example, the

CWs recalled monthly "town hall" meetings during which Defendant Paulsen would discuss the Company's integration problems in detail.  For example, CW 5 recalled that employees were shown a detailed integration "Road Map" graphic that detailed the Company's integration plans, and that Defendant Paulsen and others would regularly discuss the significant delays in IT systems integration and other integration problems that were plaguing the integration.  CW 5 explained that "*[t]here were always town halls and things like that going on where they were discussing the road map, and it was all the way up to Brad Paulsen …It was all the way up to the top*."  CW 10 also recalled these monthly "town hall" meetings with Paulsen, and said it was regularly discussed in these Town Hall meetings that "we're having some difficulties" with the integration, "because they had to restart certain things that didn't go quite the way they wanted, *so they had to revise everything and start over*," and that "*[t]hey would say that certain things had to be pushed back because they ran into glitches that they had to iron out*."  And CW 6 gave strikingly similar accounts of town hall meetings with Defendant Paulsen, explaining that Paulsen and other management would go over the integration "road map" and explain that "we ran into a hiccup with the testing and it's been delayed, or they would say something else like – we're supposed to here at this time, but we're there."

178.    *In Remarkably Frank Tone And Language, Analysts Understood Defendants' Disclosures As Admissions That Demonstrated Defendants' Knowledge Of Integration Problems During The Class Period And Undermined Management's Credibility.*  In a rarity for sophisticated securities analysts, Defendants' disclosures prompted these analysts to openly and pointedly question Rentokil management's credibility and the veracity of Defendants' Class Period representations to investors.  For example, after Defendants' September 11, 2024 disclosures, Deutsche Bank specifically questioned the timing of the revelations and Defendants' prior

representations, noting that "*today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims*."

179.    Similarly, HSBC emphasized investors' concerns regarding the disclosure, highlighting "*the timing of the profit warning*" and the fact that investors had "*[p]lenty of questions… and not too many answers*," including marked "confusion" given Defendants' wholly positive statements as recently as the end of July.  Jefferies noted that the "unscheduled trading update" would "*raise further questions on management control and visibility in the region*."  Citi also highlighted the disparity between management's prior statements and the September disclosure, noting: "*[d]espite talking about encouraging momentum at their interims on 25 July*, management downgraded 2H PBI expectations by c20% due to weaker trading in July and August *which significantly dents [management's] credibility*."  RBC also emphasized that they were "very surprised" and "flabbergasted" by the disclosures, such that "*management credibility has taken a further dint*" and that "*management have a tough task to rebuild credibility.*"

180.    After the Company's March 6, 2025 disclosures, analysts were similarly stunned by the timing of the Company's disclosures.  For example, Citi noted that the "lack of US progress disappoints," and in particular, in light of the Company's sudden "branch strategy U-turn," "*it seems operationally the business remains challenged 4 years after the announcement of the [Terminix] deal in December 2021, which could be described as underwhelming*."  RBC also emphasized the "*about-turns on branding, branch numbers*" and other key aspects of the integration, and took this as "*an admittance that the original plan wasn't working*."

181.    *The Suspiciously Timed Resignations of Two Individual Defendants and Multiple Other Senior Management Responsible For The Terminix Integration Support Scienter.*  In the

wake of Rentokil's disastrous Terminix integration, the Company announced numerous, high-level resignations of the executives that were directly tasked with overseeing the integration.

182.    Specifically, on October 17, 2024, at the same time as it also announced that it would commence a "review" of the Company's integration strategy, Rentokil announced the departure and replacement of the Company's North America CFO, Jason Coyle, and its North America Chief Operating Officer, Eric Rimiller.  In addition, the Company announced that it had replaced its North America Chief Marketing Officer, who was reassigned within the Company.

183.    This exodus of executives with ties to the integration was just the tip of the iceberg. Indeed, just one month after announcing the Company's "review" of the failing Terminix integration, on November 25, 2024, the Company announced that Defendant Ingall-Tombs would resign from his position effective only a month later, on January 1, 2025.  Then, on January 28, 2025, Rentokil announced that the Company's North America CEO who was directly responsible for the integration, Defendant Paulsen, would resign after just over a year with the Company. Defendant Paulsen's resignation occurred the same day that Rentokil issued a Trading Update that again reported disappointing North America growth, and just six weeks before the Company would effectively abandon and reverse its integration plans.

184.    The suspiciously timed resignations of these Individual Defendants and other high-level executives who were directly responsible for the failed Terminix integration provides significant support for a finding of Defendants' scienter.

## VII.    LOSS CAUSATION

### A.    April 18, 2024 Partial Corrective Disclosure

185.    On April 18, 2024, Rentokil issued a trading update warning of North America organic revenue growth of just 1.5%—below the already disappointing prior guidance of 2% for the first quarter (and 2% to 4% for the full year) that Defendants had issued six weeks earlier on

March 7, 2024.  Jefferies analysts noted that management's poor "[e]xpectation management" was "unhelpful in US Pest," given that the missed growth target was set "only six weeks ago," and Oppenheimer analysts lamented "weak growth" in North America.

186.    On this news, the price of Rentokil ADSs fell $2.64 per ADS, or more than 9%, from a closing price of $28.25 per ADS on April 17, 2024, to a closing price of $25.61 per ADS on April 18, 2024.  Nevertheless, as discussed herein, Defendants continued to make materially false and misleading statements and omitted material information that prevented Rentokil's ADS price from falling even further and maintained artificial inflation in the price of Rentokil ADSs.

### B.    September 11, 2024 Partial Corrective Disclosure

187.    On September 11, 2024, Rentokil issued a trading update that revealed significant downgrades to its North America financial outlook for 2024.  In contrast to positive statements to the market about the Terminix integration as recently as July 25, 2024, Rentokil revealed that "we've got two separate businesses which are largely at an operational front end not integrated yet."  In contrast with Defendants' recent statements that Rentokil had "completed" "Phase 1" and "Phase 2" of the integration and thus fully integrated the Company's "IT stack" and "internal reporting" systems, Defendants revealed that the companies still had "two operational reporting processes," such that each of the Company's regions had "a different flow of information from the operational system for either heritage Rentokil or heritage Terminix."  Consequently, Rentokil still had "a lot of work to do to get these systems integrated as we go through the next two years."

188.    Rentokil further acknowledged "disruption to organic growth from branch integration" and revealed that "trading performance in July and August was lower than anticipated," such that it now expected its North America Organic Growth to be just 1% in the second half of 2024, with sales experiencing a "net volume decline."  Further, despite repeatedly touting "cost synergies," Rentokil now admitted that North America was facing "higher sales,

service and other costs," such that North America adjusted operating profit margin would be significantly reduced to just 17.2% (rather than the 19% most recently forecasted).

189.    Analysts excoriated management.  Deutsche Bank noted that "today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims" and described the Company's "[s]elf-inflicted blows" to its North American business, noting that "[t]he bulk of the downgrade [to forecasts] is attributed to North America, where revenue growth in 2H24E is now expected to be c. 1% versus previous guidance of c. 3%."  UBS headlined its September 12, 2024 report "Integration pains, execution wanes.  Cut [Price Target]," emphasizing the "Tougher Terminix integration" and noting they saw a "slower organic growth path over FY 25-26e (given the long period of integration ahead)."  UBS further elaborated that "Rentokil's lower profit outlook for FY'24 was driven by the lack of improvement in N[orth] A[merica] Pest Control organic growth, and the company now expects just +1% y/y in H2'24 (in line with H1 – despite easier comparators, increased growth investments, and recent guidance targeting >3%)."  UBS also noted that "[m]anagement were clear that this is an execution, not market issue," and that "our concern is that there is still a long way to go in the integration process…"  Citi headlined its report, "A Series of Unfortunate Events," and similarly noted that "[d]espite talking about encouraging momentum at their interims on 25 July, management downgraded 2H PBI expectations by c20% due to weaker trading in July and August which significantly dents credibility."

190.    In response to this news, Rentokil's ADS price plummeted 21% in one day, or $6.65 per ADS, from $31.60 per ADS on September 10, 2024 to a close of $24.95 on September 11, 2024, on extraordinarily high volume.  Nevertheless, as discussed herein, Defendants continued to make materially false and misleading statements and omitted material information that prevented

Rentokil's ADS price from falling even further and maintained artificial inflation in the price of Rentokil ADSs.

### C.    March 6, 2025 Corrective Disclosure

191.    On March 6, 2025, Rentokil released its 2024 Preliminary Results filed with the SEC on Form 20-F and held an accompanying investor call.  Defendants admitted that "executing [the integration] has clearly impacted our North American business performance," and announced that it was abandoning its Terminix integration strategy, instead announcing a "revised branch strategy" whereby the Company would now maintain over 500 separate branches that would remain unintegrated.  Moreover, instead of consolidating branches under the Terminix and Rentokil brands, the Company would now maintain separate "regional brands[] rather than merging them over time with Terminix."

192.    Further, in a reversal of its repeated promises of hundreds of millions of dollars in "synergies," Defendants now acknowledged that they were unable to identify any synergies that resulted from the merger, thus announcing that "going forward we will not report separately on net synergy delivery" because attempting to "disaggregate" them from other costs was supposedly "overly subjective."

193.    Analysts were stunned, with one analyst asking during the Company's investor call "what has been the challenge in rolling out these systems?"  and another expressing surprise that "we're 2 years into the integration…now digital leads and conversions are still weak… [and] [y]our brand and branch strategy is changing today." Defendant Ransom had few answers, responding that the Company "had to do some pretty extensive work on IT systems" and that it was still "hacking our way through the jungle here of integration."  Following the call, analysts from Citi emphasized that the Company's "lack of US progress disappoints," and noted that in light of the "branch strategy U-turn, with management no longer pursuing consolidation," "it

seems operationally the business remains challenged 4 years after the announcement of the [Terminix] deal in December 2021, which could be described as underwhelming." UBS highlighted that, with the abandonment of reporting synergies "investors may have concerns about … the limited visibility on the building blocks to >20% [North America] margins post-integration." RBC similarly underscored that there had been several "about-turns on branding, branch numbers" and other key aspects of the integration, and took this as "an admittance that the original plan wasn't working."

194.    On this news, Rentokil's ADS price fell another 10%—or $2.50 per share—from a close of $25.15 on March 5, 2025 to a close of $22.65 on March 6, 2025.

## VIII.    PRESUMPTION OF RELIANCE

195.    At all relevant times, the market for the Company's ADSs was an open, efficient and well-developed market for the following reasons, among others:

    a)    Rentokil's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b)    As a regulated issuer, Rentokil filed periodic reports with the SEC and the NYSE;

    c)    Rentokil regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d)    Rentokil was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those

brokerage firms' sales force and certain customers. Each of these reports
was publicly available and entered the public marketplace.

196.   As a result of the foregoing, the market for Rentokil's ADSs reasonably and
promptly digested current information regarding the Company from all publicly available sources
and reflected such information in the price of the Company's ADSs.  All investors who purchased
the Company's ADSs during the Class Period suffered similar injury through their purchase of
Rentokil's ADSs at artificially inflated prices, and a presumption of reliance applies.

197.   A Class-wide presumption of reliance is also appropriate in this action under the
U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128
(1972), because the Class's claims are grounded on Defendants' material omissions.  Because this
action involves Defendants' failure to disclose material adverse information regarding Rentokil's
business and operations—information that Defendants were obligated to disclose— positive proof
of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be
material in the sense that a reasonable investor might have considered them important in making
investment decisions.  Given the importance of the material misstatements and omissions set forth
above, that requirement is satisfied here.

## IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

198.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-
looking statements under certain circumstances does not apply to any of the false and misleading
statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all
relate to then-existing facts and conditions.  In addition, to the extent certain of the statements
alleged to be false or misleading may be characterized as forward-looking, they were not
adequately identified as forward-looking statements when made, and there were no meaningful

cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

199.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Rentokil who knew that such statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

200.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Rentokil ADSs between October 19, 2023 and March 5, 2025, inclusive (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Rentokil at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

201.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rentokil's ADSs were actively traded on the NYSE. As of March 6, 2025, the Company had tens of millions of ADSs outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members

of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

202.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

203.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

204.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

    b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Rentokil;

    d)    whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Rentokil;

    e)      whether the market price of Rentokil ADSs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

    f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI.    CLAIMS FOR RELIEF

<u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants**

206.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

207.    Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rentokil ADSs; and (iii) cause Lead Plaintiff and other members of the Class to purchase Rentokil ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

208.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Rentokil ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

209.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Rentokil's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rentokil's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Rentokil and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

210.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation,

development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

211.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Rentokil's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its ADSs.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

212.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Rentokil ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by

Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased Rentokil ADSs during the Class Period at artificially inflated prices and were damaged thereby.

213.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Rentokil was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their Rentokil ADSs, or, if they had purchased such ADSs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

214.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

216.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

217.    The Individual Defendants acted as controlling persons of Rentokil within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated

90

to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

219.    As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## XII.    PRAYER FOR RELIEF

220.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

    a)    Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b)    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class

against Defendants in an amount to be proven at trial, including interest thereon;

c)    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)    Awarding such other and further relief as this Court deems appropriate.

## XIII.  JURY DEMAND

221.    Lead Plaintiff demands a trial by jury.

Dated: April 8, 2025                    Respectfully submitted,

By: */s/ J. Gerard Stranch IV*
J. Gerard Stranch IV, BPR 23045
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* application forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Lester R. Hooker (*pro hac vice* application forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
lhooker@saxenawhite.com

92

*Attorneys for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ J. Gerard Stranch IV*