**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

|  |  |
|---|---|
| LABORERS LOCAL #235 PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RENTOKIL INITIAL PLC, ANDREW M. RANSOM, STUART M. INGALL-TOMBS, and BRADLEY S. PAULSEN,<br><br>Defendants. | No. 2:24-cv-02932-SHL-tmp |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ............................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 6

    A.   Terminix Was The Most Important Acquisition In Rentokil's History, And The Centerpiece Of Its North America Strategy ..................................... 6

    B.   Throughout Class Period, Defendants Assured Investors Of "Excellent Progress" In The Terminix Integration, Thus Preparing The Company For Full Branch Integration ............................................................................... 7

    C.   In Truth, The Systems Integration Was Not "Done," And The Glitches Were Not "Resolved And Put To Bed" ................................................... 9

    D.   The Truth Begins To Emerge ................................................................. 12

    E.   The Truth Fully Emerges ...................................................................... 14

III.  ARGUMENT .................................................................................................. 16

    A.   The Complaint Pleads Material Misstatements And Omissions .......................... 16

        1.   Defendants' Statements About The Integration's Progress Were Materially False And Misleading ............................................... 16

        2.   Defendants' Forward-Looking Statements Arguments Fail ..................... 21

        3.   Defendants' Puffery Arguments Fail ........................................... 22

    B.   The Complaint Raises A Strong And Compelling Inference Of Scienter ............ 24

        1.   Defendants' Positive Statements Concealed Current Negative Information About The Integration That "Diverged" With Their External Statements About The Integration's Progress .......................... 25

        2.   Just Six Weeks Passed Between Defendants' Misleading Statements And The First Corrective Disclosure ................................... 27

        3.   The Critical Importance Of The Terminix Integration Further Supports An Inference Of Scienter ................................................. 28

        4.   The Accounts Of Former Employees Support Scienter ........................... 28

        5.   The Suspicious Resignations Of The Executive Team Responsible For The Terminix Integration Supports Scienter ................................. 29

        6.   Defendants' "Inference Of Innocence" Is Not More Compelling ............. 30

IV.   CONCLUSION ............................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................................... 27

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
552 F. Supp. 3d 406 (E.D.N.Y. 2021) ..................................................................................... 17

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
29 F.4th 802 (6th Cir. 2022) .................................................................................................... 24

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ................................................................................................... 21

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ................................................................................................... 24

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................................ 24, 30

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................................... 29

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ..................................................................................... 29

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ................................................................ 23, 28

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .......................................................................... 20

*Heritage Glob. Network Los Angeles, Inc. v. Welch*,
2024 WL 695772 (M.D. Tenn. Feb. 20, 2024)................................................................... 24, 28

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................................... 21

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................................ 23

*In re FibroGen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).......................................................................... 28

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004)................................................................................................... 23

ii

*In re Gen. Motors Co. Sec. Litig.*,
   773 F. Supp. 3d 429 (E.D. Mich. 2025) .................................................................. 24, 26

*In re Upstart Holdings, Inc. Sec. Litig.*,
   2024 WL 3647705 (S.D. Ohio Aug. 5, 2024) ......................................................... 24

*In re Yum! Brands, Inc. Sec. Litig.*,
   73 F. Supp. 3d 846 (W.D. Ky. 2014) ....................................................................... 23

*Jackson Cnty. Employees' Ret. Sys. v. Ghosn*,
   510 F. Supp. 3d 583 (M.D. Tenn. 2020) ................................................................. 22

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
   2024 WL 4274362 (2d Cir. Sept. 24, 2024) ............................................................ 17

*Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
   2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ................................................ *passim*

*Miller v. Champion Enters. Inc.*,
   346 F.3d 660 (6th Cir. 2003) ................................................................................... 21

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
   2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ............................................................. 23

*Rensin, Tr. of Rensin Joint Tr. v. United States Cellular Corp.*,
   755 F. Supp. 3d 1048 (N.D. Ill. 2024) .................................................................... 27

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ............................................................... 19

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................................... 18

*Shupe v. Rocket Companies, Inc.*,
   660 F. Supp. 3d 647 (E.D. Mich. 2023) .............................................................. 23, 26

*Strougo v. Tivity Health, Inc.*,
   551 F. Supp. 3d 839 (M.D. Tenn. 2021) ......................................................... 5, 17, 23

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,*
   83 F.4th 514 (6th Cir. 2023) .................................................................................... 26

*Weiner v. Tivity Health, Inc.*,
   365 F. Supp. 3d 900 (M.D. Tenn. 2019) .......................................................... 5, 19, 21

*Winslow v. BancorpSouth, Inc.*,
   2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ....................................................... 26

iii

*Zaller v. Fred's, Inc.*,
    560 F. Supp. 3d 1146 (W.D. Tenn. 2021)................................................................... 23, 24, 27, 30

Plaintiff respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws.[1]

## I.     PRELIMINARY STATEMENT

During the Class Period,[2] by far the most important issue facing Rentokil was its integration of Terminix.  Announced on December 14, 2021, Defendants heralded the $6.7 billion Terminix acquisition as a "***transformational combination***" that was "***the biggest and most strategic acquisition in the history of [Rentokil]***."  The entire key to the merger's success was whether Terminix could be successfully integrated into Rentokil's operations, which Defendants claimed would unlock hundreds of millions of dollars in "synergies" for the Company.

Throughout the Class Period, on each and every earnings call and investor conference, Defendants consistently and repeatedly assured investors that the integration was proceeding precisely as the Company had planned, boasting of the "***excellent progress we're making on the integration***," and that it remained "***on track***" and "***firmly on course***."  Significantly, Defendants highlighted that they had successfully completed certain specific key milestones of the integration process.  For example, on March 7, 2024, Defendants proclaimed that they had "***now completed Phase 1 of the integration program***," and in so doing, they had "***streamlined and unified the organization to create a single Rentokil Terminix team***."

On July 25, 2024—nearly two years after the Terminix merger had closed—Defendants asserted that they had "***completed Phase 2 of the integration***," which included integrating the

---

[1] "MTD" or "Br." refers herein to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 38-1).  All citations to "¶_" are to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "AC") (ECF No. 33). All terms not otherwise defined herein have the same meanings as in the Complaint.  Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

[2] The Class Period runs from October 19, 2023 through March 5, 2025, inclusive.

disparate operating systems of the two companies—a critically important achievement that would now allow the companies to become fully integrated.  Indeed, Defendant Ransom proclaimed that he was "***most excited about***" the fact that "***we have done the systems integration***," which he stated had "***gone really, really well***," and was a necessary prerequisite "***to integrate this business fully and properly***."  To further emphasize the significance of this milestone, Ransom made clear that it was "***a big tick to say you have got the systems integration done. Well done, good, excellent***," while further underscoring that any "day one glitches" had already been remedied, stating that "***every single one of [them] ha[d] been resolved and put to bed***."  As a result, with a "***single set of systems [that were] operating well***," Rentokil was now poised to complete the critically important "Phase 3"—the full integration of hundreds of Rentokil and Terminix branches that would unlock the deal's massive "synergies."  Fueled by Defendants' representations, Rentokil's ADS price climbed to a high of $32.96 on August 26, 2024.

As was ultimately revealed, Defendants' statements were entirely false and misleading.  On September 11, 2024—just six weeks after assuring the market that they had "completed Phase 2" and "done the systems integration"—Defendants stunned the market by announcing that the integration was such a disaster that Rentokil was actually experiencing a "net volume decline" in sales and would be forced to dramatically slash guidance for 2024.  Defendants further admitted that, rather than having a "single set of systems that were operating well," in reality Rentokil and Terminix were still operating as if they were two completely separate businesses with systems that remained years away from being integrated.  As Defendants Ransom and Ingall-Tombs explicitly acknowledged: "***we've got two separate businesses which are largely at an operational front end not integrated yet***," and "***what we have still got is 2 operational reporting processes***," pursuant to which "***each of the 7 regions has a different flow of information from the operational system for***

2

*either heritage Rentokil or heritage Terminix*." Defendants also conceded that they were entirely to blame for these "execution challenges," starkly admitting: "*this is on us*."

In response to this news, Rentokil's ADS price plummeted 21% in a single day, and analysts directly questioned management's veracity and credibility in light of the disclosures, noting that they expressly contradicted what Defendants told the market just six weeks earlier. Indeed, analysts emphasized that "*today's warning raises questions over … credibility given it comes only 6 weeks after the [July 25, 2024 earnings release]*," that there were "*[p]lenty of questions… and not too many answers*," and that they were "*very surprised"* and even "*flabbergasted*," such that, "*we think management have a tough task to rebuild credibility*."

On October 17, 2024, Defendants announced that, in light of the integration issues, Rentokil would conduct an in-depth "review" of the Terminix integration. This soon led to the departure or reassignment of no fewer than five of the Company's most senior officers responsible for the Terminix integration over the next several months, including Defendant Ingall-Tombs on November 25, 2024, and Defendant Paulsen on January 28, 2025.

The full truth was finally revealed on March 5, 2025, when Defendants were forced to admit that the integration problems were so severe, and so pervasive, that Rentokil would have to abandon the integration plan it had been touting to investors for the previous four years. Indeed, Ransom made clear that the systems integration that had supposedly been completed back in July 2024 had still not occurred, stating that Rentokil still "*had to do some pretty extensive work on IT systems*" and was still "*hacking our way through the jungle here of integration*." As a result, the Company would not be able to integrate, or combine, the hundreds of separate Rentokil and Terminix branches located across the country and would instead maintain them as separate entities. And rather than recognizing "hundreds of millions of dollars" in synergies from integrating

3

Terminix's operations, Defendants now stated that they would no longer even attempt to identify any such synergies that would result from the merger, claiming (after years of saying otherwise) that attempting to "disaggregate" them from other costs was purportedly "overly subjective."  On this news, Rentokil's ADS price fell another 10%, and analysts again lambasted Rentokil's "*U-turn, with management no longer pursuing consolidation*" of Terminix branches, noting that the "*about-turns*" on integration was "*an admittance that the original plan wasn't working*."

The Complaint's highly detailed allegations are based on, in addition to Defendants' own admissions, the accounts of no fewer than 19 former employees of Rentokil and Terminix located across the country, all of whom had direct personal knowledge of the integration issues plaguing the Company during the Class Period, and many of whom had direct contact with the Company's most senior officers.  Nevertheless, Defendants argue that the Complaint fails to plead that they made a single false statement, or that they had any knowledge of the myriad issues impacting what they themselves called the "biggest and most strategic acquisition in the history of [Rentokil]."  Defendants' arguments lack merit and should be swiftly rejected.

First, contrary to what Defendants contend, the vast majority of their statements were decidedly not inactionable "forward-looking" statements or immaterial "puffery."  To the contrary, they were specific, present and past-tense statements that were designed to—and did—assure investors that the integration was proceeding precisely as planned.  Indeed, statements that Phases 1 and 2 were "complete," that the systems integration was "done," and that "every single [day one glitch] has been resolved and put to bed" are quite clearly "statements of present or historical fact [that] could be verified at the time they were made, and thus [were] not forward-looking." *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *2 (S.D. Ohio Sept. 27, 2021).  Moreover, these statements were the opposite of puffery—they were factual

4

and verifiable positive statements about the single most important acquisition in the Company's history, and included representations that Defendants had "completed" specific, critical integration milestones that they in fact had not completed and could not complete. *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 844-45, 848 (M.D. Tenn. 2021) (statements that acquired business was "on track according to plan" false and misleading in the face of "contradictory evidence.").

Undoubtedly because they recognize that their statements are actionable, Defendants seek to rewrite the Complaint's allegations, arguing that, even if they were material, their statements were not false because Defendants never promised investors that they had completed the entire integration or that all possible IT issues had been permanently resolved. But this is not what the Complaint alleges. Instead, the Complaint alleges that Defendants falsely told investors they had "completed" critical milestones in the integration process when they had not—facts that their own admissions ("we've got two separate businesses which are largely at an operational front end not integrated yet") make readily apparent. Moreover, Defendants repeatedly made positive statements about the integration's "progress" while contemporaneously concealing the severe problems and delays that ultimately made full integration impossible. *See Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019) ("[o]nce a company has chosen to speak on an issue…it cannot omit material facts related to that issue so as to make its disclosure misleading.").

Finally, the Complaint is replete with strong scienter allegations. The Terminix integration was the most critical transaction in Rentokil's history, and Defendants were asked about it and spoke in depth about it in every single investor communication during the Class Period. Defendants themselves boasted to investors about the excellent "visibility" they had into the integration's progress—which they were "tracking every single week" according to a "very very very detailed plan"—and they conceded that they were to blame for the integration debacle,

5

stating: "**this is on us**."  Moreover, numerous former employees confirmed that Defendants held monthly "Town Hall" meetings led by Rentokil's North America CEO, Defendant Paulsen, wherein Defendants discussed the Company's severe integration delays in detail—which caused Rentokil to fall behind its integration "Road Map"—and that Defendants knew full well that they had not completed the critical integration milestones they assured investors they had achieved.

In addition, the fact that four senior officers of the Company responsible for the integration (including two named Defendants) left Rentokil immediately after the Company began disclosing the issues with the integration; the fact that the disclosure came just weeks after Rentokil had assured investors that the systems integration had been completed, and analysts' scathing commentary on management's credibility (or lack thereof), all augment the inference of knowing or reckless misconduct.  In sum, taken holistically, such facts readily establish scienter.

Accordingly, Defendants' motion to dismiss the Complaint should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Terminix Was The Most Important Acquisition In Rentokil's History, And The Centerpiece Of Its North America Strategy

On December 14, 2021, Rentokil announced the Terminix acquisition for approximately $6.7 billion.  Rentokil touted the "transformational combination" as "**by far…the biggest and most strategic acquisition in the history of our Company, and of our Industry**," creating the "global leader in pest control" and the largest pest control company in North America.  ¶29.  Critically, Rentokil would not operate Terminix as a separate company.  Instead, Rentokil announced it would fully integrate Terminix's systems, processes, personnel, and, ultimately, combine hundreds of Terminix and Rentokil branches, reducing the companies' footprint from 600 branches to just 400 branches.  ¶31.  In so doing, Rentokil promised it could achieve massive "synergies," including by creating greater "route density" through combined service routes, and thereby service more

6

customers per day without sacrificing service or quality. ¶32-33.

Rentokil's acquisition of Terminix closed on October 12, 2022. ¶36. Over the next year, Rentokil repeatedly emphasized the extensive preparatory work it was doing to ensure that it could smoothly and fully integrate Terminix. ¶¶37-47. For example, critical to the success of the merger was the integration of the companies' disparate IT systems used for sales, customer resource management, route planning, accounting, and other functions. To that end, on Rentokil's March 16, 2023 earnings call and presentation, Defendants touted that they had "*done tremendous work*" on the integration front and that integration "*pre-work has now all been completed.*" ¶40. Similarly, Rentokil's July 27, 2023 earnings release touted the progress Rentokil had purportedly made toward integration, citing "Positive Results from Initial Integration Pilots," and claiming that Rentokil had already fully mapped the integration of the companies' IT systems. ¶44.

> **B.** **Throughout Class Period, Defendants Assured Investors Of "Excellent Progress" In The Terminix Integration, Thus Preparing The Company For Full Branch Integration**

Throughout the Class Period, Defendants assured investors that the integration was "*firmly on course*" and was making "excellent progress" in achieving a series of highly specific milestones that were essential prerequisites for full branch integration and "synergy" realization. For example, on October 19, 2023, the first day of the Class Period, Rentokil's Trading Update touted the Company's "*[c]ontinued good progress on [] the integration of Terminix* ..." and stated that the "*[d]elivery of the Terminix integration plan has progressed well* in the third quarter." ¶49.

On March 7, 2024, Defendants issued an earnings release and held an investor call that again emphasized the "*excellent progress we're making on the integration.*" ¶51. Moreover, Defendants touted that they had "*now completed Phase 1 of the integration program*," which constituted the "*foundations for [its] success*" because it included highly specific HR, IT, administrative and operational integration milestones. ¶52. Defendants also highlighted multiple

7

"key initiatives realized in the year" in the systems integration, including updated and enhanced customer tracking and field sales tools; an updated Customer Relationship Management ("CRM") platform, which the Company claimed improved service technicians' ability to "generate sales leads and upsell opportunities"; and an integrated "big data platform" that would "allow for Terminix data to be integrated and increasingly provide actionable analytics from across our entire branch network." ¶53. As a result, Defendant Ransom emphasized to investors that Rentokil had "*streamlined and unified the organization to create a single Rentokil Terminix team*."  ¶54.

On July 25, 2024, Rentokil announced its interim results for the first half of 2024. In the accompanying earnings call, Defendants proclaimed that they had now "*completed Phase 2 of the integration plan*"—*i.e.*, the crucial integration of Rentokil's IT systems that was a prerequisite to full Rentokil/Terminix branch integration.  ¶59. Specifically, Defendant Paulsen—Rentokil's North America CEO—announced that "*[i]n the first half of this year, we have completed Phase 2 of the integration plan*," which included having "*developed and tested 22 systems with 190 features to enable the integrations and harmonized multiple business processes, contracts and applications*." ¶60.  Significantly, Paulsen emphasized that this had gone "*very well*" and that Rentokil now had "*a single set of systems*." *Id.*  Removing any doubt as to the significance of this milestone, Defendant Ransom emphasized that what he was "*most excited about*" was the fact that Rentokil had "*done the systems integration*" and that the systems were now "*fully integrated*," which was "*a big thing*" and an "*enormous task...that has gone really, really well*":

> *The thing that I'm really most excited about in the second quarter is we've done the systems integration*. I know that might not sound a big thing to many of you, *but it is a big thing*. So to integrate this business fully and properly, we have to do two things. *We have to get the systems fully integrated. That's an enormous task, an enormous task, so many things that have to be done well and that has gone really, really well.* So we've now got an IT stack that we have converted Terminix colleagues from their system into the new system. We've converted standalone acquisitions to the new system. We've converted commercial, residential, termite

8

to the new system. We've had multiple day one glitches, *every single one of which has been resolved and put to bed*.

¶63.  To underscore the point, Ransom exclaimed: "*that is a big tick to say you have got the systems integration done. Well done, good, excellent*."  ¶64. Consequently, with "Phase 2" now "complete," Rentokil had a "green light" for the "first branch integrations," which had begun a full month earlier and were already having a "good start and [were] on schedule."  ¶65.

**C.    In Truth, The Systems Integration Was Not "Done," And The Glitches Were Not "Resolved And Put To Bed"**

In truth, Rentokil had not "completed" Phases 1 and 2 of the integration by July 2024, the systems integration was not "done," and the glitches had not been "resolved and put to bed." Instead, as former employees from across the country confirmed, Rentokil was experiencing fundamental and crippling systems integration failures, as Defendants would later admit.

For example, CW 1, a regional manager responsible for ten branches before he left Rentokil in July 2024, described how the integration projects in his region were a "*disaster*," such that "*we lost customers left and right by the tune of hundreds [or] thousands of customers*."  ¶72.  He described how IT systems "*were not working in the field or in the office*," creating "*billing issues with big [commercial] customers*" and even "*sending customers to the wrong [Rentokil-owned] company*," such that "*we lost a ton of customers*."  *Id.*  Similarly, CW 4, an IT Senior Program Manager, described how Rentokil's attempts to integrate data into unified platforms were repeatedly delayed from May 2024 until October 2024 and beyond.  ¶¶77-78.  In fact, Rentokil was still attempting to combine the same data when he left in December 2024. *Id.*

Numerous other former employees provided detailed descriptions of Rentokil's problem-riddled internal integration plans, including that Rentokil attempted test integrations in Florida— one of its largest markets—but that these tests failed due to IT integration problems.  As CW 5 explained, "Florida was supposed to be the first region to go," but "they actually stopped it in

9

Florida and moved into the Central region." ¶79. CW 5 explained that the companies' respective systems would not communicate, and this was never fixed by the time he left in October 2024, as Rentokil experienced "***huge issues getting the systems to talk to each other***" and "***major issues with Terminix coming over to [Rentokil's] PestPac [Customer Relationship Management] platform***." ¶¶79-82. CW 5 explained that "***[e]verything that they tried to migrate to Terminix was actually holding up the migration***. ***The systems just didn't communicate***." ¶81.

CW 7, a Florida district manager, corroborated that these problems led to multiple integration delays. ¶84. He explained that problems integrating the Companies' CRM platforms meant that "***[t]here were errors all the time … and we were having to fight through those***," that "***[w]e couldn't take payments [] and documentation would not load up***[,]" and that systems were regularly crashing, which was continuing when he left in September 2024. ¶¶85-86. CW 2 similarly explained that, up until he left in November 2024, "they were struggling with" unifying systems, such that "***[t]hey had to keep pushing out the dates. It was a disaster***." ¶87.

Notably, after Rentokil refocused its efforts from Florida to the "Central" region, employees in that region experienced similar problems. For example, CW 8 explained how the Company "***kept on pushing [integration] back because we're having these [systems integration] problems***," up until when he left in October 2024, and CW 2—who had previously worked in Wisconsin—heard similar accounts from his former Central region colleagues. ¶88.

Significantly, numerous CWs confirmed that these problems had a severe negative impact on Rentokil's sales, which was ultimately reflected in the Company's surprise profit warning and lowering of guidance in September 2024. For example, at least five different CWs across the country gave corroborating accounts of how systems integration failures led to the Company "cannibalizing" its own business, as employees of Rentokil and its subsidiary companies had no

10

way of determining through their IT systems whether they were pitching the same clients, and vice versa—even though, in some cases, the respective branches were now "co-located" in the same building. ¶¶102-04. CW 5 explained that by the time he left in October 2024, "*there were still Terminix people trying to outsell Rentokil people, and they were still acting like competitors rather than one entity.*" *Id.* CWs 7, 10, 16, and 18 all gave strikingly similar accounts. *Id.*[3]

Former employees in other parts of the country reported similar delays in integrating IT systems well into late 2024. CW 9, who worked in the Washington, DC area said that, by the time he left in July 2024, the companies operated entirely separately. ¶89. CW 3, who worked in Kentucky and Ohio and left in August 2024, recalled delays in combining the respective companies' Salesforce platforms, and recalled that, when they finally attempted to combine the two, it created massive glitches that angered customers. ¶90. CW 13, who worked in Mississippi, and CW 14, who worked in the Northwest, similarly said they had seen no IT integration progress by the time they left in November and October 2024, respectively. ¶93.

Significantly, numerous former employees confirmed that Rentokil's most senior officers were fully aware of these issues throughout the Class Period. For example, CWs 5, 6, and 10 each described their participation in monthly "Town Hall" meetings run by Defendant Paulsen, during which Paulsen would discuss, at length, the Company's IT integration progress according to a highly detailed "Road Map" chart. ¶¶94-96. These CWs independently corroborated that Paulsen would discuss the exact IT problems they were experiencing, including the fact that the Company

---

[3] Additionally, contrary to Defendants' claims of "synergies," six different CWs confirmed short-sighted cost cuts that briefly increased margins but negatively impacted sales. ¶¶97-101. CW 7 described a massive downsizing of management and sales personnel, leading to significant sales declines. ¶98. CWs 5, 8, and 16 also described personnel cuts that made managers responsible for larger numbers of branches but hurt sales and customer service as a result. ¶¶100-01. CWs 1, 5, and 15 described major cuts to marketing that similarly severely hurt sales. ¶¶98-99.

11

was behind where it was supposed to be on the "Road Map." *Id.* Thus, Defendants knew full well that these severe issues materially delayed specific integration milestones and regional projects: "[t]here were always town halls and things like that going on where they were discussing the road map, and it was all the way up to [] Paulsen . . . ***It was all the way up to the top***." *Id.*

Additionally, CW 1, a regional manager, regularly reported the massive IT integration problems he experienced in his region to Vice President Dan Tripoli, who became Rentokil's COO during the Class Period. ¶72. And CW 4—a senior IT officer who was two levels below the Company's Chief Information Officer and worked directly on a critical Company-wide IT systems integration project—confirmed the utter failures of the systems integration. CW 4 explained that because of these integration issues, the project was delayed multiple times from May to October 2024, and even when he left the Company in December 2024, Rentokil still lacked crucial data for this integration project. ¶¶77-78.

### D.    The Truth Begins To Emerge

On September 11, 2024, Defendants stunned the market by entirely reversing the positive statements they had made about the Terminix integration just six weeks earlier. ¶110.

*First,* while Defendants had claimed to be "firmly on track" for full branch integration, with the critical systems integration purportedly already completely "done," Defendant Ingall-Tombs now admitted that the exact opposite was true: the integration was floundering, and the Company's systems had *not* been successfully integrated. Instead, Rentokil and Terminix were still operating as "***two separate businesses, which are largely at an operational front end, not integrated yet***." ¶111. Indeed, Ingall-Tombs admitted that the integration was very much "***still a work in progress, if I'm honest***," because "***what we have still got is 2 operational reporting processes***," and "***each of the 7 regions has a different flow of information from the operational system for either heritage Rentokil or heritage Terminix***." *Id.* As such, rather than having

12

"completed" the systems integration, the reality was that Rentokil still had "*a lot of work to do to get these systems integrated as we go through the next two years*…." *Id.*

Rentokil's integration setbacks were so severe that they had caused sales to plummet. As Defendants explained, due to "*disruption to organic growth from branch integration*," Rentokil's sales were experiencing a "*net volume decline*," forcing Defendants to slash guidance of 2-4% growth issued just six weeks earlier to an anemic 1%, reflecting negative sales growth. ¶¶112-13.

Finally, Defendants admitted that this weakness was the result of their own "execution challenges" and not market issues—*i.e.*, "*this is on us*." ¶114. Indeed, Defendants acknowledged that they had had "*good visibility*" into the problems and that the negative disclosures were thus not the result of a "visibility issue"—prompting an analyst to remark on the "*disconnect…between having reasonably good visibility and then having quite a big profit warning*." ¶115.

In response to these disclosures, Rentokil's ADS price plummeted 21% in one day, or $6.65, from $31.60 on September 10, 2024 to a close of $24.95 on September 11, 2024. ¶116.

Analysts were stunned by Defendants' sudden contradiction of their positive statements just six weeks earlier, and thus uniformly questioned management's credibility. Deutsche Bank noted that "*today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims*." ¶117. UBS emphasized "that "*[m]anagement were clear that this is an execution, not market issue*," and that "*our concern is that there is still a long way to go in the integration process*…." ¶118. HSBC noted "*the timing of the profit warning*" and expressed "*confusion*" with "*[p]lenty of questions… and not too many answers*." *Id.* RBC reported that they were "*very surprised*" and "*flabbergasted*" by the disclosure, noting that "*management keeps missing its targets. Hence, we think management have a tough task to rebuild credibility*." ¶119.

Despite these disclosures, Defendants sought to minimize the significance of Rentokil's

13

integration problems and assured investors that the integration "***continues to go well***." For example, Defendant Ransom stated that "when you change systems, inevitably, ***there is some disruption***," and he characterized the issue as a "small element." ¶120. Similarly, in response to an analyst question about "execution on the integration so far," Ransom responded that "***[w]e've done very, very significant heavy lifting on systems integration, moving historic Terminix branches and Terminix systems onto the new platform***," and asserted that this had "***gone extremely well so far***," with the "vast majority" of problems "***resolved very, very, very quickly***." ¶121. Thus, as to whether Rentokil could still "migrate Terminix branches … onto the new IT stack without major drama," he explained "***the answer would appear to be a strong yes***." *Id.*

On October 17, 2024, however, Defendants announced they were conducting an in-depth "review" of the Terminix integration, which would further delay the realization of promised "synergies" from the merger. ¶123. Contemporaneously, Defendants also began a purge of the senior executives responsible for the integration, including the replacement of the Company's North America CFO and COO, and the internal reassignment of North America CMO. *Id.* Soon thereafter, on November 25, 2024, Rentokil announced the resignation of Defendant Ingall-Tombs, and on January 28, 2025, Rentokil announced the resignation of Defendant Paulsen. ¶124.

### E.  The Truth Fully Emerges

On March 6, 2025, as Rentokil released its 2024 Preliminary Results, Defendants stunned investors by entirely contradicting their prior statements about the integration.

First, Defendants disclosed that the systems integration—which had supposedly been "complete" by July 2024—was still not even close to finished, and even the "core IT developments" would not be done until late 2025. As Ransom admitted, the systems integration had been "***a significant lift for the organization and there's much work ahead of us***." ¶130.

Second, due to these failures, Rentokil would be unable to complete "Phase 3" of the

14

integration—*i.e.*, the integration of hundreds of Rentokil and Terminix branches (¶66)—which Defendants had touted as the key to realizing the merger's massive "synergy" benefits (¶¶31-33). Instead, following an "integration strategy review," ***Rentokil was now entirely abandoning its integration plans***, and had adopted a "***revised branch strategy***," pursuant to which it would maintain a footprint of well over 500 branches (rather than consolidating them). *Id.* Additionally, Rentokil would adopt a "***revised brand strategy***"—maintaining its numerous "regional brands" rather than consolidating them under the Rentokil/Terminix umbrella. ¶¶126, 175, 191.

Finally, in a striking reversal of its previous emphasis on hundreds of millions of dollars in "synergies" that Rentokil's merger with Terminix would supposedly generate for the Company, Rentokil now admitted that those synergies did not exist. Specifically, Defendants disclosed that "***going forward we will not report separately on net synergy delivery***," purportedly because attempting to "disaggregate" them from other costs was "***overly subjective***." ¶¶128, 175, 192.

On this news, Rentokil's ADS price fell another 10%—or $2.50 per share—from a close of $25.15 on March 5, 2025 to $22.65 on March 6, 2025. ¶133. During the earnings call that day, analysts incredulously questioned: "***what has been the challenge in rolling out these systems?***" and lamented that "***obviously we're 2 years in to the integration…There's a lot changing …Your brand and branch strategy is changing today***." ¶131. Defendant Ransom struggled to respond, admitting that Defendants were still "***hacking our way through the jungle here of integration***," and that they "***had to do some pretty extensive work on IT systems***." *Id.* Following the call, Citi reported that the Company's "***lack of US progress disappoints***," and highlighted the "***branch strategy U-turn***," with management now contemplating a "footprint of 500 branches." ¶134. Citi further emphasized that "***operationally the business remains challenged 4 years after the announcement of the [Terminix] deal in December 2021, which could be described as***

15

*underwhelming*….” *Id.* RBC lamented Rentokil’s “***about-turns on branding [and] branch***

***numbers***” and took this as “***an admittance that the original plan wasn’t working***.” ¶135.[4]

## III.   ARGUMENT

### A.   The Complaint Pleads Material Misstatements And Omissions

#### 1.   Defendants’ Statements About The Integration’s Progress Were Materially False And Misleading

Throughout the Class Period, Defendants repeatedly boasted that the Terminix integration

remained “***on track***” and “***firmly on course***,” with strong “progress toward full branch

integration.”  ¶¶49-51, 57, 137, 140, 147, 153.  On March 5, 2024, Defendants touted their

purported “complet[ion]” of “Phase 1 of the integration” plan—thus forming a “***streamlined and***

***unified [] organization to create a single Rentokil Terminix team***.” ¶¶54, 141. And significantly,

on July 25, 2024, Defendants unequivocally announced they had “***completed Phase 2 of the***

***integration plan***,” which comprised the “***enormous task***” of “***get[ting] the systems fully***

***integrated***,” thus creating a “***a single set of systems***” that had been “***successfully tested and***

***deployed***.”  ¶¶59, 152-56.  Indeed, Defendant Ransom emphasized that the systems integration

was not merely underway, but that the Company had “***done the systems integration***,” which was

the thing Ransom was “really most excited about,” as this “***big thing***” was the essential prerequisite

to “***integrat[ing] this business fully and properly***.” ¶155.  And Ransom insisted that this had “gone

really, really well,” with “***every single one***” of the “glitches” now “***resolved and put to bed***.” ¶156.

---

[4] Defendants claim that Plaintiff “mischaracterizes” the March 5, 2025 disclosure because it “did not alter Rentokil’s expected timeline for completing the integration or reflect that it failed.”  Br. at 20.  This is nonsense.  Defendants completely abandoned the branch integration and brand consolidation that were supposedly the keys to the entire merger, and analysts uniformly lamented the disclosure, emphasizing Rentokil’s “***branch strategy U-turn***,” its “***lack of US progress***,” and that the disclosure was “***an admittance that the original plan wasn’t working***.”  ¶¶134-35.

16

Defendants' statements were materially false and misleading.  As Defendants admitted a mere six weeks thereafter, the integration was *not* "on track," Phase 2 was *not* complete and the systems integration was *not* done. Instead, the exact opposite was true—rather than having a "single set of systems" that were fully integrated, Rentokil and Terminix were still "***two separate businesses***" with "***two operational reporting processes***," and that there was still "***a lot of work to do to get these systems integrated***."  ¶¶111, 160, 187.   Indeed, even by March 2025, there was *still* "***much work ahead of us***" in systems integration, with the "core IT developments" to be "essentially completed" only in the second half of 2025.  ¶¶130, 164.  Such admissions readily establish falsity.  *See, e.g., Strougo*, 551 F. Supp. 3d at 844-45, 848 (statements that acquired business was "on track according to plan" and "performing well" were misleading in the face of "contradictory evidence"); *Cardinal Health*, 2021 WL 4397946, at *16 ("Defendants continued to represent that the [] acquisition and [the] integration of …[the acquired company's] systems was on track and going well" but later disclosed that the integration was struggling and harming business); *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 413, 415-16 (E.D.N.Y. 2021) (upholding false statements about having already achieved "'deep integration' of the [company's] software systems," when defendants later admitted that "the company was just 'starting to see some integration'" of those systems.).

Moreover, as 19 former Rentokil and Terminix employees from across the country uniformly confirmed, Rentokil was not only still experiencing "glitches" in its systems integration, but it had completely *failed* to integrate those systems in its test markets, evidencing that Rentokil and Terminix branches *could not be fully integrated.  See, e.g., Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 WL 4274362, at *4 (2d Cir. Sept. 24, 2024) (statement touting integration of sales team was false where CWs "provided details as to the lack of integration in the sales teams

17

at the time [the] statements regarding full integration were made").  For example, as numerous CWs confirmed, Defendants initially attempted to integrate the Florida region, but were forced to abandon this due to IT integration problems, and then faced the same issues in the Central region as well.  Defendants were thus well aware of material information that expressly contradicted their statements to investors that the systems integration was "done" with all of the initial glitches "resolved and put to bed."  *See, e.g., S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (misleading to claim "information systems were fully integrated … when [the company] was suffering technology problems that affected" the proper functioning of those systems).

Defendants nonetheless claim that it was not misleading to tell investors that Phase 2 was "complete," because, in so stating, all they were supposedly referring to was having completed the "legal entity merger, consolidated accounting system, and identif[ication of] the combined business's end-state IT infrastructure."  Br. at 17.  But this is *not* what Defendants said.  Defendants did *not* merely tout a "legal entity merger" or claim they had "identified" end-state IT systems.  To the contrary, Defendants claimed that they had "***complete[d]***" and "***done the systems integration***." Indeed, Ransom boasted of this supposed accomplishment at length, touting it as a "***big thing***" and an "***enormous lift***" that had gone "really, really well," and exclaiming "***my goodness me, that is a big tick to say you have got the systems integration done. Well done, good, excellent***."  ¶¶63-64. Defendants' *post hoc* attempt to re-write their own false statements should be rejected.

Defendants also argue that their statements were not false because they never promised that "Phase Two would resolve all the combined Company's IT-related issues, for all systems, across the United States, for all time," but rather that Rentokil had "launched its consolidated IT environment that would *eventually* power the consolidated branches after the integration was complete."  Br. at 18 (emphasis in original).  But, again, this is *not* what Defendants said—they

18

did not claim that their IT systems would "eventually" function properly "after the integration was complete." Rather, Ransom unequivocally asserted that the systems integration was "done" with all glitches "resolved and put to bed." Yet, both the CWs and Defendants' later admissions demonstrate that the opposite was true—Rentokil's and Terminix's systems not only were not integrated, but *could not* be successfully integrated due to a myriad of interoperability problems that made branch integration impossible. *See, e.g., Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*14 (D.N.J. July 27, 2018) ("disclosure of the known impediments to successful integration would have significantly altered the mix of information available to a reasonable investor."). Furthermore, it was materially misleading for Defendants to speak positively about completing the systems integration, while omitting the severe problems that the integration was then facing. *Weiner*, 365 F. Supp. 3d at 913 ("[o]nce a company has chosen to speak on an issue …it cannot omit material facts related to that issue so as to make its disclosure misleading.").[5]

Indeed, the entire purpose of Defendants representing that Phase 2 was "complete" was to assure the market that Rentokil was well positioned to complete branch integrations—and in fact, Defendants represented at that time that they were already successfully doing so. ¶¶65-66. Analyst responses confirm that that this was the message the market received, which was the polar opposite of Defendants' ultimate disclosures. *See, e.g.*, ¶66 (RBC expressing "confiden[ce]" that management was "executing on the integration" wherein "most of the heavy lifting has been done on functionality"); *compare with* ¶119 (RBC "very surprised" and "flabbergasted" by Defendants' September 2024 disclosures such that "management credibility has taken a further dint") and ¶135 (RBC noting Defendants' March 2025 "admittance that the original plan wasn't working").

---

[5] As such, Defendants' March and April 2024 statements touting specific IT integration milestones (Br. at 19) were misleading for the additional reason that they boasted of progress in the systems integration while omitting to discuss the material setbacks that integration was then facing.

19

Similarly, Defendants argue that the CWs' experiences with integration failures were "entirely consistent" with Defendants' statements, because any problems CWs experienced *before* July 2024 were "consistent" with Rentokil being in the "testing" phase of the integration at that time, while any integration problems experienced *after* July 2024 were also "consistent" with Rentokil being in the branch integration phase. Br. at 21. But this argument is nonsensical. Defendants unequivocally claimed that the "systems integration" was "done" with "a single set of systems operating well" and glitches "resolved and put to bed."[6] A systems integration cannot be "done" when there is still "a lot of work to do to get these systems integrated" and the companies are "still operating as two separate businesses," with "2 operational reporting processes."

Finally, Defendants' statements about purported "synergies" being achieved by the Terminix integration were false and misleading. As the Complaint alleges, Defendants' cost-cutting measures did not actually achieve "synergies"—*i.e.*, net cost benefits—but merely slashed spending on items like marketing, to the detriment of sales. ¶¶97-101. *See Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *11–12 (N.D. Ill. Aug. 11, 2021) (statements touting "synergies" and "cost efficiencies" false when cost cuts negatively impacted business). Indeed, by the end of the Class Period, Defendants announced that "going forward ***we will not report separately on net synergy delivery***," because identifying any such synergies was now "***overly subjective***."[7] ¶128.

---

[6] Contrary to Defendants' claims that a mere "handful" of CWs experienced IT problems in or after July 2024, the Complaint pleads allegations from 14 different CWs who were still experiencing those problems when they left the Company either in or after July 2024. Specifically, CW 1, CW 9, and CW 10 left the Company in July 2024; CW 3 left in August 2024; CW 7 left in September 2024; CW 5, CW 8, CW 14, CW 16, and CW 17 left in October 2024; CW 2 and CW 13 left in November 2024; and CW 4 and CW 15 left in December 2024. ¶¶172 n.7, 89 n.15, 91 n.16, 75 n. 8-9, 84 n.13, 79 n.11, 88 n.14, 93 n. 20, 101 n. 22-23, 93 n.19, 77 n. 10, and 98 n. 21.

[7] Defendants argue that this was not an admission because, even on March 5, 2025, Defendants "remain[ed] confident" that Rentokil would achieve "significant operational cost savings." Br. at 21-22. But Defendants are conflating "***net synergies***"—*i.e.*, synergies *after* accounting for integration costs, which they touted during the Class Period—with mere "***operational cost***

20

## 2.    Defendants' Forward-Looking Statements Arguments Fail

"The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made....[i]f so, then the statement is not forward-looking." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018).

Many of the purported "forward-looking" statements are statements of present fact. For example, Defendants' October 2023 statement that Rentokil was "on course with our integration plans," Defendant Ransom's April 2024 statement that "our integration program is on track," and the Defendants' July 2024 statement that branch integrations were "on schedule" (Br. at 11), are actionable because they "convey[ed] that the *current* state of the integration efforts had progressed to a point that made it reasonably likely for [the company] to complete the integration process by a certain time." *Cardinal Health*, 2021 WL 4397946, at *12 (emphasis in original); *see also In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (same).[8] Moreover, these statements accompanied more concrete, objective statements about the achievement of specific integration milestones such as the "complet[ion]" of Phase 1 and Phase 2 of the integration.

Further, even Defendants' statements that were arguably forward-looking (*e.g.* those that contained guidance or synergy projections) were not accompanied by meaningful cautionary language. As is well-established, "[a] warning that identifies a potential risk, but impl[ies] that no such problems were on the horizon even if a precipice was in sight, would not meet the statutory standard for safe harbor protection." *Weiner*, 365 F. Supp. 3d at 911. Here, the cautionary language identified by Defendants merely warned that financial projections "may differ materially from

---

*savings*," which does not account for the net impact of the cuts. Indeed, this is wholly consistent with the Complaint's allegations that Defendants cut costs without any net synergy benefits.

[8] Defendants' authority is thus inapposite. For example, in *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 677 (6th Cir. 2003), the challenged statement did not state any definite present fact but merely expressed an assumption or hope that strong earnings growth would continue.

21

expectations" *if* the Company were to experience "difficulties in integrating, streamlining and optimizing the Group's IT systems, processes and technologies."  Br. at 13.  However, at the time of the statements, Rentokil was already experiencing such difficulties, which were already negatively impacting its sales and growth.  Similarly, Rentokil's warning that "there'll inevitably be some issues" with integration (*id.*) was hardly a sufficient warning of the specific problems *already* occurring.  Further, Defendants' statement that there had been "day one glitches" (*id.*) was the exact opposite of cautionary, as it was an effusive assurance that while the Company had "multiple day one glitches," "***every single one of [them] has been resolved and put to bed***."[9]

### 3.    Defendants' Puffery Arguments Fail

Defendants argue that "most" of the alleged false statements are "textbook examples of inactionable puffery."  Br. at 15-17.  Defendants are wrong.

First, many of the alleged false statements were plainly factual and objectively verifiable claims about the achievement of specific integration milestones, including the "complet[ion]" of Phase 1 and Phase 2 and the "systems integration."   These were "statements of fact that can be proven or disproven using standard tools of evidence," and are thus not puffery.  *Jackson Cnty. Employees' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 613 (M.D. Tenn. 2020).  Indeed, far from being immaterial, these statements concerned the most highly material subject to investors—the integration of Rentokil's "largest acquisition[] to date," and thus its "integration efforts and

---

[9] Other risk language cited by Defendants is too generic to cover the specific integration-related problems Rentokil experienced, warning of general risks such as that growth "could" be impacted by "an inability to implement its business strategies…" and of "the possibility that management may be distracted from regular business concerns by the need to integrate operations and that unforeseen difficulties can arise" in various aspects of the business.  Br. at 13-14.  Additionally, the Complaint pleads actual knowledge of falsity.  For example, as described further below, multiple CWs described monthly town hall meetings in which Defendant Paulsen, discussed, in detail, specific delays and setbacks in the systems integration.  Moreover, Defendants' admissions demonstrate that they had been aware of these problems during the Class Period.

performance would [] have a profound significance to investors." *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018); *see also Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 685 (E.D. Mich. 2023) ("a supposed lack of materiality may not support dismissal unless the information is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question.").

Second, Defendants fail even to identify which statements they believe should be dismissed as puffery. Instead, Defendants quote a handful of isolated, out-of-context words ("substantial," "good," "strong," "on track," "excellent") and string cite fourteen different paragraphs of the Complaint in which they appear. Br. at 15. But this approach is universally rejected by courts, as individual words and phrases "must not be assessed in a vacuum [] *i.e.*, by plucking the statements out of their context to determine whether the words, taken per se… constitute puffery." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017).[10] Here, in context, Defendants' statements were obviously material, as they were designed to assure investors that the most important project in Rentokil's ***history***—the integration of Terminix—was progressing according to plan. *See, e.g., Strougo*, 551 F. Supp. 3d at 844-45, 848 (statements that acquired business was "on track according to plan" and "performing well" not puffery).[11]

---

[10] While "Defendants argue that such statements would not move the needle for a sophisticated investor… analyst reports show that sophisticated investors did in fact consider these representations significant." *TreeHouse Foods*, 2018 WL 844420, at *2; *see, e.g.,* ¶63 (RBC "came away confident" and believed integration was "on track"). Moreover, Defendants' authority does not help them. (Br. at 15-17). In *Zaller v. Fred's, Inc.*, 560 F. Supp. 3d 1146, 1164-65 (W.D. Tenn. 2021) the defendants generically described an acquisition as "a transformative event." The same is true for *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 863 (W.D. Ky. 2014) (generic statements about food safety), *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (generic statements about "quality," and "safety"), and *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *9 (S.D.N.Y. Mar. 30, 2021) ("progress" on integration was puffery in absence of more specific statements).

[11] Defendants' September 11, 2024 statement that issues with systems integration had been "resolved very, very, very quickly" was facially not puffery (Br. at 15), as it was a response to an

**B.    The Complaint Raises A Strong And Compelling Inference Of Scienter**

Scienter can be either a "knowing and deliberate intent to manipulate, deceive, or defraud," or "recklessness." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022).  The Sixth Circuit has emphasized that "the only appropriate approach following *Tellabs*'s mandate...is to address[] the allegations collectively…and, importantly, not parse out the allegations for individual analysis." *In re Gen. Motors Co. Sec. Litig.*, 773 F. Supp. 3d 429, 449 (E.D. Mich. 2025)(quoting *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011)).  Further, "where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *In re Upstart Holdings, Inc. Sec. Litig.*, 2024 WL 3647705, at *2 (S.D. Ohio Aug. 5, 2024) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008)).

Courts in this Circuit "consult a non-exhaustive list of considerations known as the *Helwig* factors," alongside others.  *Id*. at *3.  However, those factors "are neither elements of any cause of action nor a checklist that every plaintiff must mechanically work its way down," but are merely "relevant to [the scienter] inquiry." *Heritage Glob. Network Los Angeles, Inc. v. Welch*, 2024 WL 695772, at *13–14 (M.D. Tenn. Feb. 20, 2024); *see also Zaller*, 560 F. Supp. 3d at 1173 (although *Helwig* factors were "split," "[a]t bottom, the Court is charged with scrutinizing the allegations holistically…").  Here, a holistic analysis wholly supports a strong inference of scienter.

---

analyst question about "early branch integration" and whether there was anything "you're seeing that may be different from expectations," or any "need to sort of rethink around that branch strategy." ¶162.  In response, Ransom specifically assured that "***We've done very, very significant heavy lifting on systems integration, moving historic Terminix branches and Terminix systems onto the new platform. That's very complex, very multifaceted that has gone extremely well so far. Lots and lots of issues have popped up, but the vast majority have all been resolved very, very, very quickly***"—such that Rentokil would still be able to fully integrate Terminix's branches. *Id.*  Thus, the statement was highly material in context, as it was expressly aimed at providing reassurance (in response to specific analyst questions) that the integration was progressing well.

24

### 1.    Defendants' Positive Statements Concealed Current Negative Information About The Integration That "Diverged" With Their External Statements About The Integration's Progress

The second *Helwig* factor, "divergence between internal reports and external statements on the same subject," and the sixth factor, "disregard of the most current factual information before making statements," both strongly support an inference of scienter.

First, Defendants admitted that Rentokil and Terminix were still "two separate businesses" with "two operational reporting processes," and that there was still "a lot of work to do to get these systems integrated."  Defendants thus could not have believed in good faith, at the time of their statements, that the systems integration was completely "done" and that Phase 1 and Phase 2 of the integration were "complete" at the time of their misleading statements.

Second, many CWs described attending monthly "Town Hall" meetings wherein Defendant Paulsen explicitly discussed Rentokil's systems integration delays versus the planned "Road Map" for the integration, including discussing specific setbacks in the IT systems integration. ¶¶94-96, 176-77.[12]   Indeed, CWs 5, 6, and 10 corroborated that the integration's extensive delays were discussed at length during these monthly meetings, with CW 5 succinctly stating: "[t]here were always town halls and things like that going on where they were discussing the road map, and *it was all the way up to [Defendant] Paulsen . . . It was all the way up to the top*."  Moreover, several CWs described how Rentokil was forced to push back its entire systems integration plan when it attempted, and failed, to integrate systems first in the Florida market and then in the Central region. ¶¶79-88. Yet, Defendants' public statements "diverged" markedly from

---

[12] Defendants complain that the Complaint's descriptions of these meetings are insufficiently specific. Br. at 26-28.  But the CWs confirmed that Paulsen's "Road Map" was highly detailed, and that Paulsen discussed the specific IT integration delays they experienced.  ¶¶94-96.  Nor is the lack of exact meeting dates relevant, since the Complaint alleges the meetings were "monthly."

25

these internal facts.  Defendants never once told the public that testing their systems integration in multiple critical regions had been an utter failure, but instead said the opposite—that the systems integration was "done" and had "gone really well," with all "glitches…resolved and put to bed."

Third, Defendants themselves repeatedly told investors that they closely and personally tracked the minute details of the integration progress.  Indeed, Defendants spoke repeatedly about the status of the integration each and every quarter, and provided detailed reports on the supposed progress of each step of the integration.  For example, during the March 7, 2024 investor call, Defendant Ransom stated that his "confidence" in the integration was derived from the fact that Defendants had "***always had a very, very, very detailed plan.  We keep that plan up to date***… ***we're tracking every single week.  We have fortnightly reviews of the program.  And we make sure that all of our colleagues…update their assumptions regularly***."  Simply stated, Defendants cannot claim to have been unaware of the massive issues with the integration process after telling investors for years how closely and carefully they personally monitored that process.  *See, e.g., Shupe*, 660 F. Supp. 3d at 678 ("self-admitted monitoring infers scienter.")

Similarly, in other calls, Defendant Ransom touted his "daily visibility" into key metrics, and in the Company's September 2024 disclosure, Ransom acknowledged he had had "good visibility" into the integration problems.[13] *See, e.g., Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*23 (M.D. Tenn. Apr. 26, 2011) ("admissions from top executives that they are

---

[13] Quoting *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,* 83 F.4th 514,531 (6th Cir. 2023), Defendants dismiss these facts as mere "generalized descriptions of internal meetings." Br. at 24.  But in *Teamsters*, defendants' "disclosures of increasing liability for termite-damage claims were not flatly contradictory to the true state of affairs at the company," and thus defendants' attendance at meetings concerning that issue did not contribute to scienter. *Id.* at 530.  Here, by contrast, CWs described "Town Hall" meetings in which Defendant Paulsen discussed the Company's severe integration delays in relation to its own "Road Map," thus flatly contradicting claims that the integration was "on track" and that Phases 1 and 2 were "complete."

involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter."). And further, Defendants not only regularly spoke about the integration at length in investor calls, but gave detailed answers to analysts' questions about the integration's progress, and thus "held themselves out as knowledgeable regarding topics about which analysts often asked." *Rensin, Tr. of Rensin Joint Tr. v. United States Cellular Corp.*, 755 F. Supp. 3d 1048, 1066 (N.D. Ill. 2024); *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (inferring scienter where executive "held himself out to investors as knowledgeable" by speaking "in detail" about project). Moreover, Defendants themselves admitted that the integration problems were not the result of market factors but that they were to blame for them, stating: "This is on us." ¶114.

### 2. Just Six Weeks Passed Between Defendants' Misleading Statements And The First Corrective Disclosure

The third *Helwig* factor, the "closeness in time of [Defendants'] allegedly fraudulent statement[s] … and the[ir] later disclosure of inconsistent information," also supports scienter. Defendants' September 2024 disclosure that Rentokil still had "two separate businesses" with "two operational reporting processes," and that there was still "a lot of work to do to get these systems integrated," came just *six weeks* after Defendants assured the market that the "systems integration" was fully "done" and "Phase 2 of the integration" was "completed." *See, e.g., Zaller*, 560 F. Supp. 3d at 1172 (three months between statement and contradictory disclosure supported scienter); *Cardinal Health*, 2021 WL 4397946, at *15 (two months between misrepresentations and "disclosures of inconsistent information which shocked investors" supported scienter).

Significantly, analysts highlighted the temporal proximity between these disclosures and management's prior positive statements. Analysts noted that "***today's warning raises questions over guidance and credibility given it comes only 6 weeks after the interims***," and expressed

27

"*confusion*" with "*[p]lenty of questions… and not too many answers*," given management's representations "*discussed in late July.*" ¶¶117-18. *See, e.g., In re FibroGen, Inc.,* 2022 WL 2793032, at \*22 (N.D. Cal. July 15, 2022) (analyst reaction to disclosure supported scienter).

### 3. The Critical Importance Of The Terminix Integration Further Supports An Inference Of Scienter

Courts in this Circuit regularly find that "high-level executives can be presumed to be aware of matters central to their business's operation." *Grae*, 2017 WL 6442145, at \*21. Here, Defendants themselves described the $6.7 billion Terminix acquisition as "*the biggest and most strategic acquisition in the history of our Company, and of our Industry.*" The Terminix acquisition promised to double the size of Rentokil's business in North America—the largest pest control market in the world. Moreover, the completion of Phase 2 of the integration was the essential prerequisite to fully integrating Terminix branches and achieving the full purpose and benefits of the acquisition. As such, "the idea that the individuals responsible for [the integration] would have been ignorant of the [the integration's severe problems] is highly implausible." *Heritage* 2024 WL 695772, at \*14; *see also Cardinal Health*, 2021 WL 4397946 at \*15-16 ("importance" of integration to "core business" supported scienter).

### 4. The Accounts Of Former Employees Support Scienter

The Complaint includes the accounts of no fewer than 19 former employees who gave cross-corroborating accounts of the problems Rentokil faced in integrating its systems. Of these, a full 14 were still at the Company at the time of Defendants' July 2024 statements, and ten remained at the Company into late 2024. *See* n.6, *supra*. *Inter alia*, these former employees uniformly corroborate that, at the times of all of Defendants' misstatements, (i) Company-wide and regional systems integration projects were still being repeatedly delayed (¶78-88); (ii) managers across the country were observing pervasive problems with integrating Terminix's systems with Rentokil's

28

(¶¶71-96); (iii) branches and regions across the country were experiencing crippling sales, customer service, and marketing problems resulting from failed systems integrations (*id.*); and (iv) Defendant Paulsen was personally running "Town Hall" meetings in which he discussed, in depth, the integration delays in comparison with the Company's integration "Road Map." ¶¶94-96.

Defendants assert that these employees were too "low-level" to be relevant to scienter, and that many of them did not have contact with the Individual Defendants. Br. at 26-28. This argument fails. First, CW 4 was a senior IT executive just two levels below the C-suite, reported directly to a Company IT Vice President, and managed significant aspects of Rentokil's systems integration ***nationwide***. ¶77. Second, CWs 5, 6, and 10 ***personally attended and independently corroborated*** the monthly "Town Hall" meetings with Paulsen, wherein Rentokil's severe integration problems and delays were explicitly discussed. ¶¶94-96. *See, e.g., Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (CWs described defendants' participation in meetings discussing integration problems). Third, CW 1 was a regional manager who reported the problems he observed to VP and later COO Tripoli. ¶72. And finally, a "company-wide" inference can be drawn where, as here, "numerous" employees corroborate one another. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).[14]

### 5.    The Suspicious Resignations Of The Executive Team Responsible For The Terminix Integration Supports Scienter

In the span between the Company's September 2024 and March 2025 disclosures, and amid an internal "review" of the integration, no fewer than five C-suite officers of the Company—each of whom was directly responsible for overseeing the Terminix integration—either resigned from

---

[14] *Ind. State. Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 946 (6th Cir. 2009) (Br. at 27) is inapposite, as the CW in that case alleged that the individual defendant at issue was aware of an entirely different issue than the one later disclosed.

the Company or were reassigned. ¶52. Significantly, this included virtually all of the key North America executives who directly oversaw the Terminix integration—including the resignations of Defendant Paulsen, and Rentokil's North America CFO and North America COO—as well as the reassignment of the Company's North America CMO and the resignation of Defendant CFO Ingall-Tombs. These resignations further support scienter.[15] *See, e.g., Cardinal Health*, 2021 WL 4397946, at *15 (resignations of officers "directly responsible for the […] acquisition and integration, and who spoke positively about it to investors" supported scienter).

### 6.    Defendants' "Inference Of Innocence" Is Not More Compelling

Defendants argue that the "most cogent explanation of the facts alleged in the Complaint" is that "Defendants gave their best projections for Rentokil's integration of Terminix and regularly updated investors when issues with the integration caused it to change its projected timeline and goals." Br. at 29. But such an inference is nonsensical, as it is directly contradicted by the fact that analysts uniformly excoriated management at the end of the Class Period for their lack of credibility. Indeed, Defendants assured investors they had completed specific integration "phases" that they, in fact, had not completed. This was independently confirmed by Defendants' ***own admissions*** and ***corroborated by 19 former Rentokil employees***. Given these extraordinary facts, "the inference that [Defendants] recklessly disregarded the falsity of their extremely optimistic statements is at least as compelling" as any opposing inference. *Frank*, 646 F.3d at 961.[16]

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

---

[15] The timing of these resignations between the corrective disclosures and during the integration "review" refutes Defendants' argument that the Complaint "simply lists the dates that four officers left the Company" while alleging "nothing 'more.'" Br. at 28.

[16] Because the Complaint adequately alleges a primary violation, it also adequately alleges a Section 20(a) claim. *See Zaller*, 560 F. Supp. 3d at 1175.

Dated: July 9, 2025                     Respectfully submitted,


                                        By: */s/ J. Gerard Stranch IV*
                                        J. Gerard Stranch IV, BPR 23045
                                        **STRANCH, JENNINGS & GARVEY PLLC**
                                        The Freedom Center
                                        223 Rosa L. Parks Avenue, Suite 200
                                        Nashville, TN 37203
                                        Telephone: (615) 254-8801
                                        gstranch@stranchlaw.com


                                        **SAXENA WHITE P.A.**
                                        Steven B. Singer (*pro hac vice* forthcoming)
                                        Joshua H. Saltzman (admitted *pro hac vice*)
                                        10 Bank Street, Suite 882
                                        White Plains, NY 10606
                                        Tel.: (914) 437-8551
                                        Fax: (888) 631-3611
                                        ssinger@saxenawhite.com
                                        jsaltzman@saxenawhite.com


                                        **SAXENA WHITE P.A.**
                                        Lester R. Hooker (admitted *pro hac vice*)
                                        7777 Glades Road, Suite 300
                                        Boca Raton, Florida 33434
                                        Tel.: (561) 394-3399
                                        Fax: (561) 394-3382
                                        lhooker@saxenawhite.com

                                        *Attorneys for Lead Plaintiff*

31

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ J. Gerard Stranch IV*